SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
BY: Arnold C. Lakind, Esquire
Telephone: (609) 275-0400
Fax: (609) 275-4511
e-mail: alakind@szaferman.com

KABATECK BROWN KELLNER LLP
644 South Figueroa Street
Los Angeles, California 90017
BY: Richard L. Kellner, Esquire, *to be admitted pro hac vice*
Telephone: (213) 217-5000
Fax: (213) 217-5010
e-mail: rlk@kbklawyers.com

GEORGE PRESSLY, ESQ.
11 Orchard Avenue
Nashua, NH 03060
Telephone: (603)-320-7030
e-mail: gpressly@presslylaw.com

Attorneys for Rachel Eastman and Academic Software,
on behalf of themselves and all others similarly situated

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RACHEL EASTMAN, an individual; ACADEMIC SOFTWARE, a New Jersey Corporation; on behalf of themselves and all others similarly situated;<br><br>       Plaintiffs,<br><br>    vs.<br><br>FIRST DATA CORPORATION, a Delaware Corporation; and FIRST DATA MERCHANT SERVICES CORPORATION, a Florida Corporation;<br><br>    Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. Breach of Contract;**<br><br>**2. Breach of The Covenant of Good Faith and Fair Dealing;**<br><br>**3. Fraudulent Concealment;**<br><br>**4. Fraudulent Inducement;**<br><br>**5. Violation of The Consumer Fraud Act;**<br><br>**6. Unjust Enrichment; and**<br><br>**7. Declaratory Relief**<br><br>**JURY TRIAL DEMANDED** |

1

1    Plaintiffs, RACHEL EASTMAN, residing at 75 Sherwood Road, Dumont,

2  New Jersey 07628, and ACADEMIC SOFTWARE, with a principal place of

3  business located at 141 Ayers Court, Teaneck, NJ 07666, on behalf of themselves

4  and all others similarly situated, and against Defendants, FIRST DATA

5  CORPORATION and FIRST DATA MERCHANT SERVICES CORPORATION,

6  both having a principal place of business located at 5565 Glenridge Connector NE,

7  Suite 2000, Atlanta, Georgia 30342, allege the following:

8    **NATURE OF ACTION**

9    1.    This is a class action against First Data Corporation and First Data

10  Merchant Services Corporation, collectively ("Defendants" or "First Data") for

11  knowingly and unlawfully defrauding Plaintiffs and thousands of small businesses by

12  charging an exorbitant and unconscionable fee under a purported lease agreement for

13  credit and debit card equipment.  In leasing this equipment to Plaintiffs and class

14  members, First Data withholds and conceals material information, thereby allowing it to

15  impose unconscionable charges and excessive fees.

16    2.    First Data fraudulently induced Plaintiffs to accept an unconscionable lease

17  for point of sale ("POS") credit card and debit card processing equipment.  Plaintiffs were

18  not informed of the cost of the equipment, the finance rate, finance charge, or lease

19  charge associated with the POS device and the cost is not included in the signed merchant

20  agreement.  (Attached hereto as Exhibit A is a copy of the merchant processing

21  application for Rachel Eastman.)

22    3.    First Data also subjected Plaintiffs to charges not included on the merchant

23  agreements for the POS leases.

24    4.    These improper lease fees unconscionably charged by Defendants have

25  resulted in substantial damages to the class.

26    5.    Because the class' claims arise from a practice that is common to all class

27  members, this case is particularly well suited for class action treatment.

28

6.      Plaintiffs seek to represent the following class defined as follows:
All customers in the State of New Jersey who leased point of sale
credit and/or debit card processing equipment from Defendants from
the time period set by the applicable statute of limitations prior to the
filing of this action to the date of judgment.

**THE PARTIES**

7.      Plaintiff Rachel Eastman is an individual who, during all relevant times, resided in Teaneck, New Jersey.  Plaintiff Eastman was doing business as Academic Software, and engaged in commercial operations during the relevant time in Teaneck, New Jersey.

8.      Plaintiff Academic Software is a New Jersey Corporation, owned and managed by Rachel Eastman.

9.      Plaintiffs are informed, believe, and thereon allege, that Defendant First Data Corporation is a Delaware Corporation, with its principal place of business located in Atlanta, Georgia, and is conducting the business of credit card transaction processing services and related equipment lease services.  Plaintiffs are informed, believe, and thereon allege that First Data Global Leasing is a business division of First Data Corporation and is operated by First Data Corporation.

10.     Plaintiffs are informed, believe, and thereon allege, that Defendant First Data Merchant Services Corporation is a Florida Corporation, with its principal place of business located in Atlanta, Georgia, and is conducting the business of credit card transaction processing services and related equipment lease services.

11.     As used herein, the term "Defendants" or "First Data" refers collectively to all Defendants named herein.

**GENERAL ALLEGATIONS**

12.     Plaintiffs are informed, believe, and thereon allege that all Defendants, were at all relevant times acting as actual agents, conspirators, ostensible agents, partners and/or joint venturers and employees of all other Defendants, and that all acts alleged

3

COMPLAINT

1    herein occurred within the course and scope of said agency, employment, partnership,

2    joint venture, conspiracy and/or enterprise, and with the express and/or implied

3    permission, knowledge, consent, authorization and ratification of their co-Defendants;

4    however, this allegation is pleaded as an "alternative" theory wherever not doing so

5    would result in a contradiction with other allegations.

6        13.    As an alternative theory, Plaintiffs are informed and believe, and on that

7    basis allege, that Defendants are alter egos of each other. Plaintiffs are informed and

8    believe, and on that basis allege, that there is common control over Defendants, and they

9    operate pursuant to a common business plan. There is unity of interest among Defendants.

10       14.    The alternative alter-ego relationship among the Defendants should be

11   recognized to prevent an injustice. If the alter-ego relationship among Defendants is not

12   recognized, an inequity will result because an entity responsible for wrongdoing will be

13   shielded from liability. When considering an award of punitive damages, the entire net

14   worth of a Defendant is considered. If the corporate structure of the alter-ego Defendants

15   is disregarded, punitive damages will be based solely on the assets of a single or

16   "fronting" entity; assets which are smaller than the other culpable entities. Because

17   punitive damages are meant to punish and make an example of the wrongdoer, it would

18   be inequitable to allow entities responsible for the wrongdoing complained of to shield

19   their assets and escape punitive damage liability. Moreover, the co-Defendant entities

20   which make, in whole or in part, the decisions would escape liability, which is

21   inequitable. Furthermore, the alter ego relationship should be recognized to ensure

22   effective injunctive and declaratory relief, so that the wrongful practices alleged herein

23   are not relocated to an affiliated company. If Defendants were permitted to avoid an

24   injunction by relocating the misconduct, an inequity would result.

25       15.    All allegations in this complaint are based on information and belief and/or

26   are likely to have evidentiary support after a reasonable opportunity for further

27   investigation or discovery. Whenever allegations in this complaint are contrary or

28   inconsistent, such allegations shall be deemed alternative.

**JURISDICTION AND VENUE**

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), the "Class Action Fairness Act," as the amount in controversy exceeds $5,000,000.00, there are in excess of 100 class members.

17.     Venue is proper within this District and Division pursuant to 28 U.S.C. §1391(a) because a substantial part of the acts, events and omissions giving rise to the claims occurred in this district, and because there is personal jurisdiction in this district over the named Defendants because they have had continuous and systematic contracts in this District by actively doing business here.

**FACTUAL ALLEGATIONS**

**First Data**

18.     First Data provides electronic commerce and payment solutions for merchants, financial institutions, and card issuers.  Thus, First Data seeks to profit whenever a consumer uses anything but cash to make a purchase from a First Data client.

19.     A significant amount of First Data revenue comes from a business segment it defines in its most recent 10-K as the "Retail and Alliance Services" business.  This includes "merchant acquiring services," which facilitate a merchant's ability to accept, among other things, credit and debit cards by authorizing, capturing and settling the merchant's transactions.  Merchant acquiring services also provides POS devices and other equipment necessary to capture merchant transactions.

20.     First Data realizes revenues in its merchant acquiring services by, among other things, charging fees to merchants, and leasing POS devices.

21.     First Data is not simply a finance company or a disinterested third party financier to a merchant's decision on how a merchant chooses to process non-cash transactions, or from whom the merchant elects to obtain the equipment and services to do so.  In fact, First Data seeks to be the hub of the transaction.  It seeks to provide the

COMPLAINT

equipment a merchant needs to effectuate a non-cash transaction, lease and finance that equipment, and realize ongoing revenue from the merchant's use of that equipment.

**First Data –in its role as manufacturer and supplier of POS equipment**

22.     First Data is a large provider of POS hardware and software.  First Data manufactures its own line of POS hardware that in part is geared towards small and large merchants.   For example, First Data manufactures:

a)  The First Data FD50 terminal, which is promoted as an affordable, reliable terminal that allows your customers to choose virtually every payment type quickly and securely.

b)  The First Data FD100 terminal, which is promoted as combining performance, security, ease of use and adaptability when a change is needed.

c)  The First Data FD100Ti terminal, which is promoted as an affordable, all-in-one terminal solution that combines performance, security, reliability and ease of use into a low-cost, feature-rich device. With the new smaller footprint and sleek titanium design, it delivers high-quality transaction processing and, by using newer technologies, provides a safe, secure Internet protocol (IP)/dial-up platform.

d)  The First Data FD200 terminal, which is promoted as a compact all-in-one solution—terminal, check reader/imager, dual built-in printers—that processes checks and all types of payment cards quickly, easily and securely.

e)  The First Data FD300 terminal, which is promoted as the latest in payment processing technology—including simultaneous, single-terminal support for multiple merchants and payment types.

f)  The First Data FD400 wireless terminal, which is promoted as a lightweight, hand-held solution that lets mobile merchants accept payments

COMPLAINT

at the point of sale—wherever the sale takes place. One wireless device that does the work of three: terminal, printer and PCI PIN Entry Device.

23.     First Data not only manufactures its own line of POS terminals, First Data supplies a variety of POS terminals manufactured by third parties, including but not limited to the following: the NURIT 8000 Terminal, manufactured by Verifone; a series of POS terminals manufactured by Hypercom; a series of POS terminals manufactured by Ingenico; and a series of POS terminals manufactured by Verifone.

24.     At all times relevant to this Complaint, First Data manufactured POS terminals and equipment and was a supplier of third party POS terminals and equipment.

25.     At all relevant times First Data has been aware of the actual retail cost of not only its own POS equipment, but also the POS equipment manufactured by third parties, which it supplies to merchants.

**First Data –in its role as financier of the equipment**

26.     First Data Global Leasing ("FDGL") is a division of First Data and is not a separate legal entity.  FDGL claims to specialize in providing agents, bank partners and independent sales organizations ("ISO") with cost-effective solutions for leasing quality, POS equipment.  FDGL claims to have over 400,000 merchant clients.

27.     On information and belief, First Data does not finance its lease receivables or lease assets and has not established a specific credit line to fund leases, but rather First Data funds those "leases" from working capital and/or credit facilities established by First Data for general purposes.

28.     On information and belief, First Data is not taking any material risk when it finances POS terminals, similar in nature to risk assumed by a traditional, independent . equipment lessor.

29.     On information and belief, First Data does not routinely perform credit checks when it finances POS equipment, in part because the terms are so advantageous that First Data will recoup any outlay within months of the execution of the lease and in

part because First Data takes elaborate steps to offset to third parties the risk of a merchant's nonpayment.

30. On information and belief, First Data does not establish an interest rate, finance charges, lease charges or any other lease terms based upon the specific merchant's credit characteristics and the equipment that merchant seeks to finance.

31. Significantly, First Data in its financial reporting does not separate revenue from its FDGL business line with other revenue sources and in 2009 claims to have close to $800 million from the sale and lease of its POS equipment.

**First Data -- relies in part on third parties to generate revenues**

32. First Data offers its products and services through several channels, including its own sales force.

33. First Data also offers its products, financing and processing services to merchants through a labyrinth of arrangements with third party organizations, including "contractual alliance arrangements", independent sales organizations, and other sales partners. For purposes of this complaint, each is referred to herein as an "ISO".

34. Each ISO executes with First Data an agreement to sell First Data POS equipment, finance that equipment and some type of revenue share of the recurring fees associated with each merchant (the "ISO Agreement").

35. On information and belief, with each ISO Agreement, First Data (1) creates specific programs for ISO compensation; (2) contractually transfers risk of merchant non-payment from First Data to the ISO; (3) creates, for First Data, the right to set off amounts it determines are owed by the ISO to First Data for merchant nonpayment; (4) drafts, negotiates and approves the form finance and processing documents before an ISO is allowed to sell or lease First Data equipment, finance POS equipment with First Data and/or set up a merchant to process non-cash transactions using First Data's systems; (5) monitors the performance of each ISO; and (6) coordinates the sales activities on a systematic and ongoing basis.

COMPLAINT

36.     Generally, the person interacting with the merchant during the sales process is a First Data sales representative, or a representative or a sales person from an ISO.

37.     On information and belief, First Data has created compensation metrics for the individual sales person and/or the ISO for signing up new small business merchants. On information and belief, one central aspect of these compensation metrics is equipment financing and the sales person or the ISO is rewarded based upon how favorable the lease terms are for First Data on any lease he/she or it writes.

38.     On information and belief, the grossly unfair and unconscionable lease terms are not designed to finance the equipment being leased.

39.     On information and belief, First Data is responsible for approving all aspects of a merchant sign up, from the drafting of all contracts to the set up of the account, and an ISO must comply with specific instructions given to it by First Data.

40.     On information and belief, overcharging small merchants for POS equipment serves several common corporate purposes for First Data, including the following: (1) sharing in the profit of these leases is a central and important selling point for First Data to sign up new ISO's and retain existing ISO's and on information and belief First Data offers common, lucrative incentives to ISO's that revolve around sharing in the profits of these leases; (2) On information and belief, First Data can inflate its revenues and earnings by now realizing as revenue up to ten times and more than the true value of POS equipment First Data actually sold or leased; and (3) By creating profit share incentives for ISO's relating to the profit from First Data's POS equipment leases, First Data can negotiate with ISO's and retain more revenue relating to other equally lucrative but reoccurring processing fees.

**Execution of the Merchant Processing Application**

41.     The formation of a business relationship starts when a small business merchant executes a document that is part application and part contract. While various forms of this document exist, as explained below, the core elements are common across all forms.

COMPLAINT

42. In one embodiment, the form is entitled "Merchant Processing Application" (Exhibit A). This and other similar documents are collectively referred to as the "Merchant Application".

43. On information and belief, First Data plays an integral role in drafting and approving the form Merchant Applications.

44. This is the only document a merchant executes.

45. Many common characteristics exist across the Merchant Application, including the following:

(a) No Merchant Application lists the price of the equipment being leased;

(b) No Merchant Application discloses the finance charges, interest rate or lease rate of the financing;

(c) No Merchant Application sets forth the commencement dates of the financing arrangement;

(d) No Merchant Application includes the waivers if any that the Merchant must make to obtain financing;

(e) No Merchant Application discloses and explains who actually supplies the equipment;

(f) No Merchant Application sets forth the warranties of the supplier of the POS equipment; and

(g) Every Merchant Application requires First Data's internal approval, so First Data knows the value of the collateral supporting each lease it funds.

46. First Data Global Leasing, the supposed lessor, does not sign the Merchant Application and in fact it appears that in all cases First Data as lessor never executes any agreement directly with the merchant.

47. The terms of the Merchant Agreement are designed to mislead and confuse small business owners.

COMPLAINT

48.     On information and belief, First Data is aware of this confusion and is aware of reports of fraud, but has taken no action to remedy these persistent and reported problems and has not set up protocols and procedures to prevent confusion and fraud.

49.     On information and belief, First Data in part designs the Merchant Application to hide from the merchant the terms of any lease agreement and generally to confuse the lessee. In partial support, a review of one of the Merchant Applications attached as Exhibit A reveals:

> (a) The Merchant Application is a pre-printed form and is designed such that the sales representative for the ISO must complete the Merchant Application;
>
> (b) The Merchant Application was designed to look like an application, not a contract;
>
> (c) The title "Merchant Processing Application" gives no hint that part of the form will be an equipment lease;
>
> (d) The "Merchant Processing Application" does not provide a clear description of what in fact is being "leased."
>
> (e) The title of the form deceives the signer insofar as he/she/it does not realize it is a binding agreement.

50.     The purpose of any reference in the contract to the program guide is ambiguous.

51.     While the lease section is confusing, this section – being the only place where the financial terms of the supposed lease are written down – is more notable for what First Data specifically leaves out of the document. First Data specifically leaves out the actual price of the equipment. First Data leaves out the lease rate, finance charges and/or interest rate of the financing. First Data leaves out the onerous waivers and disclaimers that are later sent to the lessee and is later told is part of the contract.

---

11

COMPLAINT

52.    In the section where the parties sign the Merchant Application certain terms and conditions are in small print surrounding the signature lines, but again are confusing, inconspicuous and designed to mislead.

**The Program Manual – an afterthought**

53.    First Data prepares a document called a "Program Manual," which the Merchant Application purports to make part of the contract.  At the end of the Program Manual are the specific terms and conditions of an equipment lease.   The merchant does not execute the Program Manual.  The Program Manual was not provided to Plaintiffs, and is not provided to class members, until after the execution of the Merchant Application.   The Program Manual is provided to class members, if at all, after execution of the Merchant Application either in written form or on a CD.  (Attached as Exhibit B is a copy of a Program Manual – pgs. 5, 6, 25 and 26 missing).

**Facts related to Rachel Eastman and Academic Software**

54.    Rachael Eastman owns a small business called Academic Software.   In October 2008, Academic Software entered into a Merchant Application.   (Exhibit A.) Rachel Eastman executed the document.

55.    The Merchant Application does not list the price of the equipment.

56.    The retail price of the NURIT 2085 is approximately $249.

57.    Academic Software was never presented with any additional documentation at the time it executed the Merchant Application.

58.    Several days after the execution of the Merchant Agreement, Rachel Eastman received a CD, which may have contained a Program Manual.

59.    Although First Data does not manufacture this equipment, it does act as a supplier of this equipment.

60.    Plaintiff Eastman and Academic Software were charged an early termination fee for terminating the Merchant Application.

61.    First Data debited Academic Software's business account more than the stated cost of the lease.

COMPLAINT

62. Once she refused to pay additional sums of money, First Data began collection proceedings against her and her company, forcing her to pay an additional $1,200.

63. First Data, on information and belief, stood to make significant sums of money from Academic Software should it begin processing credit and debit card payments under the Merchant Application, including but not limited to its pro rata portion of discount fees, miscellaneous fees, check verification fees and other types of reoccurring monthly fees based either on a flat rate monthly charge of a per use charge.

64. The retail price of the NURIT 2085 is approximately $249. Assuming 15% interest, a 10% residual buyout and 48-month term, her monthly payment should be $6.78 a month. The payment terms in her contract of $69.95 a month for 48 months, assuming a 15% interest rate and a 10% residual buyout suggests a retail price of $2500.

## CLASS ALLEGATIONS

65. Plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated pursuant to Federal Rule of Civil Procedure, Rule 23. Plaintiffs seek to represent the following class:

> All customers in the State of New Jersey who leased point of sale
> credit and/or debit card processing equipment from Defendants from
> the time period set by the applicable statute of limitations prior to the
> filing of this action to the date of judgment.

66. Plaintiffs reserve the right to amend or otherwise alter the Class definition presented to the Court at the appropriate time, or to propose or eliminate sub-Classes, in response to facts learned through discovery, legal arguments advanced by Defendants or otherwise.

67. Excluded from the class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and

13

COMPLAINT

1    assigns. Also excluded from the class is any judge, justice, or judicial officer presiding

2    over this matter and any members of his/her immediate family or judicial staff.

3        68.    The Class members are so numerous that the individual joinder of all

4    members is impracticable under the circumstances of this case. While the exact number

5    of class members is unknown at this time, Plaintiffs are informed and believe that the

6    Class consists of thousands of members.

7        69.    Plaintiffs' claims are typical of the claims of the class. Plaintiffs are

8    members of the class they seek to represent. Members of the class are ascertainable from

9    Plaintiffs' description of the class and/or Defendants' records and/or records of third

10   parties accessible through discovery.

11       70.    The representative Plaintiffs will fairly and adequately represent the

12   members of the class and have no interests which are antagonistic to the claims of the

13   class. The Plaintiffs' interests in this action are antagonistic to the interests of

14   Defendants, and they will vigorously pursue the claims of the class.

15       71.    The representative Plaintiffs have retained counsel who are competent and

16   experienced in class action litigation, and have successfully represented Plaintiffs in

17   complex class actions.

18       72.    Common questions of law and fact impact the rights of each member of the

19   class and a common remedy by way of permissible damages, restitutionary disgorgement

20   and/or injunctive relief is sought for the class.

21       73.    There are numerous and substantial questions of law and fact common to all

22   members of the class which will predominate over any individual issues. These common

23   questions of law and fact include, without limitation:

24       a.  Whether the Defendants violated the Consumer Fraud Act, N.J.S.A. 56:8-1

25           et seq.;

26       b.  Whether the written contract entered into is unconscionable or contains

27           unconscionable terms;

28

COMPLAINT

1         c.  Whether the cost, finance rate, finance charge and/or lease charge are
2             material terms to the lease;

3         d.  Whether Defendants knew the material terms of the contract;

4         e.  Whether Defendants intended to deceive Plaintiffs;

5         f.  Whether Plaintiffs justifiably entered into the lease based on the
6             information that was disclosed;

7         g.  Whether Defendants had a duty to disclose the material terms due to their
8             partial disclosures;

9         h.  Whether Defendants committed fraud or fraudulent concealment;

10        i.  Whether Plaintiffs are entitled to rescission of the contract;

11        j.  Whether Defendants breached their contract;

12        k.  Whether Defendants have been unjustly enriched;

13        l.  Whether Defendants should be required to provide restitutionary
14             disgorgement to class members;

15        m.  Whether class members have been damaged by Defendants' conduct;

16        n.  Whether class members are entitled to declaratory relief; and

17        o.  Whether Defendants' conduct should be enjoined.

18      74.    The persons in the class are so numerous that disposition of their claims in
19 this case and as part of a single class action lawsuit, rather than numerous individual
20 lawsuits, will benefit the parties and greatly reduce the aggregate judicial resources that
21 would be spent.

22      75.    Plaintiffs know of no difficulty that will be encountered in the management
23 of this litigation, which would preclude its maintenance of a class action.

24      76.    This case is brought and can be maintained as a class action under Rule
25 23(b)(1), 23(b)(2) and 23(b)(3):

26         a.    Injunctive and/or declaratory relief to the class is appropriate:
27              Defendants have acted or refused to act on grounds generally
28              applicable to the class, thereby making final injunctive relief or

COMPLAINT

corresponding declaratory relief with respect to the class as a whole appropriate;

b. Predominant questions of law or fact: questions of law or fact common to all class members, including those identified above, predominate over questions affecting only individual class members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require. Moreover, absent class treatment of this controversy, the amount of individual class members' losses in comparison to the enormous cost of litigation makes it almost certain that few class members would ever be able to even seek, let alone obtain, redress for their injuries.

77. Defendants have acted on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole. Prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the Defendants.

78. Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue a course of action, which will result in further damages to Plaintiffs and the class members.

# FIRST CAUSE OF ACTION

# BREACH OF CONTRACT

### (By **Plaintiffs and the Class Against Defendants**)

79. Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

80. Plaintiffs and Defendants have a contractual relationship for the lease of point of sale processing equipment for credit and/or debit cards whereby Defendants provide the equipment and Plaintiffs incur a cost for that lease.

81. Defendants' Merchant Application, with regard to the lease at issue, is procedurally and substantively unconscionable.

82. Defendants Merchant Application does not provide lessee with the actual cost of the POS equipment. The Merchant Application does not include an interest rate, finance charges or lease charges.

83. The actual cost of the POS equipment is so far in excess of the lease cost the provision of the contract is manifestly and highly unjust.

84. The Merchant Application is not executed by the leasing company specified by the Merchant Application.

85. The Merchant Application purports to contain additional terms in a twenty nine page "program guide" which is not available for review by the lessee prior to entering into the lease and contains onerous purported contract terms in tiny print. Language related to the lease is buried in smaller than 8 point type on the twenty second page of the document.

86. The Merchant Application is a form document. Industry practice does not allow lessees or small business owners an opportunity to make changes to the agreement. The agreement is presented on a "take it or leave it" basis. Consistent with Defendants' practice, Plaintiffs were not provided an opportunity to make any changes to the agreement. Given the superior bargaining power of Defendants, the agreement is a

COMPLAINT

1    contract of adhesion.

2         87.    Defendants have charged the Plaintiffs more than the terms of the Merchant

3    Application in breach of that contract.

4         88.    Plaintiffs have performed all relevant conditions, covenants and promises

5    required on their part to be performed in accordance with the terms and conditions of the

6    contract and/or that performance has been excused or waived by Defendants.

7         89.    Defendants breached the terms of the agreement by unconscionably

8    overcharging for the leases at issue.

9         90.    Plaintiffs and class members have been damaged as the result of

10   Defendants' breach of contract, including, but not limited to, incurring improper charges.

11

12   ## SECOND CAUSE OF ACTION

13   ## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

14   ### (By Plaintiffs and the Class Against Defendants)

15        91.    Plaintiffs re-allege and incorporate by reference the allegations contained in

16   the preceding paragraphs of this complaint, as though fully set forth herein.

17        92.    The contract identified in this action contained an implied covenant of good

18   faith and fair dealing, whereby Defendants, and each of them, agreed to perform their

19   obligations under the policy in good faith, to deal fairly with Plaintiffs, and not to

20   unreasonably deprive Plaintiffs of the benefits due under the contract.

21        93.    Defendants tortiously breached its implied covenants of good faith and fair

22   dealing arising from the contracts by charging unconscionable and excessive lease rates,

23   failing to disclose the cost, interest rate, finance charges or lease charges, charging

24   excessive fees, withdrawing from the Plaintiffs' bank account more money each month

25   than the Merchant Agreement even allows them to withdraw and by other conduct,

26   including but not limited to that expressly set forth in this complaint.

27

28

94.    Without any reasonable basis for doing so, and with full knowledge and/or conscious disregard of the consequences, Defendants, and each of them, have failed and refused to act in good faith or act fairly toward Plaintiffs, and Defendants have, in bad faith, failed and refused to perform their obligations under the contracts.

95.    As a direct and proximate result of said breaches of the covenants of good faith and fair dealing by Defendants, and each of them, Plaintiffs have incurred, and continue to incur, damages.

96.    As a further direct and proximate result of the wrongful conduct of Defendants, and each of them, Plaintiffs have also sustained other economic damages, as set forth above, and other damages in an amount to be proven at trial.

97.    As to the conduct alleged herein to have been engaged in by representatives of Defendants, and each of them, the officers, directors and managing agents authorized and ratified each and every act on which Plaintiffs' allegations of damages herein are based.

## THIRD CAUSE OF ACTION

## FRAUDULENT CONCEALMENT

### (By **Plaintiffs and the Class Against Defendants**)

98.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

99.    Defendants did not disclose to and/or concealed from Plaintiffs the cost, finance rate, finance charge or lease charge of the POS equipment.  Defendants' Merchant Application contained none of these terms and they were never communicated to Plaintiffs by any means.

100.    Defendants omitted the cost, finance rate, finance charge and lease charge of the POS equipment from Plaintiffs.

101.   The cost, finance rate, finance charge and/or lease charge are material facts on which any reasonable lessee would reasonably rely and base her decision to enter into a lease.

102.   Defendants intentionally, maliciously, fraudulently or oppressively failed to disclose, concealed or omitted the cost, finance rate, finance charge and/or lease charge of the POS equipment.

103.   Defendants, at all times, knew the cost, finance rate, finance charge and/or lease charge for the POS equipment they were leasing.

104.   Defendants failure to disclose, concealment and/or omission of the cost, finance rate, finance charge and/or lease charge was intended to induce Plaintiffs into entering into an unfair lease.

105.   Defendants disclosure of some but not all the terms of the lease created a duty on their part to fully disclose the terms of the lease.

106.   Plaintiffs justifiably entered into the lease with the limited and partial information they were provided.

107.   Plaintiffs and class members have been damaged as the result of Defendants' fraud, including, but not limited to, incurring improper lease charges.

## FOURTH CAUSE OF ACTION
## FRAUD IN THE INDUCEMENT
### (By Plaintiffs and the Class Against Defendants)

108.   Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

109.   Defendants did not disclose to and/or concealed from Plaintiffs the cost, finance rate, finance charge or lease charge of the POS equipment. Defendants Merchant Application contained none of these terms and they were never communicated to Plaintiffs by any means.

COMPLAINT

110.   Defendants failure to disclose and/or concealment of the cost, finance rate, finance charge or lease charge of the POS equipment from Plaintiffs induced Plaintiffs to execute the contract.  If Defendants have disclosed all material facts, Plaintiffs and class members would not have entered into a contract for the lease of POS equipment.

111.   Plaintiffs were not presented with the "program guide" or given an opportunity to review that document prior to entering into the lease.

112.   Defendants intended to induce Plaintiffs to enter into a lease for POS equipment by concealing material facts regarding the lease terms.

113.   Plaintiffs justifiably entered into the lease with the limited and partial information they were provided.

114.   Plaintiffs and class members have been damaged as the result of Defendants' fraudulent inducement, including, but not limited to, incurring contractual duties and incurring improper lease charges.

## FIFTH CAUSE OF ACTION

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT ("CFA")

## (N.J.S.A. §56:8-1 *et seq.*)

### (By Plaintiffs and the Class Against Defendants)

115.   Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

116.   Defendants are "persons" that engaged in the "sale" of "merchandise," within the meaning of the CFA.

117.   In connection with the lease of POS equipment, Defendants employed unlawful commercial practices in violation of the CFA, by, among other things: (1) knowingly failing to disclose material information and terms to Plaintiffs and other lessors of Defendants' POS equipment, such as unit cost, lease charge, finance rate or finance charge of the POS equipment; (2) charging unconscionable interest and fees as

COMPLAINT

rent for the POS equipment; (3) charging hidden fees for the lease of the POS equipment; and (4) withdrawing from the Plaintiffs' bank accounts more each month than the Merchant Application authorized.

118.    Defendants knowingly concealed, suppressed and omitted material facts with respect to the lease of the POS equipment, with the intent that Plaintiffs would rely on such acts of concealment, suppression or omission.

119.    Defendants' unconscionable conduct described herein included the omission, suppression and concealment of material facts concerning the lease of its POS equipment.

120.    Defendants' conduct of charging Plaintiffs excessive and unconscionable rates and fees required Plaintiffs to incur unjustified expenses.

121.    The foregoing acts, misrepresentations, omissions and unconscionable commercial practices caused Plaintiffs to suffer an ascertainable loss in the form of monies spent to lease POS equipment and costs associated with extricating themselves from the leases, and they are entitled to recover such damages, together with appropriate penalties, costs and fees available at law.

122.    Defendants violated the Consumer Fraud Act by charging Plaintiffs interest rates exceeding New Jersey's civil usury law, N.J.S.A. 31:1-1 et seq., and criminal usury law, N.J.S.A. 2C:21-19.

123.    The lease of the POS equipment was "non-cancellable" and contained an option to purchase the equipment at the end of the term, and as such was, in reality, an installment purchase contract.

124.    As an installment purchase contract, charges in excess of the retail price of the POS equipment are attributable to the time sale of the goods.

125.    This difference, between the retail price of goods sold through an installment purchase contract and the charges collected over the time, is interest under New Jersey law.

126. The rates of interest Plaintiffs were charged on the POS equipment "leases" were far in excess of the interest rate limits imposed under New Jersey usury laws.

127. New Jersey usury law restrictions on lending practices are extensive and are part of the State's consumer protection efforts.

128. Charging a usurious rate of interest is an unconscionable commercial practice under the Consumer Fraud Act.

129. Charging a usurious rate of interest is also a regulatory violation under the Consumer Fraud Act, since charging such interest violates usury laws intended to protect consumers.

130. As a result of the unlawful interest charged by Defendants, Plaintiffs suffered an ascertainable loss.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (By Plaintiffs and the Class Against Defendants)

131. Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

132. Defendants actively participated in a scheme whereby they unlawfully and unfairly assessed unconscionable fees on lessees. Defendants knew and were aware of these unlawful, unfair or unconscionable business practices.

133. Defendants concealed the true facts and circumstances from Plaintiffs.

134. By wrongfully obtaining and assessing lease charges, Defendants were unjustly enriched at the expense of Plaintiffs.

135. Defendants were aware of the benefit they were receiving as a result of their wrongful acts, and have enjoyed the benefit of their financial gains, to the detriment and the expense of Plaintiffs.

COMPLAINT

136. Defendants' retention of the monies gained through their wrongful acts and practices would be inequitable considering the circumstances by which Defendants obtained these monies.

137. The actions described in this complaint by Defendants were done with a conscious disregard of Plaintiffs' rights. These actions constitute conduct which is unlawful behavior done with an intent to injure Plaintiffs, such as to constitute oppression, fraud or malice, entitling Plaintiffs to punitive damages.

138. Plaintiff and the class are entitled to and seek restitution from Defendants and an order disgorging all profits, benefits, and other compensation obtained by Defendants for their wrongful conduct.

## SEVENTH CAUSE OF ACTION
## DECLARATORY RELIEF
### (By Plaintiffs and the Class Against Defendants)

139. Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1. Certification of the proposed class and notice thereto to be paid by Defendants;

2. For general, special, compensatory, treble and incidental damages in an amount to be determined at trial, prejudgment interest and other damages according to proof;

3. For rescission of the written contract or part thereof;

4. For reasonable attorneys' fees and costs;

5. For punitive and exemplary damages according to proof;

6.  For restitutionary disgorgement of all profits Defendants obtained as a result of their unlawful, unfair, and/or fraudulent business practices;

7.  For appropriate injunctive and declaratory relief;

8.  For interest and costs of suit herein; and

9.  For such further relief as the Court may deem just and proper.

DATED:  September 20, 2010

                                         SZAFERMAN, LAKIND
                                         BLUMSTEIN & BLADER, P.C.

                                         By: _____
                                              Arnold C. Lakind

COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of all claims and causes of action in this lawsuit.

DATED:  September 20, 2010

                            SZAFERMAN, LAKIND
                              BLUMSTEIN & BLADER, P.C.

                            By: _____
                                    Arnold C. Lakind

COMPLAINT