SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
By: Arnold C. Lakind, Esquire
    Nathan M. Edelstein, Esquire
    Mark A. Fisher, Esquire
Telephone: (609) 275-0400
Fax: (609) 275-4511
e-mail: mfisher@szaferman.com

KABATECK BROWN KELLNER LLP
644 South Figueroa Street
Los Angeles, California 90017
By: Richard L. Kellner, Esquire, *admitted pro hac vice*
Telephone: (213) 217-5000
Fax: (213) 217-5010
e-mail: rlk@kbklawyers.com

KYROS PRESSLY LLP
11 Orchard Avenue
Nashua, NH 03060
By: George Pressly, Esquire, *admitted pro hac vice*
Telephone: (603)-320-7030
e-mail: gpressly@presslylaw.com

*Attorneys for Rachel Eastman, Academic Software, Budget Windows, John Pierson and AIA Enterprises, Inc, d/b/a Chesterfield Inn*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RACHEL EASTMAN, an individual; ACADEMIC SOFTWARE, a New Jersey Corporation; AIA ENTERPRISES INC. d/b/a CHESTERFIELD INN, a New Jersey Corporation, BUDGET WINDOWS, a New Jersey Corporation, JOHN PIERSON, an individual, on behalf of themselves and all others similarly situated;<br><br>Plaintiffs,<br><br>vs.<br><br>FIRST DATA CORPORATION, a Delaware Corporation; and FIRST DATA MERCHANT SERVICES CORPORATION, a Florida Corporation;<br><br>Defendants. | Case No. 2:10-cv-4860 (WHW)(MCA)<br><br>**FIRST AMENDED COMPLAINT (CLASS ACTION)**<br><br>**JURY DEMAND** |

1

FIRST AMENDED COMPLAINT

1     Plaintiffs, RACHEL EASTMAN, residing at 75 Sherwood Road, Dumont,

2  New Jersey 07628, ACADEMIC SOFTWARE, with a principal place of business

3  located at 141 Ayers Court, Teaneck, NJ 07666, AIA ENTERPRISES, INC., d/b/a

4  Chesterfield Inn, with a principal place of business located at 633 Chesterfield-

5  Arneytown Road, Chesterfield, New Jersey 08515, BUDGET WINDOWS, with a

6  principal place of business located at 9 Berkley Road, Hopatcong, New Jersey 07843

7  and JOHN PIERSON, residing at 9 Berkley Road, Hopatcong, New Jersey 07843,

8  on behalf of themselves and all others similarly situated, and against Defendants,

9  FIRST DATA CORPORATION and FIRST DATA MERCHANT SERVICES

10  CORPORATION, both having a principal place of business located at 5565

11  Glenridge Connector NE, Suite 2000, Atlanta, Georgia 30342, allege the following:

12
### NATURE OF ACTION

13     1.    This is a class action against First Data Corporation and First Data

14  Merchant Services Corporation, collectively ("Defendants" or "First Data") for

15  knowingly and unlawfully defrauding Plaintiffs and thousands of small businesses by

16  charging an exorbitant and unconscionable fee under a purported lease agreement for

17  credit and debit card equipment.  In leasing this equipment to Plaintiffs and class

18  members, First Data withholds and conceals material information, thereby allowing it to

19  impose unconscionable charges and excessive fees.

20     2.    First Data fraudulently induced Plaintiffs to accept an unconscionable lease

21  for point of sale ("POS") credit card and debit card processing equipment.  Plaintiffs were

22  not informed of the cost of the equipment, the finance rate, finance charge, or lease

23  charge associated with the POS device and the cost is not included in the signed merchant

24  agreement.  (Attached hereto as Exhibit A is a copy of the merchant processing

25  application for Rachel Eastman.)

26     3.    First Data also subjected Plaintiffs to charges not included on the merchant

27  agreements for the POS leases.

28

4.     These improper lease fees unconscionably charged by Defendants have resulted in substantial damages to the class.

5.     Because the class' claims arise from a practice that is common to all class members, this case is particularly well suited for class action treatment.

6.     Plaintiffs seek to represent the following class defined as follows:

All customers in the State of New Jersey who leased point of sale credit and/or debit card processing equipment from Defendants from the time period set by the applicable statute of limitations prior to the filing of this action to the date of judgment.

**THE PARTIES**

7.     Plaintiff Rachel Eastman is an individual who, during all relevant times, resided in Teaneck, New Jersey.  Plaintiff Eastman was doing business as Academic Software, and engaged in commercial operations during the relevant time in Teaneck, New Jersey.

8.     Plaintiff Academic Software is a New Jersey Corporation, owned and managed by Rachel Eastman.

9.     Plaintiff AIA Enterprises, Inc., d/b/a Chesterfield Inn, is a New Jersey Corporation.

10.     Plaintiff Budget Windows is a New Jersey corporation, owned and operated by John and Maria Pierson.

11.     Plaintiff John Pierson is an individual who, during all relevant times, resided in New Jersey.

12.     Plaintiffs are informed, believe, and thereon allege, that Defendant First Data Corporation is a Delaware Corporation, with its principal place of business located in Atlanta, Georgia, and is conducting the business of credit card transaction processing services and related equipment lease services.  Plaintiffs are informed, believe, and thereon allege that First Data Global Leasing is a business division of First Data Corporation and is operated by First Data Corporation.

**FIRST AMENDED COMPLAINT**

13.     Plaintiffs are informed, believe, and thereon allege, that Defendant First Data Merchant Services Corporation is a Florida Corporation, with its principal place of business located in Atlanta, Georgia, and is conducting the business of credit card transaction processing services and related equipment lease services.

14.     As used herein, the term "Defendants" or "First Data" refers collectively to all Defendants named herein.

## GENERAL ALLEGATIONS

15.     Plaintiffs are informed, believe, and thereon allege that all Defendants, were at all relevant times acting as actual agents, conspirators, ostensible agents, partners and/or joint venturers and employees of all other Defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy and/or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of their co-Defendants; however, this allegation is pleaded as an "alternative" theory wherever not doing so would result in a contradiction with other allegations.

16.     As an alternative theory, Plaintiffs are informed and believe, and on that basis allege, that Defendants are alter egos of each other.  Plaintiffs are informed and believe, and on that basis allege, that there is common control over Defendants, and they operate pursuant to a common business plan. There is unity of interest among Defendants.

17.     The alternative alter-ego relationship among the Defendants should be recognized to prevent an injustice.  If the alter-ego relationship among Defendants is not recognized, an inequity will result because an entity responsible for wrongdoing will be shielded from liability.  When considering an award of punitive damages, the entire net worth of a Defendant is considered.  If the corporate structure of the alter-ego Defendants is disregarded, punitive damages will be based solely on the assets of a single or "fronting" entity; assets which are smaller than the other culpable entities.  Because punitive damages are meant to punish and make an example of the wrongdoer, it would be inequitable to allow entities responsible for the wrongdoing complained of to shield

4

FIRST AMENDED COMPLAINT

their assets and escape punitive damage liability.  Moreover, the co-Defendant entities which make, in whole or in part, the decisions would escape liability, which is inequitable.  Furthermore, the alter ego relationship should be recognized to ensure effective injunctive and declaratory relief, so that the wrongful practices alleged herein are not relocated to an affiliated company.  If Defendants were permitted to avoid an injunction by relocating the misconduct, an inequity would result.

18.     All allegations in this complaint are based on information and belief and/or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.  Whenever allegations in this complaint are contrary or inconsistent, such allegations shall be deemed alternative.

## JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), the "Class Action Fairness Act," as the amount in controversy exceeds $5,000,000.00, there are in excess of 100 class members.

20.     Venue is proper within this District and Division pursuant to 28 U.S.C. §1391(a) because a substantial part of the acts, events and omissions giving rise to the claims occurred in this district, and because there is personal jurisdiction in this district over the named Defendants because they have had continuous and systematic contracts in this District by actively doing business here.

## FACTUAL ALLEGATIONS

### First Data

21.     First Data provides electronic commerce and payment solutions for merchants, financial institutions, and card issuers.  Thus, First Data seeks to profit whenever a consumer uses anything but cash to make a purchase from a First Data client.

22.     A significant amount of First Data revenue comes from a business segment it defines in its most recent 10-K as the "Retail and Alliance Services" business.  This includes "merchant acquiring services," which facilitate a merchant's ability to accept, among other things, credit and debit cards by authorizing, capturing and settling the

FIRST AMENDED COMPLAINT

merchant's transactions.  Merchant acquiring services also provides POS devices and other equipment necessary to capture merchant transactions.

23.     First Data realizes revenues in its merchant acquiring services by, among other things, charging fees to merchants, and leasing POS devices.

24.     First Data is not simply a finance company or a disinterested third party financier to a merchant's decision on how a merchant chooses to process non-cash transactions, or from whom the merchant elects to obtain the equipment and services to do so.  In fact, First Data seeks to be the hub of the transaction.  It seeks to provide the equipment a merchant needs to effectuate a non-cash transaction, lease and finance that equipment, and realize ongoing revenue from the merchant's use of that equipment.

**First Data –in its role as manufacturer and supplier of POS equipment**

25.     First Data is a large provider of POS hardware and software.  First Data manufactures its own line of POS hardware that in part is geared towards small and large merchants.   For example, First Data manufactures:

a)  The First Data FD50 terminal, which is promoted as an affordable, reliable terminal that allows your customers to choose virtually every payment type quickly and securely.

b)  The First Data FD100 terminal, which is promoted as combining performance, security, ease of use and adaptability when a change is needed.

c)  The First Data FD100Ti terminal, which is promoted as an affordable, all-in-one terminal solution that combines performance, security, reliability and ease of use into a low-cost, feature-rich device. With the new smaller footprint and sleek titanium design, it delivers high-quality transaction processing and, by using newer technologies, provides a safe, secure Internet protocol (IP)/dial-up platform.

d)  The First Data FD200 terminal, which is promoted as a compact all-in-one solution—terminal, check reader/imager, dual built-in printers—that

6

FIRST AMENDED COMPLAINT

processes checks and all types of payment cards quickly, easily and
securely.

    e)   The First Data FD300 terminal, which is promoted as the latest in payment
processing technology—including simultaneous, single-terminal support for
multiple merchants and payment types.

    f)   The First Data FD400 wireless terminal, which is promoted as a
lightweight, hand-held solution that lets mobile merchants accept payments
at the point of sale—wherever the sale takes place. One wireless device that
does the work of three: terminal, printer and PCI PIN Entry Device.

26.    First Data not only manufactures its own line of POS terminals, First Data supplies a variety of POS terminals manufactured by third parties, including but not limited to the following: the NURIT 8000 Terminal, manufactured by Verifone; a series of POS terminals manufactured by Hypercom; a series of POS terminals manufactured by Ingenico; and a series of POS terminals manufactured by Verifone.

27.    At all times relevant to this Complaint, First Data manufactured POS terminals and equipment and was a supplier of third party POS terminals and equipment.

28.    At all relevant times First Data has been aware of the actual retail cost of not only its own POS equipment, but also the POS equipment manufactured by third parties, which it supplies to merchants.

**First Data –in its role as financier of the equipment**

29.    First Data Global Leasing ("FDGL") is a division of First Data and is not a separate legal entity.  FDGL claims to specialize in providing agents, bank partners and independent sales organizations ("ISO") with cost-effective solutions for leasing quality, POS equipment.  FDGL claims to have over 400,000 merchant clients.

30.    On information and belief, First Data does not finance its lease receivables or lease assets and has not established a specific credit line to fund leases, but rather First Data funds those "leases" from working capital and/or credit facilities established by First Data for general purposes.

FIRST AMENDED COMPLAINT

31.     On information and belief, First Data is not taking any material risk when it finances POS terminals, similar in nature to risk assumed by a traditional, independent equipment lessor.

32.     On information and belief, First Data does not routinely perform credit checks when it finances POS equipment, in part because the terms are so advantageous that First Data will recoup any outlay within months of the execution of the lease and in part because First Data takes elaborate steps to offset to third parties the risk of a merchant's nonpayment.

33.     On information and belief, First Data does not establish an interest rate, finance charges, lease charges or any other lease terms based upon the specific merchant's credit characteristics and the equipment that merchant seeks to finance.

34.     Significantly, First Data in its financial reporting does not separate revenue from its FDGL business line with other revenue sources and in 2009 claims to have close to $800 million from the sale and lease of its POS equipment.

**First Data – relies in part on third parties to generate revenues**

35.     First Data offers its products and services through several channels, including its own sales force.

36.     First Data also offers its products, financing and processing services to merchants through a labyrinth of arrangements with third party organizations, including "contractual alliance arrangements", independent sales organizations, and other sales partners.  For purposes of this complaint, each is referred to herein as an "ISO".

37.     Each ISO executes with First Data an agreement to sell First Data POS equipment, finance that equipment and some type of revenue share of the recurring fees associated with each merchant (the "ISO Agreement").

38.     On information and belief, with each ISO Agreement, First Data (1) creates specific programs for ISO compensation; (2) contractually transfers risk of merchant non-payment from First Data to the ISO; (3) creates, for First Data, the right to set off amounts it determines are owed by the ISO to First Data for merchant nonpayment; (4)

drafts, negotiates and approves the form finance and processing documents before an ISO is allowed to sell or lease First Data equipment, finance POS equipment with First Data and/or set up a merchant to process non-cash transactions using First Data's systems; (5) monitors the performance of each ISO; and (6) coordinates the sales activities on a systematic and ongoing basis.

39.     Generally, the person interacting with the merchant during the sales process is a First Data sales representative, or a representative or a sales person from an ISO.

40.     On information and belief, First Data has created compensation metrics for the individual sales person and/or the ISO for signing up new small business merchants. On information and belief, one central aspect of these compensation metrics is equipment financing and the sales person or the ISO is rewarded based upon how favorable the lease terms are for First Data on any lease he/she or it writes.

41.     On information and belief, the grossly unfair and unconscionable lease terms are not designed to finance the equipment being leased.

42.     On information and belief, First Data is responsible for approving all aspects of a merchant sign up, from the drafting of all contracts to the set up of the account, and an ISO must comply with specific instructions given to it by First Data.

43.     On information and belief, overcharging small merchants for POS equipment serves several common corporate purposes for First Data, including the following: (1) sharing in the profit of these leases is a central and important selling point for First Data to sign up new ISO's and retain existing ISO's and on information and belief First Data offers common, lucrative incentives to ISO's that revolve around sharing in the profits of these leases; (2) On information and belief, First Data can inflate its revenues and earnings by now realizing as revenue up to ten times and more than the true value of POS equipment First Data actually sold or leased; and (3) By creating profit share incentives for ISO's relating to the profit from First Data's POS equipment leases, First Data can negotiate with ISO's and retain more revenue relating to other equally lucrative but reoccurring  processing fees.

FIRST AMENDED COMPLAINT

**Execution of the Merchant Processing Application**

44.     The formation of a business relationship starts when a small business merchant executes a document that is part application and part contract.  While various forms of this document exist, as explained below, the core elements are common across all forms.

45.     In one embodiment, the form is entitled  "Merchant Processing Application".  This and other similar documents are collectively referred to as the "Merchant Application".

46.     On information and belief, First Data plays an integral role in drafting and approving the form Merchant Applications.

47.     This is the only document a merchant executes.

48.     Many common characteristics exist across the Merchant Application, including the following:

      (a) No Merchant Application lists the price of the equipment being leased;

      (b) No Merchant Application discloses the finance charges, interest rate or lease rate of the financing;

      (c) No Merchant Application sets forth the commencement dates of the financing arrangement;

      (d) No Merchant Application includes the waivers if any that the Merchant must make to obtain financing;

      (e) No Merchant Application discloses and explains who actually supplies the equipment;

      (f) No Merchant Application sets forth the warranties of the supplier of the POS equipment; and

      (g) Every Merchant Application requires First Data's internal approval, so First Data knows the value of the collateral supporting each lease it funds.

FIRST AMENDED COMPLAINT

49.     First Data Global Leasing, the supposed lessor, does not sign the Merchant Application and in fact it appears that in all cases First Data as lessor never executes any agreement directly with the merchant.

50.     The terms of the Merchant Agreement are designed to mislead and confuse small business owners.

51.     On information and belief, First Data is aware of this confusion and is aware of reports of fraud, but has taken no action to remedy these persistent and reported problems and has not set up protocols and procedures to prevent confusion and fraud.

52.     On information and belief, First Data in part designs the Merchant Application to hide from the merchant the terms of any lease agreement and generally to confuse the lessee.  In partial support, a review of one of the Merchant Applications attached as Exhibit A reveals:

> (a) The Merchant Application is a pre-printed form and is designed such that the sales representative for the ISO must complete the Merchant Application;
>
> (b) The Merchant Application was designed to look like an application, not a contract;
>
> (c) The title "Merchant Processing Application" gives no hint that part of the form will be an equipment lease;
>
> (d) The "Merchant Processing Application" does not provide a clear description of what in fact is being "leased."
>
> (e) The title of the form deceives the signer insofar as he/she/it does not realize it is a binding agreement.

53.     The purpose of any reference in the contract to the program guide is ambiguous.

54.     While the lease section is confusing, this section – being the only place where the financial terms of the supposed lease are written down – is more notable for what First Data specifically leaves out of the document.  First Data specifically leaves out

the actual price of the equipment.  First Data leaves out the lease rate, finance charges and/or interest rate of the financing.  First Data leaves out the onerous waivers and disclaimers that are later sent to the lessee and is later told is part of the contract.

55.     In the section where the parties sign the Merchant Application certain terms and conditions are in small print surrounding the signature lines, but again are confusing, inconspicuous and designed to mislead.

**The Program Manual – an afterthought**

56.     First Data prepares a document called a "Program Manual," which the Merchant Application purports to make part of the contract.  At the end of the Program Manual are the specific terms and conditions of an equipment lease.   The merchant does not execute the Program Manual.  The Program Manual was not provided to Plaintiffs, and is not provided to class members, until after the execution of the Merchant Application.   The Program Manual is provided to class members, if at all, after execution of the Merchant Application either in written form or on a CD.  (Attached as Exhibit B is a copy of a Program Manual – pgs. 5, 6, 25 and 26 missing).

**Facts Related to Proposed Class Representatives**

***Rachel Eastman and Academic Software***

57.     Rachael Eastman owns a small business called Academic Software.   In October 2008, Academic Software entered into a Merchant Application.   (Exhibit A.) Rachel Eastman executed the document.

58.     The Merchant Application does not list the price of the equipment.

59.     The retail price of the NURIT 2085 is approximately $249.

60.     Academic Software was never presented with any additional documentation at the time it executed the Merchant Application.

61.     Several days after the execution of the Merchant Agreement, Rachel Eastman received a CD, which may have contained a Program Manual.

FIRST AMENDED COMPLAINT

62.     Although First Data does not manufacture this equipment, it does act as a supplier of this equipment.

63.     Plaintiff Eastman and Academic Software were charged an early termination fee for terminating the Merchant Application.

64.     First Data debited Academic Software's business account more than the stated cost of the lease.

65.     Once she refused to pay additional sums of money, First Data began collection proceedings against her and her company, forcing her to pay an additional $1,200.

66.     First Data, on information and belief, stood to make significant sums of money from Academic Software should it begin processing credit and debit card payments under the Merchant Application, including but not limited to its pro rata portion of discount fees, miscellaneous fees, check verification fees and other types of reoccurring monthly fees based either on a flat rate monthly charge of a per use charge.

67.     The retail price of the NURIT 2085 is approximately $249.  Assuming 15% interest, a 10% residual buyout and 48-month term, her monthly payment should be $6.78 a month.  The payment terms in her contract of $69.95 a month for 48 months, assuming a 15% interest rate and a 10% residual buyout suggests a retail price of $2500.

***Budget Windows and John Pierson***

68.     Plaintiff John Pierson, along with his wife, Maria, owns and operates Budget Windows.  On or about November 11, 2011, he executed a Merchant Application (attached as Exhibit C) substantially similar in form to the Merchant Application executed by Academic Software.

69.     The Merchant Application did not list the retail price of the point of sale terminal.

70.     The Merchant Application purports to represent a "lease" of a FD-50ti point of sale credit card terminal.  The financial transaction called for the payment of $59.99 each month for 48 months for the FD-50ti.

FIRST AMENDED COMPLAINT

71.     Defendants and/or its wholly owned subsidiaries manufactures and sells the FD-50ti.

72.     Budget Window was not given a copy of the Program Manual until after the execution of the Merchant Application, if at all.

73.     The fair market retail price of the FD-50ti is less than $250, yet under the terms of the financing in the Merchant Application, First Data was to charge Budget Windows $2,879.50 for the terminal.

74.     Budget Windows, when it became aware of the true cost of the terminal, canceled the financing.

***AIA Enterprises, Inc.***

75.     AIA Enterprises, on September 30, 2011, entered into a Merchant Application titled "Lease Equipment Agreement" (attached as Exhibit D) with Defendants.  All material terms of this agreement are the same as the Merchant Application entered into by other proposed class representatives.

76.     The equipment lease agreement did not disclose the retail price or fair market value of the point of sale terminal to be financed.

77.     The equipment lease agreement provided for the financing of two FD-50ti point of sale terminals.

78.     The terms of the financing provided that AIA Enterprises was to pay $61.98 a month for 48 months for the two FD-50ti terminals.

79.     The fair market value of the FD-50ti is less than $250, yet under the terms of the financing , First Data is charging AIA Enterprises $2,975 for both terminals.

80.     AIA Enterprises has not canceled the financing and continues to pay Defendants $61.98 each month.

FIRST AMENDED COMPLAINT

**CLASS ALLEGATIONS**

81.     Plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated pursuant to Federal Rule of Civil Procedure, Rule 23.  Plaintiffs seek to represent the following class:

> All customers in the State of New Jersey who leased point of sale
> credit and/or debit card processing equipment from Defendants from
> the time period set by the applicable statute of limitations prior to the
> filing of this action to the date of judgment.

82.     Plaintiffs reserve the right to amend or otherwise alter the Class definition presented to the Court at the appropriate time, or to propose or eliminate sub-Classes, in response to facts learned through discovery, legal arguments advanced by Defendants or otherwise.

83.     Excluded from the class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns.  Also excluded from the class is any judge, justice, or judicial officer presiding over this matter and any members of his/her immediate family or judicial staff.

84.     The Class members are so numerous that the individual joinder of all members is impracticable under the circumstances of this case.  While the exact number of class members is unknown at this time, Plaintiffs are informed and believe that the Class consists of thousands of members.

85.     Plaintiffs' claims are typical of the claims of the class.  Plaintiffs are members of the class they seek to represent.  Members of the class are ascertainable from Plaintiffs' description of the class and/or Defendants' records and/or records of third parties accessible through discovery.

86.     The representative Plaintiffs will fairly and adequately represent the members of the class and have no interests which are antagonistic to the claims of the

class.  The Plaintiffs' interests in this action are antagonistic to the interests of Defendants, and they will vigorously pursue the claims of the class.

87.     The representative Plaintiffs have retained counsel who are competent and experienced in class action litigation, and have successfully represented Plaintiffs in complex class actions.

88.     Common questions of law and fact impact the rights of each member of the class and a common remedy by way of permissible damages, restitutionary disgorgement and/or injunctive relief is sought for the class.

89.     There are numerous and substantial questions of law and fact common to all members of the class which will predominate over any individual issues. These common questions of law and fact include, without limitation:

     a.  Whether the Defendants violated the Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.;

     b.  Whether the written contract entered into is unconscionable or contains unconscionable terms;

     c.  Whether the cost, finance rate, finance charge and/or lease charge are material terms to the lease;

     d.  Whether Defendants knew the material terms of the contract;

     e.  Whether Defendants intended to deceive Plaintiffs;

     f.  Whether Plaintiffs justifiably entered into the lease based on the information that was disclosed;

     g.  Whether Defendants had a duty to disclose the material terms due to their partial disclosures;

     h.  Whether Defendants committed fraud or fraudulent concealment;

     i.  Whether Plaintiffs are entitled to rescission of the contract;

     j.  Whether Defendants breached their contract;

     k.  Whether Defendants have been unjustly enriched;

l.  Whether Defendants should be required to provide restitutionary disgorgement to class members;

m. Whether class members have been damaged by Defendants' conduct;

n.  Whether class members are entitled to declaratory relief; and

o.  Whether Defendants' conduct should be enjoined.

90.  The persons in the class are so numerous that disposition of their claims in this case and as part of a single class action lawsuit, rather than numerous individual lawsuits, will benefit the parties and greatly reduce the aggregate judicial resources that would be spent.

91.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation, which would preclude its maintenance of a class action.

92.  This case is brought and can be maintained as a class action under Rule 23(b)(1), 23(b)(2) and 23(b)(3):

a.  Injunctive and/or declaratory relief to the class is appropriate: Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief with respect to the class as a whole appropriate;

b.  Predominant questions of law or fact: questions of law or fact common to all class members, including those identified above, predominate over questions affecting only individual class members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require.  Moreover, absent class treatment of this controversy, the amount of individual

17

FIRST AMENDED COMPLAINT

class members' losses in comparison to the enormous cost of litigation makes it almost certain that few class members would ever be able to even seek, let alone obtain, redress for their injuries.

93.     Defendants have acted on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole.  Prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the Defendants.

94.     Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue a course of action, which will result in further damages to Plaintiffs and the class members.

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(By Plaintiffs and the Class Against Defendants)**

95.     Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

96.     Plaintiffs and Defendants have a contractual relationship for the lease of point of sale processing equipment for credit and/or debit cards whereby Defendants provide the equipment and Plaintiffs incur a cost for that lease.

97.     Defendants' Merchant Application, with regard to the lease at issue, is procedurally and substantively unconscionable.

98.     Defendants Merchant Application does not provide lessee with the actual cost of the POS equipment.  The Merchant Application does not include an interest rate, finance charges or lease charges.

99.     The actual cost of the POS equipment is so far in excess of the lease cost the provision of the contract is manifestly and highly unjust.

100.     The Merchant Application is not executed by the leasing company specified by the Merchant Application.

101.     The Merchant Application purports to contain additional terms in a twenty nine page "program guide" which is not available for review by the lessee prior to entering into the lease and contains onerous purported contract terms in tiny print. Language related to the lease is buried in smaller than 8 point type on the twenty second page of the document.

102.     The Merchant Application is a form document.  Industry practice does not allow lessees or small business owners an opportunity to make changes to the agreement. The agreement is presented on a "take it or leave it" basis.  Consistent with Defendants' practice, Plaintiffs were not provided an opportunity to make any changes to the agreement.  Given the superior bargaining power of Defendants, the agreement is a contract of adhesion.

103.     Defendants have charged the Plaintiffs more than the terms of the Merchant Application in breach of that contract.

104.     Plaintiffs have performed all relevant conditions, covenants and promises required on their part to be performed in accordance with the terms and conditions of the contract and/or that performance has been excused or waived by Defendants.

105.     Defendants breached the terms of the agreement by unconscionably overcharging for the leases at issue.
Plaintiffs and class members have been damaged as the result of Defendants' breach of contract, including, but not limited to, incurring improper charges.

## SECOND CAUSE OF ACTION

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (By Plaintiffs and the Class Against Defendants)

106.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

107.    The contract identified in this action contained an implied covenant of good faith and fair dealing, whereby Defendants, and each of them, agreed to perform their obligations under the policy in good faith, to deal fairly with Plaintiffs, and not to unreasonably deprive Plaintiffs of the benefits due under the contract.

108.    Defendants tortiously breached its implied covenants of good faith and fair dealing arising from the contracts by charging unconscionable and excessive lease rates, failing to disclose the cost, interest rate, finance charges or lease charges, charging excessive fees, withdrawing from the Plaintiffs' bank account more money each month than the Merchant Agreement even allows them to withdraw and by other conduct, including but not limited to that expressly set forth in this complaint.

109.    Without any reasonable basis for doing so, and with full knowledge and/or conscious disregard of the consequences, Defendants, and each of them, have failed and refused to act in good faith or act fairly toward Plaintiffs, and Defendants have, in bad faith, failed and refused to perform their obligations under the contracts.

110.    As a direct and proximate result of said breaches of the covenants of good faith and fair dealing by Defendants, and each of them, Plaintiffs have incurred, and continue to incur, damages.

111.    As a further direct and proximate result of the wrongful conduct of Defendants, and each of them, Plaintiffs have also sustained other economic damages, as set forth above, and other damages in an amount to be proven at trial.

As to the conduct alleged herein to have been engaged in by representatives of Defendants, and each of them, the officers, directors and managing agents authorized and ratified each and every act on which Plaintiffs' allegations of damages herein are based.

1

2 **THIRD CAUSE OF ACTION**

3 **FRAUDULENT CONCEALMENT**

4 **(By Plaintiffs and the Class Against Defendants)**

5     112.    Plaintiffs re-allege and incorporate by reference the allegations contained in

6 the preceding paragraphs of this complaint, as though fully set forth herein.

7     113.    Defendants did not disclose to and/or concealed from Plaintiffs the cost,

8 finance rate, finance charge or lease charge of the POS equipment.  Defendants'

9 Merchant Application contained none of these terms and they were never communicated

10 to Plaintiffs by any means.

11     114.    Defendants omitted the cost, finance rate, finance charge and lease charge

12 of the POS equipment from Plaintiffs.

13     115.    The cost, finance rate, finance charge and/or lease charge are material facts

14 on which any reasonable lessee would reasonably rely and base her decision to enter into

15 a lease.

16     116.    Defendants intentionally, maliciously, fraudulently or oppressively failed to

17 disclose, concealed or omitted the cost, finance rate, finance charge and/or lease charge of

18 the POS equipment.

19     117.    Defendants, at all times, knew the cost, finance rate, finance charge and/or

20 lease charge for the POS equipment they were leasing.

21     118.    Defendants' failure to disclose, concealment and/or omission of the cost,

22 finance rate, finance charge and/or lease charge was intended to induce Plaintiffs into

23 entering into an unfair lease.

24     119.    Defendants' disclosure of some but not all the terms of the lease created a

25 duty on their part to fully disclose the terms of the lease.

26     120.    Plaintiffs justifiably entered into the lease with the limited and partial

27 information they were provided.

28

FIRST AMENDED COMPLAINT

121.    Plaintiffs and class members have been damaged as the result of Defendants' fraud, including, but not limited to, incurring improper lease charges.

## **FOURTH CAUSE OF ACTION**
## **FRAUD IN THE INDUCEMENT**
### **(By Plaintiffs and the Class Against Defendants)**

122.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

123.    Defendants did not disclose to and/or concealed from Plaintiffs the cost, finance rate, finance charge or lease charge of the POS equipment.  Defendants Merchant Application contained none of these terms and they were never communicated to Plaintiffs by any means.

124.    Defendants' failure to disclose and/or concealment of the cost, finance rate, finance charge or lease charge of the POS equipment from Plaintiffs induced Plaintiffs to execute the contract.  If Defendants have disclosed all material facts, Plaintiffs and class members would not have entered into a contract for the lease of POS equipment.

125.    Plaintiffs were not presented with the "program guide" or given an opportunity to review that document prior to entering into the lease.

126.    Defendants intended to induce Plaintiffs to enter into a lease for POS equipment by concealing material facts regarding the lease terms.

127.    Plaintiffs justifiably entered into the lease with the limited and partial information they were provided.

128.    Plaintiffs and class members have been damaged as the result of Defendants' fraudulent inducement, including, but not limited to, incurring contractual duties and incurring improper lease charges.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT ("CFA")**

**(N.J.S.A. §56:8-1 *et seq.*)**

**(By Plaintiffs and the Class Against Defendants)**

129.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

130.    Defendants are "persons" that engaged in the "sale" of "merchandise," within the meaning of the CFA.

131.    In connection with the lease of POS equipment, Defendants employed unlawful commercial practices in violation of the CFA, by, among other things: (1) knowingly failing to disclose material information and terms to Plaintiffs and other lessors of Defendants' POS equipment, such as unit cost, lease charge, finance rate or finance charge of the POS equipment; (2) charging unconscionable interest and fees as rent for the POS equipment; (3) charging hidden fees for the lease of the POS equipment; and (4) withdrawing from the Plaintiffs' bank accounts more each month than the Merchant Application authorized.

132.    Defendants knowingly concealed, suppressed and omitted material facts with respect to the lease of the POS equipment, with the intent that Plaintiffs would rely on such acts of concealment, suppression or omission.

133.    Defendants' unconscionable conduct described herein included the omission, suppression and concealment of material facts concerning the lease of its POS equipment.

134.    Defendants' conduct of charging Plaintiffs excessive and unconscionable rates and fees required Plaintiffs to incur unjustified expenses.

135.    The foregoing acts, misrepresentations, omissions and unconscionable commercial practices caused Plaintiffs to suffer an ascertainable loss in the form of monies spent to lease POS equipment and costs associated with extricating themselves

23

from the leases, and they are entitled to recover such damages, together with appropriate penalties, costs and fees available at law.

136.     Defendants violated the Consumer Fraud Act by charging Plaintiffs interest rates exceeding New Jersey's civil usury law, <u>N.J.S.A.</u> 31:1-1 <u>et</u> <u>seq.</u>, and criminal usury law, <u>N.J.S.A.</u> 2C:21-19.

137.     The lease of the POS equipment was "non-cancellable" and contained an option to purchase the equipment at the end of the term, and as such was, in reality, an installment purchase contract.

138.     As an installment purchase contract, charges in excess of the retail price of the POS equipment are attributable to the time sale of the goods.

139.     This difference, between the retail price of goods sold through an installment purchase contract and the charges collected over the time, is interest under New Jersey law.

140.     The rates of interest Plaintiffs were charged on the POS equipment "leases" were far in excess of the interest rate limits imposed under New Jersey usury laws.

141.     New Jersey usury law restrictions on lending practices are extensive and are part of the State's consumer protection efforts.

142.     Charging a usurious rate of interest is an unconscionable commercial practice under the Consumer Fraud Act.

143.     Charging a usurious rate of interest is also a regulatory violation under the Consumer Fraud Act, since charging such interest violates usury laws intended to protect consumers.

144.     As a result of the unlawful interest charged by Defendants, Plaintiffs suffered an ascertainable loss.

FIRST AMENDED COMPLAINT

# SIXTH CAUSE OF ACTION

## UNJUST ENRICHMENT

### (By Plaintiffs and the Class Against Defendants)

145.   Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

146.   Defendants actively participated in a scheme whereby they unlawfully and unfairly assessed unconscionable fees on lessees.  Defendants knew and were aware of these unlawful, unfair or unconscionable business practices.

147.   Defendants concealed the true facts and circumstances from Plaintiffs.

148.   By wrongfully obtaining and assessing lease charges, Defendants were unjustly enriched at the expense of Plaintiffs.

149.   Defendants were aware of the benefit they were receiving as a result of their wrongful acts, and have enjoyed the benefit of their financial gains, to the detriment and the expense of Plaintiffs.

150.   Defendants' retention of the monies gained through their wrongful acts and practices would be inequitable considering the circumstances by which Defendants obtained these monies.

151.   The actions described in this complaint by Defendants were done with a conscious disregard of Plaintiffs' rights.  These actions constitute conduct which is unlawful behavior done with an intent to injure Plaintiffs, such as to constitute oppression, fraud or malice, entitling Plaintiffs to punitive damages.

152.   Plaintiff and the class are entitled to and seek restitution from Defendants and an order disgorging all profits, benefits, and other compensation obtained by Defendants for their wrongful conduct.

1

## SEVENTH CAUSE OF ACTION

## DECLARATORY RELIEF

### (By Plaintiffs and the Class Against Defendants)

153.   Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.   Certification of the proposed class and notice thereto to be paid by Defendants;

2.   For general, special, compensatory, treble and incidental damages in an amount to be determined at trial, prejudgment interest and other damages according to proof;

3.   For rescission of the written contract or part thereof;

4.   For reasonable attorneys' fees and costs;

5.   For punitive and exemplary damages according to proof;

6.   For restitutionary disgorgement of all profits Defendants obtained as a result of their unlawful, unfair, and/or fraudulent business practices;

7.   For appropriate injunctive and declaratory relief;

8.   For interest and costs of suit herein; and

9.   For such further relief as the Court may deem just and proper.

DATED:  June 21, 2012

SZAFERMAN, LAKIND
BLUMSTEIN & BLADER, P.C.

By:  s/ Mark A. Fisher
Mark A. Fisher

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all claims and causes of action in this lawsuit.

DATED:  June 21, 2012

SZAFERMAN, LAKIND
BLUMSTEIN & BLADER, P.C.

By:   s/ Mark A. Fisher
Mark A. Fisher

27

FIRST AMENDED COMPLAINT

# Exhibit A

Eastman 0011

## VISA/MASTERCARD/DISCOVER RISK EVALUATION ***** Your Visa/Mastercard/Discover processing will be based upon the below criteria

Average Ticket Size For Visa/MasterCard/Discover Only: $ _____     Monthly Visa/MasterCard/Discover Sales Volume: $ _____

Each applicant certifies that the above average ticket size and monthly sales volume are accurate and acknowledge that any significant variance from this information could result in delay or withheld settlement of funds and/or assessment of additional fees. Upon request, merchant must supply information to substantiate the delivery of goods and/or services and/or acknowledgement of the customer's satisfaction.

**SCHEDULE OF FEES / PROCESSING LIMITS (TO BE COMPLETED BY SALES REPRESENTATIVE)**

**Retail, Restaurants, and/or 80%+ Swiped Transactions**

Visa/MasterCard/Discover Qualified Discount Rate............. _____ % 
Authorization/Batch Closure Fee (Per Attempt)................. $ _____
Monthly Customer Service/Statement Fee (Per Month)........ $ _____
Debit Card Authorization Fee (Per Transaction
        + Network Fees)............................. $ _____
Debit Card Monthly Network Gateway Fee (Per Month)........ $ _____
EBT Transaction Fee (Per Transaction)......................... $ _____
Monthly Wireless Access Fee (Per Month)..................... $ _____
iAccess Fee (Per Month)........................................ $ 9.95
Authorization and Batch Closure for American Express, Diners and/or JCB: thirty cents per item
MidQualified Fee = Qualified Fee + forty basis points; NonQualified Fee = Qualified Fee + two-hundred and seventy-five basis points

MCC/SIC:

**Home Business, Trade Fairs, MO/TO, Internet, Outside Sales/Services, and/or Over 20% Keyed Transactions**

Visa/MasterCard/Discover Qualified Discount Rate............. _____ %
Authorization/Batch Closure Fee (Per Attempt).............. $ _____
Monthly Customer Service/Statement Fee (Per Month)...... $ _____
Monthly Wireless Access Fee (Per Month)................... $ _____
iAccess Fee (Per Month)...................................... $ 9.95
Authorization and Batch Closure for American Express, Diners and/or JCB: thirty cents per item
MidQualified Fee = Qualified Fee + forty basis points; NonQualified Fee = Qualified Fee + two-hundred and seventy-five basis points

**OTHER FEES**

Visa/MasterCard Monthly Minimum Discount Fee: $25.00/month
Chargeback Fee:           $35.00 each   AVS Fee:              $0.10 each
Request for Copy Fee:     $15.00 each   ACH Returned Item Fee: $25.00 each
Voice Authorization Fee:  $1.50 each    Application/Approval Fee: $60.00
Checking Account Change Fee: $25.00    Annual Fee:           $99.99
Early Termination Fee: Please refer to Paragraph 22.1 of the Merchant Services' Program Guide.

Comments: _____

## ADDED SERVICE ENROLLMENT

☐ Debit Card Services   ☐ Electronic Benefits Transfer (EBT): EBT/FNS#: _____   ☐ WEX / Voyager
☐ Check Services        ☐ Gift Card Services                                          ☐ Lease Services

## CARD ACCEPTANCE

Accept all MasterCard and Visa Transactions (presumed, unless any selections below are checked)

MasterCard Acceptance:
☐ Accept MC Credit transactions only
☐ Accept MC Non-PIN Debit transactions only

Visa Acceptance:
☐ Accept Visa Credit transactions only
☐ Accept Visa Non-PIN Debit transactions only

See Paragraph 1.9 of the Merchant Services' Program Guide for details regarding limited acceptance.

## EXISTING MERCHANT NUMBERS

| American Express | | Diners Club | | JCB | |
|---|---|---|---|---|---|

## AMERICAN EXPRESS NEW ENTITLEMENT

☐ Discount Rate: _____ % **or** ☐ Monthly Flat Fee: $ 5.95*
Retail:          ☐ $0.10 Transaction Fee + 0.30% CNP Downgrade
Services, Wholesale & All Other: ☐ $0.15 Transaction Fee
* Applies to merchants whose annual American Express charge volume is $4,999.00 or less.

Est. Annual Volume: $ _____   Est. Average Tkt: $ _____
☐ Monthly Gross Pay   ☐ Daily Gross Pay
Pay Frequency: ☐ 3 Day   ☐ 15 Day   ☐ 30 Day

Merchant Initials _____   Fees disclosed are billed by American Express.

## ***IMPORTANT – COMPLETE SECTION AND INCLUDE A VOIDED BUSINESS CHECK FROM ACCOUNT.***

**BANK INFORMATION**

| Bank Name: | Bank Address: | City: | State: | Zip: |
|---|---|---|---|---|

Branch: _____   Bank Phone: _____   Contact Name: _____

Transit # (ABA Routing) _____   Account # (DDA) _____

## MERCHANT SITE SURVEY *Photograph of business location (interior & exterior) are required. (Completed by Sales Representative)

Date: _____   Type of Building: _____   Square Footage (approximate): _____

Inspector's Comments: _____

I have verified the identification of the above listed principal(s). Under the penalty of perjury and accountability, I hereby certify I personally conducted this premises inspection described above and hereby certify that this business is legitimate.

Sales Representative/Inspector's Signature: _____

The undersigned, and each of them, if more than one, acknowledges and agrees that this Merchant Processing Application ("Application") is to obtain payment settlement services offered by Wells Fargo Bank, N.A. ("Bank"), a member of Visa USA, Inc. ("Visa") and MasterCard International, Inc. ("MasterCard"). In order for Merchant to obtain the settlement services described in this Application and as may be selected by Merchant (collectively and individually, as applicable, the "Services"), Merchant must agree to and accept the terms and conditions under which Bank and Merchant Lynx Services and its processing affiliate iPayment, Inc. ("iPayment") (collectively, "Servicers" or "we" or "us") will agree to provide them. Discover is not a bank card network. Bank is not a sponsor of Discover card transactions under this Agreement and is not a party to this Agreement insofar as it relates to Discover Card transactions. The provisions of this Agreement regarding Discover Card constitute an agreement solely between you and iPayment.

By signing below, the undersigned Merchant (and each individual) hereby acknowledges and confirms that: a.) The terms and conditions that Merchant must agree to and accept to obtain the Services include the terms and conditions of this Application together with all terms contained in the Merchant Services' Program Guide ("Program Guide") including any information or terms that are incorporated by reference in the Program Guide, and together contain the terms and conditions of the agreement for the Services (collectively the "Agreement"); b.) You understand that certain terms used in the Agreement (including this Application) are fully defined in the Program Guide, that you have received and reviewed this Agreement including all the documents and information which are incorporated herein by reference, (including the Program Guide which is also available for viewing and/or

downloading from the Internet at: www.ipaymentinc.com), that the Agreement sets out the terms and conditions under which Merchant may utilize the Services, and that You have an obligation to promptly contact iPayment and/or the Bank regarding any questions pertaining to any portion of this Agreement; c.) Upon acceptance of this Agreement, it becomes a legally binding contract enforceable against Merchant and with respect to certain provisions, the Individual executing such Agreement on behalf of Merchant, who is making certain representations and promises in his or her personal capacity.

By signing below, the undersigned Merchant warrants and certifies that all information submitted under the Agreement (including the Application) is true, correct, and complete and understands that Bank and iPayment will be relying on such information during the approval process, including in setting the applicable fees, rates, limits and all other terms and conditions. Merchant (and each individual) hereby authorizes Bank and/or iPayment to obtain from third parties financial and credit information relating to Merchant (and each individual) in connection with their determination of whether to accept this Agreement and hereby grants Bank and/or iPayment continuing authority to conduct credit checks and background investigations and inquiries concerning each of the undersigned including, but not limited to, financial, character and business references and Merchant's owner(s) (if Merchant is an entity). Each of the undersigned expressly authorizes Bank and/or iPayment to request and obtain from Consumer Reporting Agencies (Bureaus) consumer and business reports. Each of the undersigned furthermore agrees that all references, including banks and Consumer Reporting Agencies, may release any and all personal and business credit and financial information to Bank and/or iPayment.

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record certain identifying information from any business or individual seeking to open a new account. We are required to obtain this information no matter how the account is opened (e.g., by mail, phone, in-person, or online). We may ask to see your driver's license or other identifying documents. The information requested or obtained by us may include your: name; address (residence for individuals and place of business for non-individuals); date of birth (for individuals); US taxpayer identification number for US citizens or companies (for individuals this is usually a Social Security number); or other forms of government issued identification (for example, a passport or alien identification card) for non-US citizens.

By signing below, you agree, understand and acknowledge that: a.) The Agreement will not take effect unless and until Merchant has been approved by Bank and iPayment and Merchant is assigned and issued a Merchant Account Number; b.) Any alteration, strikeover, or modification to the preprinted text of this Application or any part of the Agreement shall be of no effect whatsoever and at Bank's and iPayment's discretion may render the Agreement invalid; c.) You must select and indicate the category of "Cards" you will accept on the Application and will collectively be referred to as "Cards". You acknowledge and agree that Merchant will be furnished with the services and products described and selected by Merchant in the Application (collectively and individually, as applicable, the "Services") and that Services will be the sole and exclusive provider of the Services. Merchant during the term of this Agreement; d.) If Merchant is approved, any cancellation by You of this Agreement within three (3) years from the date of approval or is terminated by Services prior to an Event of Default by Merchant, will be subject to the applicable early termination fees and Merchant will be charged a fee for such early termination equal to (i) $350.00 if terminated before completion of the first year of the Term; or (ii) $250.00 if terminated after completion of the first year of the Term but prior to the end of the third year of the Term (See Section 22.1 of the Agreement - Program Guide).

If information is provided in the "American Express New Entitlement" section of the Application, then the following shall apply: By signing below, Merchant represents that Merchant has read and is authorized to sign and submit this Application on behalf of the entity above and all information that Merchant has provided herein is true, complete, and accurate. Merchant authorizes American Express Travel Related Services Company, Inc. ("American Express") to verify the information in this Application and receive and exchange information about Merchant personally, including requesting reports from consumer reporting agencies. Merchant authorizes and directs American Express to inform Merchant directly, or through the entity above, of reports about Merchant that American Express has requested from consumer reporting agencies. Such information will include the name and address of the agency furnishing the report. Merchant also authorizes American Express to use the reports from consumer reporting agencies for marketing and administrative purposes. Merchant understands that upon American Express' approval of the entity indicated above to accept the American Express Card, the terms and conditions for American Express ® Card Acceptance ("Terms and Conditions") will be sent to such entity along with a Welcome Letter. By accepting the American Express Card for the purchase of goods and/or services, or otherwise indicating its intention to be bound, the entity agrees to be bound by the Terms and Conditions.

If Merchant has selected (by checking the appropriate box on the Application) to receive products and/or services offered under one or more of the Third Party Agreements referenced in the Program Guide, they hereby acknowledge and agree that the executed Signature page of the Application shall also serve as a signature page for each of the respective Third Party Agreement(s) and further acknowledge that the Third Parties are relying upon the information contained on the Application all of which are incorporated by reference into the Third Party Agreements. Merchant authorizes iPayment and Bank to share and exchange the information on the Application with the Third Parties and to provide a copy of the executed signature page to the respective Third Party, if requested.

IN WITNESS WHEREOF, the undersigned Merchant has duly executed this Agreement (including the Application) as of the date(s) indicated below, and hereby confirms that Merchant has received a complete copy of the Agreement, including a completed copy of this Application, consisting of pages one (1) through four (4), together with a copy of the Program Guide (the "Agreement").

| | |
|---|---|
| Applicant/Merchant Legal Name | Applicant/Merchant DBA Name |
| _Rachel Eastm_____  _____ | _____  _____ |
| Authorized Signature                    Date | Print Name                              Title |
| APPROVED/ACCEPTED: | APPROVED/ACCEPTED: |
| By: _____  Date: _____ | By: _____  Date: _____ |
| Wells Fargo Bank, N.A. 1200 Montego Way, Walnut Creek, CA 94598 | iPayment, Inc. 26707 West Agoura Road, Suite 100, Calabasas, CA 91302 |

## CONTINUING PERSONAL GUARANTY PROVISION - PERSONAL GUARANTOR(S):

Each signer below ("You" or "Your") agrees as follows. You, in Your individual capacity (even though You use a title or other designation with Your signature) unconditionally guarantee and promise to pay to Wells Fargo and iPayment all indebtedness of the Applicant at any time arising under or relating to the Agreement, including the related application and any related agreements or instruments, and any First Data Lease if applicable as well as any extensions, modifications, or renewals thereof. You authorize the Wells Fargo and/or its agent(s) and iPayment to investigate the individual business history of Applicant and each representative signing the Agreement, including Yourself, including investigative credit reports, in order to evaluate acceptability into the Wells Fargo Merchant Services Merchant Program and if accepted, to conduct further investigations from time to time thereafter and to report credit information to others. The obligations hereunder are joint and several and independent of the obligations of the Applicant. You acknowledge that a separate action or actions may be brought and prosecuted against You whether action is brought against Applicant or any other person, or whether the Applicant or any other person is joined in any such action or actions. You acknowledge that this guaranty is absolute and unconditional, there are no conditions precedent to the effectiveness of this guaranty, and this guaranty is in full force and effect and is binding on You in Your individual capacity as of the date you sign this Application, regardless of whether Wells Fargo and iPayment obtains collateral or any guaranties from others or takes any other action contemplated by You. As guarantor, You waive (i) presentment, demand, protest, notice of protest, and notice of nonpayment; (ii) any defense arising by reason of any defense of the Applicant or other guarantor; and (iii) the right to require Wells Fargo to proceed against Applicant or any other guarantor, to pursue any remedy in connection with the guaranteed indebtedness, or to notify You as guarantor of any additional indebtedness incurred by the Applicant, or of any changes in the Applicant's financial condition. You also authorize Wells Fargo and iPayment, without notice or consent, to (i) extend, modify, compromise, accelerate, renew, or other wise change the terms of the guaranteed indebtedness; (b) proceed against one or more guarantors without proceeding against the Applicant or another guarantor; and (c) release or substitute any part to the indebtedness or this guaranty.

You represent and warrant to Wells Fargo and iPayment that: (a) Wells Fargo and iPayment has made no representation to You as to the creditworthiness of the Applicant; and (b) You have established adequate means of obtaining from the Applicant on a continuing basis financial and other information pertaining to Applicant's financial condition. You agree to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Your risks hereunder, and You further agree that Wells Fargo and iPayment shall have no obligation to disclose to You any information or material about the Applicant which is acquired by Wells Fargo and iPayment in any manner.

You acknowledge and agree that until all obligations subject to this guaranty shall have been paid in full, You shall have no right of subrogation, and You waive any right to enforce any remedy which Wells Fargo and iPayment now has or may hereafter have against the Applicant or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Wells Fargo and iPayment. You agree that this guaranty will be governed by California law; and shall benefit Wells Fargo, iPayment and its successors and assigns.

You understand that this is a Guaranty of payment and not of collection and that Wells Fargo Bank, N.A., Wells Fargo Merchant Services, L.L.C., and iPayment are relying on this Guaranty in entering into the Agreement.

| | | |
|---|---|---|
| _Rachel Eastm_____, An Individual | _____ | _____ |
| Signature | Print Name | Date |
| _____, An Individual | _____ | _____ |
| Signature | Print Name | Date |

## ASSOCIATION DISCLOSURE

Wells Fargo Bank, N.A. ("Bank") is the Member Bank (Acquirer) named in the Merchant Agreement.

**The Bank's mailing address and phone number are:**

Wells Fargo Bank, N.A.
Map A0347-023
1200 Montego Way
Walnut Creek, CA 94598
Phone number is: 1-925-746-4172

**Important Member Bank Responsibilities:**

(a)    The Bank is the only entity approved to extend acceptance of Association products directly to a merchant.
(b)    The Bank must be a principal (signer) to the Merchant Agreement.
(c)    The Bank is responsible for educating merchants on pertinent Visa and MasterCard Rules with which Merchants must comply; but this information may be provided to you by Processor.
(d)    The Bank is responsible for and must provide settlement funds to the merchant.
(e)    The Bank is responsible for all funds held in reserve that are derived from settlement.

**The Merchant's name, mailing address and phone number are:**

Merchant Name: _____

Merchant Address: _____

Merchant Phone: _____

**Some Important Merchant Responsibilities:**

(a)    Ensure compliance with Cardholder data security and storage requirements.
(b)    Maintain fraud and chargebacks below thresholds.
(c)    Review and understand the terms of the Merchant Agreement.
(d)    Comply with Association Rules.

The responsibilities listed above **do not supersede** terms of the Merchant Agreement and are provided to ensure that Merchant understands some important obligations of each party.  **This Disclosure page must be dated and signed by the Merchant's principal owner or authorized officer, which signature confirms that he/she has reviewed a copy of this document and that Merchant must be (and has been) provided with an executed copy of this Disclosure page at the time it is signed (which Merchant must retain) as well as a copy of the completed Merchant Application executed by Merchant (and Merchant Agreement).**

Sales Representative Name: _____

| | |
|---|---|
| _Rachel Eastman_ | |
| Merchant's Signature | Merchant's Printed Name |
| VP | |
| Title | Date |

Revision 0608.ML

**MERCHANT LYNX**
ADDENDUM TO MERCHANT AGREEMENT

**PURCHASE AGREEMENT**
**AND RECEIPT FOR FUNDS**

Legal Name _Academic Software Inc_          DBA _Academic Software_

Sales Rep _____          Date _9/11/c1_

The undersigned (Merchant) agrees to purchase the following goods and services from Merchant Lynx on the date hereof.*

| QTY | EQUIPMENT DESCRIPTION OR REPROGRAM INSTRUCTIONS | EACH | TOTAL |
|---|---|---|---|
| 1 | Manual Imprinter (Merchant must initial waiver if not purchasing) | $ 35.00 | $ 35.00 |

Hours of operation:

Website address: www.

Cell phone number:

Special Instructions:

| | | | |
|---|---|---|---|
| | | $ | $ |
| | Sub Total | $ | $ |
| *Merchant acknowledges a non- refundable application fee | Sales Tax (7%) | $ | $ |
| | Total | $ | $ |

Merchant hereby authorizes Merchant Lynx Services to initiate and /or transmit automatic credit and/or debit entries to the Account and Depository identified in the attached voided check (hereafter, "Merchant's Account"). Said authority includes, but is not limited to, the initiation and transmission of such entries, request, or orders as may be necessary to charge Merchant's Account for any fees or other amounts payable by Merchant to Merchant Lynx Services under the terms of the Merchant Bankcard Agreement and Purchase Agreement.

Merchant understands and agrees that upon signing any Lease Documents, the Merchant will be held fully responsible for the entire length of the Lease Agreement from the date of the actual signatures. In the event of a Lease Default or Decline by the undersigned Merchant, the Lease Agreement will be assigned back to Merchant Lynx Services and debited at such time in its entirety by Merchant Lynx Services through the (ACH) Automated Clearing House. Merchant understands that Merchant Lynx Services shall have no liability for any negligent design or manufacture of any point of sale terminal, printer or other equipment used by Merchant for the acceptance of credit card transactions.

INVESTIGATIVE CONSUMER REPORT: An investigative or Consumer Report may be made in connection with application and applicants authorize Merchant Lynx Services, or any credit bureau or any credit reporting agency employed by Merchant Lynx Services or agents of Merchant Lynx Services to investigate the references given or any other statements or data obtained from Merchant, or any of the undersigned principals, for the purpose of this application or any application for accompanying POS terminals or equipment financing.

Merchant shall indemnify and hold Merchant Lynx Services harmless from all liability, loss and damage, including reasonable attorney's fees and costs which may arise as a result whether direct or indirect, of any act or failure to act or the breach of any warranty by Merchant pursuant to the terms of this Agreement and the Card Associations operating regulations. Warranty of all equipment, supplies, and shipping charges will be covered under a charge of ten dollars per month electronically collected on the fifth of each month. Merchant also acknowledges that any fees paid to Merchant Lynx Services at the time of sale, will not be available for refund in the event Merchant cancels agreement for any reason. Merchant agrees that any verbal agreement between the parties will not be honored unless otherwise in writing. Merchant also acknowledges that any rate guarantees or waiver in fees are subject to a period not to exceed twelve months. Merchant will give Merchant Lynx Services the opportunity to honor or match any rate offered by any competitor prior to changing service providers. Any buy-out will be subject to a six month period in which after such time will be null & voided.

The Merchant Agreement shall become effective upon issuance of a Merchant Account Number and shall be in full force and effect for a period of twenty-four months. The Merchant Agreement will renew for an additional twelve months if no notice is received in writing thirty days prior to the commencement date. Merchant also acknowledges a penalty fee of three-hundred and fifty dollars to be assessed to the account if cancelled within the first twelve months and two-hundred and fifty dollars thereafter. This is in direct accordance with the Merchant Application and Agreement set forth by IPayment, Incorporated. I have fully read and understand the terms and conditions set forth in the Merchant Application and Agreement and understand that I will receive the agreement in its entirety to include all eight pages via my welcome package.

Merchant Lynx Services will use due care in providing services covered by the Merchant Agreement and the performance of all services called for under the Agreement shall be consistent with industry standards. The liability, if any, of Merchant Lynx Services under this Agreement for any claims, costs, damages, losses and expenses for which it is or may be legally liable, whether arising in negligence or other tort, contract, or otherwise, will not exceed in the aggregate of the amount of fees paid by Merchant, less interchange and assessments, over the previous 12-month period, calculated from the date the liability accrued. In no event will Merchant Lynx Services or its agents, officers, directors or employees are liable for special or consequential damages.

I, the (Retail) Merchant understand that for all non-swiped transaction and voice authorizations approvals that take place, an imprint of the specific credit card must be preformed along with the cardholder's signature. I further understand that failure to comply with this set of procedures can result in the processing institution's denial of that particular transaction or a delay in the funding of that transaction. These procedures are in direct compliance with Visa/MasterCard regulations.

Merchant's Signature X _Rachel Eastman_          Title _Gn_          Date _9/6/11_

Please initial here if you are declining to purchase a Manual Imprinter from Merchant Lynx Services. _RE_

# Exhibit B

# Merchant Services

# Program Guide

866 474-4144


First Data.

/

Case 2:10-cv-04860-WHW-CLW   Document 52-1   Filed 09/14/09/2 Page 27 Page 37 PageID: 034

## PREFACE

Thank you for selecting us for your payment processing needs. Accepting numerous payment options provides a convenience to your customers, increases your customers' ability to make purchases at your establishment, and helps speed payment to your account.

This Program Guide presents terms governing the acceptance of Visa® MasterCard® and Discover® Network Credit Card and non-PIN Debit Card payments. The Program Guide also includes provisions applicable to American Express® and Other Services. Other Services include all services related to: JCB® Card, PIN Debit Card, and Electronic Benefits Transfer payments, TeleCheck® check services, TRS® collection services, Equipment purchase and rental, Gift Card Services, and acceptance of Cards from other Non-Bank Card Associations such as Voyager Fleet Systems, Inc. ("Voyager"), Wright Express Corporation and Wright Express Financial Services Corporation (collectively, "WEX"), Your Merchant Processing Application will indicate the types of payments and services you have elected to accept.

This Program Guide, together with your Merchant Processing Application and the Schedules thereto (the "Agreement"), contains the terms and conditions under which Processor and/or Bank and/or other third parties, such as TeleCheck for check services, will provide services to You. We will not accept any alterations or strike-outs to the Program Guide and, if made, any such alterations or strike-outs shall not apply. Please read this booklet completely as it contains important information.

### IMPORTANT INFORMATION ABOUT BANK'S RESPONSIBILITIES:

Discover Network Card Transactions and Other Services are not provided to you by Bank, but are provided by Processor and/or third parties. For PIN Debit transactions, third parties may include sponsoring or acquiring banks that are not related to Bank ("PIN Debit Sponsor Banks").

The provisions of this Agreement regarding Discover Network Card Transactions and Other Services constitute an agreement solely between you and Processor and/or third parties. Bank is not a party to this Agreement insofar as it relates to Discover Network Card Transactions, and Other Services, and Bank is not responsible, and shall have no liability, to You in any way with respect to Discover Network Card Transactions, and Other Services.

### OTHER IMPORTANT INFORMATION:

Credit Cards present risks of loss and non-payment that are different than those with other payment systems. In deciding to accept Credit Cards, you should be aware that you are also accepting these risks.

Visa U.S.A., Inc. ("Visa"), MasterCard International, Incorporated ("MasterCard") and DFS Services, LLC ("Discover Network") are payment card networks that electronically exchange Sales Drafts and Chargebacks for Credits and debits, (We will refer to Visa, MasterCard, and Discover Network as "Associations".) Sales Drafts are electronically transferred from banks (in the case of MasterCard and Visa transactions) or network acquirers (in the case of Discover Network transactions) that acquire them from merchants such as yourself (these banks and network acquirers are referred to as "Acquirers") through the appropriate Association, to the bank that issued the Cardholder's Credit Card (referred to as "Issuers"). The Issuers then bill their Cardholders for the transactions. The Associations charge the Acquirers interchange fees and assessments for submitting transactions into their systems. A substantial portion of the Discount or Transaction Fees that you pay will go toward these fees and assessments.

In order to speed up the payment process, the Issuer transfers the funds back through the Association to the Acquirer at approximately the same time that the Issuer receives the electronic Sales Drafts. Even though the payments under this system are made simultaneously, all payments made through the Associations are conditional and subject to reversals and adjustments.

Each Association has developed rules and regulations ("Association Rules") that govern their Acquirers and Issuers and the procedures, responsibilities and allocation of risk for this process. Merchants are also bound by Association Rules. The Association Rules and applicable banking laws give Cardholders and Issuers certain rights to dispute transactions, long after payment has been made to the merchant. These disputed transactions are referred to as Chargebacks.

We do not decide what transactions are charged back and we do not control the ultimate resolution of the Chargeback. While we can attempt to reverse a Chargeback to the Issuer, we can only do so if the Issuer agrees to accept it or the Association requires the Issuer to do so after a formal appeal process. Sometimes, your customer may be able to successfully charge back a Credit Card transaction even though you have provided your goods or services and are otherwise legally entitled to payment from your customer. While you may still be able to pursue claims directly against that customer, neither we nor the Issuer will be responsible for such transactions.

You will be responsible for all Chargebacks and adjustments associated with the transactions that you submit for processing.

Please refer to the Glossary for defined terms used in the Agreement.

# TABLE OF CONTENTS

**PART I: CARD SERVICES**

**A. CREDIT CARD OPERATING PROCEDURES**

1. MasterCard, Visa and Discover Network Acceptance . . . . . . . . . . . . . . . . . 3
   1.1. Card Descriptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   1.2. Effective/Expiration Dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   1.3. Valid Signature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   1.4. Users Other Than Cardholders . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   1.5. Special Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   1.6. Delayed Delivery or Deposit Balance . . . . . . . . . . . . . . . . . . . . . . 4
   1.7. Recurring Transaction and Preauthorized Order Regulations . . . 4
   1.8. Honoring Cards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   1.9. Card Acceptance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   1.10. Deposits of Principals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   1.11. Merchants in the Lodging Industry . . . . . . . . . . . . . . . . . . . . . . . . 5
   1.12. Customer Activated Terminals and Self-Service Terminals . . . . . 5
   1.13. Displays and Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   1.14. Cash Payments by and Cash Disbursements to Cardholders . . . . 5
   1.15. Discover Network Cash Over Transactions . . . . . . . . . . . . . . . . . . 5
   1.16. Telecommunication Transactions . . . . . . . . . . . . . . . . . . . . . . . . . 5
2. Suspect Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
3. Completion of Sales and Credit Drafts . . . . . . . . . . . . . . . . . . . . . . . . . 6
   3.1. Information Required . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   3.2. Mail/Telephone/Internet (Ecommerce) and
        Other Card Not Present Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   3.3. Customer Service Telephone Numbers for Cards
        Other Than MasterCard, Visa and Discover Network . . . . . . . . . . 7
4. Data Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
5. Authorizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   5.1. Card Not Present Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   5.2. Authorization via Telephone
        (Other Than Terminal/Electronic Device Users) . . . . . . . . . . . . . 8
   5.3. Authorization via Electronic Devices . . . . . . . . . . . . . . . . . . . . . . 8
   5.4. Third Party Authorization System . . . . . . . . . . . . . . . . . . . . . . . . . 8
   5.5. Automated Dispensing Machines . . . . . . . . . . . . . . . . . . . . . . . . . 8
   5.6. Pre-Authorization for T&E (Travel & Entertainment)
        and Restaurant Merchants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   5.7. Discover Network Procedure for Request for Cancellation
        of Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
6. Submission/Deposit of Sales and Credit Drafts . . . . . . . . . . . . . . . . . . 9
   6.1. Submission of Sales for Merchants Other Than Your Business . . . 9
   6.2. Timeliness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   6.3. Mail/Branch Deposit Procedures . . . . . . . . . . . . . . . . . . . . . . . . . 9
   6.4. Electronic Merchants: Daily Batching Requirements
        & Media Submission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
7. Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
8. Refunds/Exchanges (Credits) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   8.1. Refunds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   8.2. Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
9. Retention of Records for Retrievals and Chargebacks . . . . . . . . . . . . 10
   9.1. Retain Legible Copies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   9.2. Provide Sales and Credit Drafts . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   9.3. Ensure Proper Retrieval Fulfillment . . . . . . . . . . . . . . . . . . . . . . . 10

10. Chargebacks and Other Debits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    10.1. Chargebacks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    10.2. Other Debits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    10.3. Summary (Deposit) Adjustments/Electronic Rejects . . . . . . . . . 12
    10.4. Disputing Other Debits and Summary Adjustments . . . . . . . . . . 12
11. Account Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    11.1. Change of Settlement Account Number . . . . . . . . . . . . . . . . . . . 13
    11.2. Change in Legal Name or Structure . . . . . . . . . . . . . . . . . . . . . . 13
    11.3. Change Company DBA Name, Address or
          Telephone/Facsimile Number . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    11.4. Other Changes in Merchant Profile . . . . . . . . . . . . . . . . . . . . . . 13
12. Association Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
13. Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**B. CARD GENERAL TERMS**

14. Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
15. Credit Card Operating Procedures; Association Rules . . . . . . . . . . . . 13
16. Settlement of Card Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
17. Exclusivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
18. Fees; Adjustments; Collection of Amounts Due . . . . . . . . . . . . . . . . . 13
19. Chargebacks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
20. Representations; Warranties; Limitations on Liability;
    Exclusion of Consequential Damages . . . . . . . . . . . . . . . . . . . . . . . . . 14
21. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
22. Assignments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
23. Term; Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
24. Reserve Account; Security Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
25. Financial and Other Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
26. Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
27. Special Provisions Regarding Non-Bank Cards . . . . . . . . . . . . . . . . . 16
28. Special Provisions for PIN Debit Card . . . . . . . . . . . . . . . . . . . . . . . . 17
29. Special Provisions Regarding Electronic Benefit Transfer . . . . . . . . . 17
30. Special Provisions Regarding Wireless Services . . . . . . . . . . . . . . . . . 18
31. Choice of Law; Venue; Waiver of Jury Trial . . . . . . . . . . . . . . . . . . . 19
32. Other Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

33. Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**PART II: THIRD PARTY AGREEMENTS**

34. Equipment Lease Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
35. TeleCheck/TRS Services Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . 24

36. Additional Important Information For Cards
    36.1. Electronic Funding Authorization . . . . . . . . . . . . . . . . . . . . . . . . 28
    36.2. Funding Acknowledgement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    36.3. Additional Fees and Early Termination . . . . . . . . . . . . . . . . . . . . 28
    36.4. Addresses For Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Duplicate Confirmation Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Confirmation Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## PART I: CARDS

### A. CREDIT CARD OPERATING PROCEDURES

This part of the Program Guide (through Section 13) describes the procedures and methods for submitting Credit Card transactions for payment, obtaining authorizations, responding to Chargebacks and Media Retrieval requests, and other aspects of the operations of our services.

Processor is a full-service financial transaction processor dedicated, among other processing services, to facilitating the passage of your Sales Drafts back to the thousands of institutions who issue the MasterCard, Visa, and Discover Network Cards carried by your customers, as well as to the Independent Card Issuers of American Express, Optima, and JCB. The Operating Procedures contained in this part focus primarily on the MasterCard, Visa, and Discover Network Associations' operating rules and regulations, and seek to provide you with the principles for a sound Card program. They are designed to help you decrease your Chargeback liability and train your employees. (In the event we provide authorization, processing or settlement of transactions involving Cards other than MasterCard, Visa and Discover Network, you should also consult those independent Card Issuers' proprietary rules and regulations.)

The requirements set forth in these Operating Procedures will apply unless prohibited by law. You are responsible for following any additional or conflicting requirements imposed by your state or local jurisdiction.

### 1. MasterCard, Visa and Discover Network Acceptance

**1.1.   Card Descriptions.** At the point of sale, the Card must be carefully examined to determine whether it is a legitimate and valid Card. The name of the Card (e.g., Visa, MasterCard or Discover Network) should appear in bold letters on the Card. For all MasterCard and Visa Cards and for some Discover Network Cards, the Card Issuer (e.g., XYZ Bank, etc.) should also appear in bold letters on the Card. The following is a description of the authorized Visa, MasterCard and Discover Network Card designs:

**Visa:** Visa Cards have the Visa symbol on the right-hand side of the Card. Above the Visa symbol is the 3-dimensional hologram of the Visa Dove design. The expiration date must be followed by one space and may contain the symbol "V." Visa Cards contain a 16-digit account number embossed across the middle of the Cards and the first digit is always a four (4). In addition, Visa Cards have the first four digits of the account number printed directly below the embossed number. You must always check these numbers carefully to ensure that they are the same. Beginning January 2006, Visa has a new Card design which differs significantly from the previous description. You are required to familiarize yourself with the new design by consulting the document entitled "Rules for Visa Merchants — Card Acceptance and Chargeback Management Guidelines" (VRM 09.01.07). You may download the document free of charge from Visa's website at http://www.visa.com/merchant or order a hardcopy to be mailed to you for a nominal charge by telephoning Visa Fulfillment at 800-VISA-311. Both the old and new Visa Card designs will be circulating concurrently in the marketplace through the year 2010. Visa Cards fitting the old or new descriptions may be accepted.

**MasterCard:** MasterCard Cards are issued under the following names: MasterCard, EuroCard, Access, Union, Million and Diamond. The MasterCard symbol appears on the front or back of the Card. MasterCard and the Globe designs appear in a 3-dimensional hologram above the symbol. In addition, the words Classic, Preferred, Gold or Business may appear. MasterCard account numbers are sixteen (16) digits, and the first digit is always a five (5). The first four digits of the account must be printed directly below the embossed number. Only MasterCard Cards fitting this description may be accepted. Pursuant to an alliance with MasterCard, Diners Club Cards issued in the United States and Canada are being re-issued with a sixteen (16) digit account number the first two digits of which are now fifty-five (55) and with the MasterCard mark and hologram on the front of the Diners Club Card. These Diners Club Cards shall be accepted and processed in the same manner as MasterCard transactions. Diners Club International Cards that are issued outside the U.S. and Canada may be re-issued with the MasterCard mark on the back of the Card. These Diners Club Cards will have account numbers that are fourteen (14) digits, the first two digits or which are thirty-six (36). When these Diners Club Cards are used within the United States, Canada and other designated areas, they will be processed as MasterCard transactions. Beginning January 2006, MasterCard has a new Card design significantly different from the previous description. You are required to familiarize yourself with the new design by consulting a document "MasterCard Card Identification Features." You may download the document free of charge from MasterCard's website at http://www.mastercardmerchant.com. Both the old and new MasterCard designs will be circulating concurrently in the marketplace through the year 2010. Only MasterCard Cards fitting the old or new descriptions may be accepted .

**Discover Network:** Most standard, rectangular Discover Network Cards display the Discover Network Acceptance Mark in the lower right corner on both sides of the Card or, through October 2008, the Discover Network/Novus Acceptance mark only on the back of the Card. After October 2008, however, Discover Network Cards will only display the Discover Network Acceptance Mark on both sides of the Card. Either the words "DISCOVER" or "DISCOVER NETWORK" appear in ultraviolet ink on the front of the Card which becomes visible when held under an ultraviolet light. Discover Network account numbers are sixteen (16) digits contained on clear and uniform size and spacing, and where a hologram is present, the last four digits of the account number extend into the hologram. Cards issued before April 15, 2006 will display either a circular or rectangular three-dimensional hologram of a globe with an arrow through it. Newer Cards will have a holographic magnetic stripe, and the holographic globe art on the front of the Card will not be present. The embossed expiration date, if present, appears in a MM/YY format below the words "Valid Thru." An underprint of the word "VOID" becomes visible on the signature line of Discover Network Cards if erasure of the signature is attempted. Most standard, rectangular Discover Network Cards have the cardholder's name embossed on the front of the Card and a scripted "D" embossed beneath the account number on the front of the card on the same line as the embossed expiration date. Also, for most standard, rectangular Cards the account number or last four (4) digits of the account number appear in reverse indent printing on the signature panel and must match the last four (4) digits of the account number embossed on the front of the Card. Standard, rectangular plastic, stored value Cards are not required to bear the cardholder name, and for certain merchants, may not bear the globe pattern hologram or the Discover Network Acceptance Mark. Valid Cards will not always be rectangular in shape (e.g., Discover Network 2GO™ cards). Discover Network may implement new Card designs and/or security features. You are required to remain familiar with Discover Network Card designs and may reference the document "Discover Network Security Features." You may download the document free of charge from Discover Network's website at http://www.discovernetwork.com/merchants/home/data/index.html.

**1.2.   Effective/Expiration Dates.** At the point of sale, the Card should be carefully examined for the effective (valid from) (if present) and expiration (valid thru) dates which are located on the face of the Card. The sale date must fall on or between these dates. Do not accept a Card prior to the effective date or after the expiration date. Otherwise, you are subject to a Chargeback and could be debited for the transaction.

**1.3.   Valid Signature.** Check the back of the Card. Make sure that the signature panel has not been disfigured or tampered with in any fashion (an altered signature panel may appear discolored, glued or painted, or show erasure marks on the surface). The signature on the back of the Card must compare favorably with the signature on the Sales Draft. The Sales Draft must be signed by the Card presenter in the presence of your authorized representative (unless a Card Not Present Sale) and in the same format as the signature panel on the Card; e.g., Harry E. Jones should not be signed H.E. Jones. The signature panels of Visa, MasterCard and Discover Network Cards now have a 3-digit number (CVV 2/CVC 2/CID) printed on the panel known as the Card Validation Code.

**Visa:** If the signature panel on the Card is blank, in addition to requesting an Authorization, you must do all the following:

- Review positive identification bearing the Cardholder's signature (such as a passport or driver's license that has not expired) to validate the Cardholder's identity.
- Indicate the positive identification, including any serial number and expiration date, on the transaction receipt.
- Require the Cardholder to sign the signature panel of the Card prior to completing the Transaction.

**MasterCard:** If the Card is not signed and the Cardholder refuses to sign the Card, do not accept it for a transaction. If the Cardholder is willing to sign the Card in your presence, request two pieces of valid and current identification (e.g., driver's license, another payment Card, etc.).

**Discover Network:** If the Card is not signed you must request two pieces of valid and current identification, one of which must be a government issued picture identification. After you confirm that the person presenting the Card is the Cardholder, require the Cardholder to sign the back of the Card.

**1.4.   Users Other Than Cardholders.** A Cardholder may not authorize another individual to use his/her Card for purchases. Be sure the signature on the Card matches with the one on the Sales Draft. Furthermore, any Card having two signatures on the back panel is invalid and any sale made with this Card can result in a Chargeback. For Cards bearing a photograph of the Cardholder, ensure that the Cardholder appears to be the person depicted in the picture which appears on the Card. If you have any questions, call the Voice Authorization Center and request to speak to a Code 10 operator.

**1.5.   Special Terms.** If you limit refund/exchange terms or impose other specific conditions for Card sales, the words "No Exchange, No Refund," etc. must be clearly printed (in 1/4" letters) on the Sales Draft near or above the Cardholder's signature. The Cardholder's copy, as well as your copy, must clearly show this information.

During a liquidation and/or closure of any of your outlets, locations and/or businesses, you must post signs clearly visible to customers stating that "All Sales Are Final," and stamp the Sales Draft with a notice that "All Sales Are Final."

Never give cash, check or in-store Credit refunds for Card sales.

NOTE: A disclosure does not eliminate your liability for a Chargeback. Consumer protection laws and Association Rules frequently allow the Cardholder to dispute these items notwithstanding such disclosures.

**1.6.    Delayed Delivery or Deposit Balance.** In a delayed delivery transaction where a Cardholder makes a deposit toward the full amount of the sale, you should execute two separate Sales Drafts (each completed fully as described in Section 3.1), the first for a deposit and the second for payment of the balance upon delivery of the merchandise or the performance of the services.

**Visa:** For Visa transactions, you must obtain an authorization if the cumulative total of both Sales Drafts exceeds the floor limit. You must obtain an authorization for each Sales Draft on each transaction date. You must assign the separate authorization numbers to each Sales Draft, respectively. You must note on each Sales Drafts the words "delayed delivery," "deposit" or "balance", as appropriate, and the authorization dates and approval codes.

**MasterCard:** For MasterCard transactions, you must obtain one authorization. You must note on both Sales Drafts the words "delayed delivery," "deposit" or "balance," as appropriate, and the authorization date and approval code.

**Discover Network:** For Discover Network transactions, you must label one Sales Draft "deposit" and the other "balance," as appropriate. You must obtain the "deposit" authorization before submitting the sales data for the "deposit" or the "balance" to us. If delivery of the merchandise or service purchased will occur more than thirty (30) calendar days after the "deposit" authorization, you must obtain a subsequent authorization for the "balance." In addition, you must complete Address Verification at the time of the "balance" authorization, and you must obtain proof of delivery upon delivery of the services/merchandise purchased. You may not submit sales data relating to the "balance" to us for processing until the merchandise/service purchased has been completely delivered.

NOTE: For MasterCard and Visa transactions, if delivery is more than twenty-five (25) days after the original transaction date (and the initial authorization request (as opposed to the thirty (30) days in Discover Network transactions), you should reauthorize the unprocessed portion of the transaction prior to delivery. If the transaction is declined, contact the Cardholder and request another form of payment. For example: On January 1, a Cardholder orders $2,200 worth of furniture and you receive an authorization for the full amount; however, only a $200 deposit is processed. The above procedures are followed, with a $2,000 balance remaining on the furniture; the $2,000 transaction balance should be reauthorized.

**1.7.    Recurring Transaction and Preauthorized Order Regulations.** If you process recurring transactions and charge a Cardholder's account periodically for recurring goods or services (e.g., monthly insurance premiums, yearly subscriptions, annual membership fees, etc.), the Cardholder shall complete and deliver to you a Cardholder approval for such goods or services to be charged to his account. The approval must at least specify the Cardholder's name, address, account number and expiration date, the transaction amounts, the timing or frequency of recurring charges and the duration of time for which the Cardholders permission is granted. For Discover Network transactions, the approval must also include the total amount of recurring charges to be billed to the Cardholder's account, including taxes and tips and your Merchant Number.

If the recurring transaction is renewed, the Cardholder must complete and deliver to you a subsequent written request for the continuation of such goods or services to be charged to the Cardholder's account. You may not complete a recurring transaction after receiving a cancellation notice from the Cardholder or Issuer or after a request for authorization has been denied.

If we or you have terminated your Merchant Agreement, you may not submit authorization requests or sales data for recurring transactions that are due after the termination date of your Merchant Agreement.

You must obtain an authorization for each transaction and write "Recurring Transaction" (or "RO." for MasterCard transactions) on the Sales Draft in lieu of the Cardholder's signature. A positive authorization response for one recurring transaction Card Sale is not a guarantee that any future recurring transaction authorization request will be approved or paid.

For all recurring transactions, You must submit the 3-digit Card Validation Code number with the first authorization request, but not subsequent authorization requests. Discover Network Association Rules specifically require that you follow this Card Validation Code procedure for Discover Network recurring transactions.

Also, for Discover Network recurring transactions, the Sales Draft must include a general description of the transaction, your merchant name and a toll-free customer service number that the Cardholder may call to obtain customer assistance from you or to cancel the written approval for the recurring transaction.

All Recurring Transactions or Preauthorized Orders may not include partial payments for goods or services purchased in a single transaction.

You may not impose a finance charge in connection with a Recurring Transaction or Preauthorized Order.

If you process recurring payment transactions, the Recurring Payment Indicator must be included in each authorization request. Penalties can be assessed by the Associations for failure to use the Recurring Payment Indicator.

**1.8.    Honoring Cards.** The following rules are requirements strictly enforced by Visa, MasterCard and Discover Network:

*   You cannot establish minimum or maximum amounts as a condition for accepting a Card, except that for Discover Network transactions, you may limit the maximum amount a Discover Network Cardholder may spend if, and only if, you have not received a positive authorization response from the Card Issuer

*   You cannot impose a surcharge or fee for accepting a Card.

*   You cannot establish any special conditions for accepting a Card.

*   You cannot establish procedures that discourage, favor or discriminate against the use of any particular Card. However, you may choose not to accept either U.S. Issued Debit Cards or U.S. Issued Credit Cards under the terms described in Section 1.9.

*   You cannot require the Cardholder to supply any personal information (e.g., home or business phone number, home or business address; or driver's license number) unless instructed by the Authorization Center. The exception to this is for a mail/telephone/internet order or delivery-required transaction, and zip code for a card-present key-entered transaction in order to obtain an Address Verification ("AVS"). Any information that is supplied by the cardholder must not be in plain view when mailed.

*   Any tax required to be collected must be included in the total transaction amount and not collected in cash.

*   You cannot submit any transaction representing the refinance or transfer of an existing Cardholder obligation deemed uncollectible.

*   You cannot submit a transaction or sale that has been previously charged back.

*   You must create a Sales or Credit Draft for each Card transaction and deliver at least one copy of the Sales or Credit Draft to the Cardholder.

*   You cannot submit a transaction or sale to cover a dishonored check.

*   If you accept Card checks, your Card check acceptance policy must treat the acceptance of checks from all payment card brands that you accept equally (e.g., if you accept MasterCard, Visa and Discover Network, your check acceptance policy must treat checks for all three payment card brands equally). You should handle these Card checks like any other personal check drawn upon a bank in the United States.

*   Failure to comply with any of the Association Rules may result in fines or penalties.

**1.9.    Card Acceptance.** If you have indicated either in the Application or by registering with us at least thirty (30) days in advance that, as between Non-PIN Debit Card transactions and Credit Card transactions, you will limit your acceptance to either (i) only accept Non-PIN Debit transactions; or (ii) only accept Credit Card transactions, then the following terms in this Section 1.9 will apply:

**1.9.1.** You will be authorized to refuse to accept for payment either Non-PIN Debit Cards or Credit Cards that are issued within the United States. You will, however, continue to be obligated to accept all foreign issued Credit or Debit Cards issued by MasterCard, Visa or Discover Network so long as you accept any type of MasterCard, Visa or Discover Network branded Card.

**1.9.2.** While many Debit Cards include markings indicating debit (such as "Visa Checkcard, Visa Buxx, Gift Card, DEBIT, or Mastermoney), many Debit Cards do not include any such markings and will not have such markings until January 2007, It will be your responsibility to determine at the point of sale whether a Card is of a type that you have indicated that you will accept. You agree to institute appropriate systems and controls to limit your acceptance to the Card types indicated. You may purchase a table of ranges of numbers currently associated with Debit Card transactions upon execution of confidentiality/non-disclosure agreements required by the Associations. You will be responsible for updating your systems to utilize such tables and to obtain updated tables.

**1.9.3.** To the extent that you inadvertently or unintentionally accept a transaction that you are not registered to accept, such transaction will downgrade and you will be charged the Non Qualified Rate or, if you are utilizing the Enhanced Recovery Reduced Discount option, you will be charged the Enhanced Recovery Reduced Rate on the volume of said transaction that Client was not registered to accept, in addition to the difference between the MasterCard/Visa/Discover Network Qualified Rate agreed to in Section 9 of the Service Fee Schedule and the actual interchange rate assessed to the downgraded transaction.

**1.9.4.** Based upon your choice to accept only the Card types indicated in the application, you may remove from your premises any existing signage indicating that you accept all Visa, MasterCard or Discover Network Cards and use approved specific signage reflecting your policy of accepting only Non-PIN Debit or Credit Cards.

**1.9.5.** Even if you elect not to accept PIN Debit Card transactions as provided above, you may still accept PIN Debit Card transactions if you have signed up for PIN Debit Card Services. The terms in Section 28 shall apply to such services.

as the "designated protocol." You shall accept only those Internet Discover Network Card transactions that are encrypted in accordance with the designated protocol. As of the date of these Operating Procedures, the designated protocol for the encryption of data is Secure Socket Layer (SSL). We may, at our discretion, Withhold Settlement until security standards can be verified. However, the designated protocol, including any specifications with respect to data encryption, may change at any time upon thirty (30) days advance written notice. You shall not accept any Internet Discover Network Card transaction unless the transaction is sent by means of a browser which supports the designated protocol.

**3.3.** Customer Service Telephone Numbers for Card types which are funded by individual non-bank Associations include:

| | |
|---|---|
| American Express/Optima | 1-800-528-5200 |
| JCB, International | 1-800-366-4822 |
| TeleCheck | 1-800-366-1054 |
| Voyager | 1-800-987-6591 |

**4) Data Security**

THE FOLLOWING IS IMPORTANT INFORMATION REGARDING THE PROTECTION OF CARDHOLDER DATA. PLEASE REVIEW CAREFULLY AS FAILURE TO COMPLY CAN RESULT IN SUBSTANTIAL FINES AND LIABILITIES FOR UNAUTHORIZED DISCLOSURE AND TERMINATION OF THIS AGREEMENT.

**4.1.** Payment Card Industry (PCI) Data Security. Visa, MasterCard, American Express, Discover Network and JCB aligned data security requirements to create a global standard for the protection of Cardholder data. The resulting PCI Data Security Standard defines the requirements with which all entities that store, process, or transmit payment card data must comply. PCI is the name used to identify those common data security requirements. The Cardholder Information Security Program (CISP) is Visa USA's data security program, the Site Data Protection (SDP) program is MasterCard's data security program and Discover Network's Information Security and Compliance (DISC) is Discover Network's data security program, each based on the PCI Data Security Standard and industry aligned validation requirements. PCI enables Acquirers, Issuers and merchants to implement a single security program, based on common security requirements, validation requirements, and tools, to ensure the protection of Cardholder data. PCI compliance validation is focused on any system(s) or system component(s) where Cardholder data is retained, stored, or transmitted, including:

- All external connections into your network (i.e., employee remote access, third party access for processing, and maintenance);
- All connections to and from the authorization and settlement environment (i.e., connections for employee access or for devices such as firewalls, and routers); and
- Any data repository outside of the authorization and settlement environment.

The Associations or we may impose fines or penalties, or restrict you from accepting Cards if it is determined that you are not compliant with the applicable data security requirements. We may in our sole discretion, suspend or terminate Card processing services under your Merchant Agreement for any actual or suspected data security compromise.

The PCI Data Security Standard and detailed information including the PCI Self-Assessment Questionnaire which you should complete, can be found at the PCI Data Security Council's website: www.pcisecuritystandards.org.

Detailed information about Visa's CISP program can be found at Visa's CISP website: www.visa.com/cisp.

Detailed information about MasterCard's SDP program can be found at the MasterCard SDP website: https://sdp.mastercardintl.com.

The PCI Data Security Standard and information about DISC can be found at Discover Network's DISC website: http://www.discovernetwork.com/resources/data/data_security_overview.html.

**4.2.** You must comply with the data security requirements shown below:

- You must install and maintain a secure network firewall to protect data across public networks.
- You must encrypt stored data and data sent across networks.
- You must use and regularly update anti-virus software and keep security patches up-to-date.
- You must restrict access to data by business "need to know" assign a unique ID to each person with computer access to data and track access to data by unique ID.
- Don't use vendor-supplied defaults for system passwords and other security parameters.
- You must regularly test security systems and processes.
- You must maintain a policy that addresses information security for employees and contractors.
- You must restrict physical access to Cardholder information.
- You may not transmit Cardholder account numbers to Cardholders for Internet transactions.

- You cannot store or retain Card Validation Codes (three-digit values printed in the signature panel of most Cards, and a four-digit code printed on the front of an American Express Card).
- You cannot store or retain Magnetic Stripe data, PIN data or AVS data. Only Cardholder account number, Cardholder Name and Cardholder expiration date can be retained subsequent to transaction authorization.
- You must destroy or purge all Media containing obsolete transaction data with Cardholder information.
- You must keep all systems and Media containing Card account, Cardholder, or transaction information (whether physical or electronic) in a secure manner so as to prevent access by, or disclosure to any unauthorized party.
- For Internet transactions, copies of the transaction records may be delivered to Cardholders in either electronic or paper format.

**4.3.** You may be subject to and we retain the right to conduct an audit performed by us or a third party designated by us to verify your compliance with security procedures and these Operating Procedures.

**4.4.** In the event that transaction data is accessed or retrieved by any unauthorized person or entity, contact us immediately, and in no event more than 24 hours after becoming aware of (i) any suspected or actual data security breach and (ii) any non-compliance by you with the security requirements.

**4.5.** You must, at you own expense (i) perform or cause to be performed an independent investigation (including a forensics analysis) of any data security breach of Card or transaction data, (ii) perform or cause to be performed any remedial actions recommended by any such investigation, and (iii) cooperate with us in the investigation and resolution of any security breach.

**4.6.** Required Information for Discover Network Security Breaches. For security breaches involving Discover Network transactions and/or data, you must provide us and/or Discover Network with the following information: (i) the date of breach; (ii) details concerning the data compromised (e.g., account numbers and expiration dates, Cardholder names and addresses, etc.); (iii) the method of such breach; (iv) your security personnel contacts; (v) the name of any person (including law enforcement) assisting you with your investigation of such breach; and (vi) any other information which we reasonably request from you concerning such breach, including forensics reports. You shall provide such information as soon as practicable, and the items listed in (i)-(v) shall be provided to us in any event within 48 hours of your initial notification to us of the breach. Discover Network reserves the right to conduct on-site visits to ensure compliance with its requirements.

**4.7.** Third Parties. The data security standards set forth above also apply to any agent or third party provider that you may use to store, process or transmit Cardholder data. In addition, such agents or third party providers must be registered with the applicable Association. Therefore, you must:

- Notify us in writing of any agent or third party processor that engages in, or proposes to engage in, the storing, processing or transmitting of Cardholder data on your behalf, regardless of the manner or duration of such activities.
- Ensure that all such agents or third party processors are (i) registered with the applicable payment card brands; and (ii) comply with all applicable data security standards, including, without limitation, the PCI Data Security Standard.

You are solely responsible for the compliance of any and all third parties that are given access by you, to Cardholder data, and for any third party software that you may use.

**5) Authorizations**

Each authorization request you submit to us must fully comply with the applicable provisions of this Agreement. Submission of an authorization request that does not fully comply may result in assessment of additional fees to you, a declined authorization response or a Chargeback to you.

You must obtain an Authorization Approval Code from us (or as provided in Section 5.4) for all transactions. A positive authorization response for MasterCard and Visa transactions remains valid for thirty (30) days. A positive authorization response for Discover Network transactions remains valid for ninety (90) days.

Failure to obtain an Authorization Approval Code for a sales transaction may result in a Chargeback and/or the termination of your Agreement. Authorization Approval Codes can be obtained through your POS Terminal or a Voice Response Unit ("VRU"). Any fees related to authorizations will be charged for a request for an Authorization Approval Code, whether or not the transaction is approved.

Do not attempt to obtain an Authorization Approval Code provided by someone other than us except as described in Section 5.4. If a Cardholder or another service provider provides you with either an authorization number or with a telephone number for obtaining authorizations, the Authorization Approval Code you receive may not be valid. Even if the transaction is initially processed and funded, it may be charged back at a later date. Also, if you receive a purported Authorization Approval Code from someone other than us, we will not have the supporting records and will be unable to verify that you received the authorization if that is later questioned in a Chargeback.

An Authorization Approval Code only indicates the availability of credit on an account at the time the authorization is requested. It does not warrant that the person presenting the Card is the rightful Cardholder, nor is it a promise or guarantee that you will not be subject to a Chargeback.

If you obtain Address Verification, you must review the AVS response separately from the authorization response and make your own decision about whether to accept the transaction. A transaction can receive an Authorization Approval Code from the Card Issuer even if AVS is unavailable or reflects that the address provided to you does not match the billing address on file at the Issuer. If the authorized Cardholder disputes such a transaction, you will be responsible for the resulting Chargeback.

If you receive a Referral response to an attempted authorization, you may not submit the transaction without calling for and receiving a voice authorization. After receiving a Referral response you may not attempt another authorization on the same Card through your POS Terminal.

If you fail to obtain an Authorization Approval Code or if you submit a Card transaction after receiving a decline (even if a subsequent authorization attempt results in an Authorization Approval Code), your transaction may be assessed fines or fees by the Associations for which you will be responsible. These currently range from $25 to $150 per transaction. To avoid these costs, always obtain an Authorization Approval Code directly from your terminal before submitting a transaction for settlement.

For Cards other than MasterCard, Visa and Discover Network (e.g., American Express, JCB, etc.) or for check acceptance, you must follow the procedures for authorization and acceptance for each.

You may not attempt to obtain multiple authorizations for a single transaction. If a sale is declined, do not take alternative measures with the same Card to obtain an approval of the sale from other authorization sources. Instead, request another form of payment. If you accept and process a transaction that was declined, or attempt multi-transactions and/or multi-authorizations, you are subject to a Chargeback, Association fines and/or cancellation of your Agreement.

**5.1.  Card Not Present Transactions.** You must obtain the 3-digit Card Validation Code (CVV2, CVC2, CID) and submit this Code with all authorization requests with respect to transactions where the Card is not present (e.g., telephone, mail or internet sales). However, for recurring transaction authorizations you should submit the Card Validation Code with the first authorization request only, and not with subsequent recurring transaction authorization requests. (See Section 1.7).

**NOTE:** For each Card Not Present Discover Network transaction, you must also verify the name and billing address of the Discover Network Cardholder using the Address Verification System (AVS), and if you do not receive a positive match, do not process the Discover Network Card Not Present transaction.

**5.2.  Authorization via Telephone (Other Than Terminal/Electronic Device Users).**

- Call your designated voice authorization toll free number and enter the authorization information into the VRU using a touch tone phone or hold for an authorization representative.

- If advised to pick up a Card, use reasonable and peaceful means to do so, and do not take any action that will alarm or embarrass the Card presenter. You will bear all responsibility for claims, liabilities, costs and expenses as a result of any action by you, your employees, vendors or agents, that attempt to retain a Card without the Issuer's direct request or failure to use reasonable, lawful means in retaining or attempting to retain the Card. Forward the Card to: Attn: Rewards Department, P.O. Box 5019, Hagerstown, MD 21740. You may be paid a reward for the return of the Card.

- On occasion, the Authorization Center will ask you to obtain identification from the Cardholder before issuing an approval code. If you are instructed to do so, clearly write the appropriate identification source and numbers in the space provided on the Sales Draft unless otherwise prohibited by law.

- If the sale is declined, please remember that our operators are only relaying a message from the Card Issuer. The fact that a sale has been declined should not be interpreted as a reflection of the Cardholder's creditworthiness. The Cardholder should be instructed to call the Card Issuer.

**5.3.  Authorization via Electronic Devices.**

- If you use an electronic terminal to obtain an Authorization Approval Code, all sales should be authorized through this equipment. Authorizations through other methods will result in additional charges to you.

- If your terminal malfunctions, refer to your Quick Reference Guide, if necessary, or call the POS Help Desk. The problem will either be corrected promptly or may require terminal programming or replacement. During the period in which your terminal is not functioning, remember to check it periodically since most terminal problems are temporary in nature and are quickly corrected.

- If a terminal is moved or if wires are disconnected, causing malfunction, call the POS Help Desk immediately and follow their instructions. You may be responsible for any service charges incurred for reactivation of the terminal.

- Until the terminal becomes operable, you must call your designated voice authorization toll free number and enter authorization information into the VRU using a touchtone phone. During this time, each transaction must be imprinted using a manual imprinter machine. Failure to obtain an Authorization Approval Code and to imprint these transactions could result in a Chargeback to your account.

**5.4.  Third Party Authorization System.** If you have contracted with another authorization network to obtain Credit Card authorization, i.e., your terminal can Split Dial, liability resulting from discrepancies with that network must be resolved between you and that network. We will not research Chargebacks resulting from Authorization Approval Codes obtained from another authorization service organization. Such Chargebacks will be passed through to you for resolution. If an authorization provided by a third party authorization system is challenged in a Chargeback, you must obtain proof (e.g., third party authorization logs) from the authorization source and submit it to us within the time frame specified on the Chargeback documentation.

IF YOU CONTRACTED TO USE ONE OF OUR AUTHORIZATION SERVICES, DO NOT USE ANOTHER THIRD PARTY SYSTEM WITHOUT NOTIFYING CUSTOMER SERVICE. OTHERWISE, WE WILL BE UNABLE TO SUCCESSFULLY RESEARCH AND DEFEND ANY AUTHORIZATION RELATED CHARGEBACKS ON YOUR BEHALF. THIS DELAY WILL SIGNIFICANTLY DECREASE YOUR TIME TO RESEARCH AND PROVIDE PROOF OF AUTHORIZATION, THUS REDUCING YOUR OPPORTUNITY TO REVERSE A CHARGEBACK.

If you utilize another authorization network, you will be responsible for the downgrade of any transactions to a higher cost Interchange that result from a mismatch of information to our systems and those of third party authorization networks (see Section 18.1).

If you use a third party authorization network, you must also comply with Section 4.7.

Call the following for other Card types:

| | |
|---|---|
| American Express/Optima | 1-800-528-2121 |
| JCB, International | 1-800-522-9345 |
| TeleCheck | 1-800-366-5010 |
| Voyager | 1-800-987-6589 |

Available 24 hours/day; 7 days/week.

All approved sales authorized in this manner must be entered manually as "post authorization" transactions into the terminal, once the terminal becomes operational. All Credit transactions must be entered into the terminal for data capture. You may be subject to a Chargeback if you receive a Referral and subsequently receive an approval. To reduce the risk of such a Chargeback, the Card should be imprinted using a manual imprinter machine. (For specific procedures on Electronic Data Capture, refer to the Terminal Operating Instructions/Users Guide.) If the terminal malfunctions for more than twenty-four (24) hours, contact Customer Service for further instructions on processing your transactions.

**5.5.  Automated Dispensing Machines.** Records must be produced for all transactions whose origin and data capture use automated dispensing machines or limited amount terminals. Records should include the Cardholder account number, merchant's name, terminal location, transaction date and amount.

**5.6.  Pre-Authorization for T&E (Travel & Entertainment) and Restaurant Merchants.** If you are a business engaged in providing travel and/or entertainment services (e.g., car rentals, hotels, motels, etc.) or a restaurant business, and engage in the practice of "pre-authorization" you must comply with the following general procedures:

- A hotel, motel, or car rental merchant may obtain an estimated Visa, MasterCard or Discover Network authorization at the time of check-in. For Visa, restaurants must not add an estimated tip amount to the authorization request beyond the value of the goods provided, or services rendered, plus any applicable tax.

- You must notify the Cardholder of the dollar amount you intend to "Pre-Authorize."

- If the customer decides to use another form of payment (e.g., cash, check, etc.) you must promptly call the Voice Authorization Response Unit to delete the authorization hold. Provide the Cardholder's account number, original dollar amount and date of the transaction, and the authorization code. If a new transaction takes place, a new imprinted and signed Sales Draft for the exact amount and a new authorization code for that amount must be obtained.

- VEHICLE RENTAL PROVIDERS MAY NOT INCLUDE POTENTIAL VEHICLE DAMAGE OR INSURANCE DEDUCTIBLES IN ANY PREAUTHORIZATIONS.

For MasterCard and Visa:

- If you receive a decline on a transaction, you must wait twenty-four (24) hours before attempting to reauthorize. If you reauthorize prior to this time frame and receive an approval, you may be subject to a Chargeback and a fine imposed by the Associations.

- Hotels, motels, and car rental merchants are allowed up to a 15% variance above the amount authorized. If the final amount charged to the Cardholder exceeds the original estimate by more than 15% above the preauthorization, you must authorize any additional amounts, and all incremental authorization codes must be written in the Authorization area along with the date of authorization and the amount authorized.

- Restaurants are allowed up to a 20% (instead of 15%) variance above the amount authorized, if the final amount exceeds the amount "authorized" by more than 20%, you must authorize the additional amount.

**For Discover Network:**

- You should obtain an authorization for the initial estimated charges and then monitor the charges to ensure that the actual charges made do not exceed the estimated charges. If the actual charges exceed the amount of the initial estimated authorization (and any subsequent estimated authorizations), then you must secure a positive authorization for the additional amount. NOTE: Subsequent authorizations should only be for the additional amount of total charges and not include amounts already authorized.

- The estimated amount of any pre-authorization for lodging accommodations must be based on (i) the intended length of stay; (ii) the room rate; (iii) applicable taxes and service charges; and (iv) other miscellaneous charges as dictated by experience.

- If an authorization request is declined, no charges occurring after that date will be accepted for that Cardholder.

- You do not need to obtain a final authorization if the total sum of charges (the final amount) does not exceed 120% of the previously authorized charges. You must record the dates, authorized amounts, and their respective Authorization Approval Codes on the Sales Draft(s).

**5.7.   Discover Network Procedure for Request for Cancellation of Authorization.** If a Discover Network Card sale is cancelled or the amount of the transaction changes following your receipt of authorization for the sale, you must call your authorization center directly and request a cancellation of the authorization. An authorization may be cancelled at any time within eight (8) days of your receipt of the authorization, but must be cancelled before the sales data relating to the transaction is submitted to us, after which the authorization cannot be changed. For an authorization cancellation, you must provide us with the following information, in this order:

- The Discover Network Merchant Number used in the authorization;
- The Card number;
- The original amount of the authorization being cancelled;
- The new amount of the total transaction (if any);
- The original authorization code for the authorization being cancelled;
- The expiration date of the Card; and
- A brief reason for the authorization cancellation.

**6. Submission/Deposit of Sales and Credit Drafts**

**6.1.   Submission of Sales for Merchants Other Than Your Business.** You may present for payment only valid charges that arise from a transaction between a bona fide Cardholder and your establishment. If you deposit or attempt to deposit transactions that arise from sales between Cardholders and a different business than the one approved by us in our Agreement with you, then the transaction may be charged back, we may suspend or debit funds associated with all such transactions, and we may immediately terminate your account and the Agreement.

**6.1.1.** Factoring. For Discover Network transactions, Factoring is considered merchant fraud and strictly prohibited, unless you are registered with us as a Payment Service Provider. Factoring is the submission of authorization requests and/or Sales Drafts by a merchant for Card transactions transacted by another business. If you submit Sales Drafts on behalf of another Person, you will suffer any losses associated with the disputes of the Discover Network Card Sales. Also if any fraud is involved, you could face criminal prosecution.

**6.2.   Timeliness.** In order to qualify for the lowest Interchange Discount Rate, all Sales and Credit Drafts must be properly completed and submitted daily. If you have not received payment for submitted Sales Drafts after one (1) week from your normal payment date, contact Customer Service. Late Submission of Sales or Credit Drafts may result in increased Interchange rates or fees or in a Chargeback to you.

**6.3.   Mail/Branch Deposit Procedures.** Complete the appropriate summary form designated for your use. Imprint the completed summary with your Merchant Identification Card, if applicable, and sign it. Please do not staple or clip Sales Drafts together or to summary forms. This will distort the Cardholder's account number and may result in a summary adjustment or Chargeback to you. Mail your deposits daily to us, or, if your Agreement allows deposit at a local bank branch, you must make daily deposits.

Do not send us the merchant copies (which are for your records); submit only the Bank hard copies of the transactions. If merchant copies are submitted, they will be returned to you unprocessed.

**6.4.   Electronic Merchants Daily Batching Requirements & Media Submission.** Batches must be transmitted to us by the time indicated on the Additional Important Information page in Part IV, Section A.2 of the Agreement in order to be processed on the date of transmission. Additionally, if you deposit via magnetic tape, electronic transmissions, or Electronic Data Capture terminal, and have contracted to

send the actual Sales and Credit Drafts to us for microfilming and retrieval, the Sales and Credit Drafts (Media) must be batched daily by register/terminal following the procedures below. Failure to do so may result in a processing fee and/or a Chargeback due to our inability to retrieve the Media as requested by the Card Issuer.

- A register/terminal Batch header form must be filled out for each Batch of Media.

- The Batch header must be imprinted with your Merchant Identification Card, and all areas completed properly (i.e., Batch number, date, amount, number of items, etc.).

- The Batch/deposit total must match to the settled/reconciled amount displayed on the terminal upon closing the Batch.

- Any discrepancies between the actual Media and electronic display must be reconciled and corrected before storing the Media (for merchants who contract to hold their Media) or before sending us the copies of the deposit. Otherwise, transactions may appear to be a new Submission and may be manually keyed (causing duplicate billing to Cardholders and resulting in Chargebacks) or we may not be able to retrieve an item when requested by the Card Issuer.

- It is your responsibility to ensure that the actual Media is batched correctly and, depending on the terms of your Agreement, either stored at your location or sent to Processor. (In some cases, the actual Media is sent daily to your head office, and forwarded to Processor for microfilming.)

- You must confirm that your equipment has transmitted its Batches to us at least once daily. Even if your equipment is designed or programmed to close and submit Batches without your intervention, it is ultimately your responsibility to confirm that the Batches have been transmitted to us for processing.

**7. Settlement**

Your funds for MasterCard/Visa/Discover Network transactions will be processed and transferred to your financial institution within two (2) business days from the time a batch is received by Processor if your financial institution is the Bank. If your financial institution is not the Bank, your MasterCard/Visa/Discover Network transactions will be processed via the Federal Reserve within two (2) business days from the time a batch is received by Processor. The Federal Reserve will transfer such amounts to your financial institution.

**8. Refunds/Exchanges (Credits)**

**8.1.   Refunds.**

- You must promptly complete and submit a Credit Draft for the total amount of the refund, which must include the following information:
  - The account number and expiration date;
  - The Cardholder's name;
  - Your name, city, state and Merchant Account Number;
  - A description of the goods or services;
  - The transaction date of the Credit;
  - The total amount of the Credit; and
  - For Discover Network transactions, the approved currency used and the signature of your authorized representative or employee.

- Full refunds must be for the exact dollar amount of the original transaction including tax, handling charges, etc. (You must identify the shipping and handling charges incurred.) The refund amount may not be for more than the original Credit Card sale amount.

- All dollar amounts and other handwritten information must be clearly written. (Stray marks on the Credit Draft will render it unreadable/illegible.)

- Do not circle or underline any information on the Credit Draft.

- Imprint the draft with the same Card used by the Cardholder to make the original purchase. You should not credit an account that differs from the account used for the original transaction.

- Never give cash, check or In-store Credit refunds for Credit Card sales.

- Have the Cardholder sign the Credit Draft, give the Cardholder the appropriate copy, and deposit the Credit Draft immediately. Failure to process a Credit within five (5) calendar days may result in a Chargeback.

- Authorization is not required for refunds.

- You cannot intentionally submit a sale and an offsetting Credit at a later date solely for the purpose of debiting and crediting your own or a customer's account.

- You are responsible for paying all refunds submitted to us on your merchant account. We assume no responsibility for verifying any Credits or refunds.

- YOU ARE RESPONSIBLE TO SECURE YOUR TERMINALS AND TO INSTITUTE APPROPRIATE CONTROLS TO PREVENT EMPLOYEES OR OTHERS FROM SUBMITTING REFUNDS THAT DO NOT REFLECT BONA FIDE RETURNS OR REIMBURSEMENTS OF PRIOR TRANSACTIONS.

9.2.   Exchanges.

• No additional paperwork is necessary for an even exchange. Just follow your standard company policy.

• For an uneven exchange, complete a Credit Draft (follow the procedures outlined in Section 8.1) for the total amount of only the merchandise returned. The Cardholder's account will be credited for that amount. Then, complete a new Sales Draft for the total amount of any new merchandise purchased.

### Retention of Records: For Retrievals and Chargebacks

9.1.   Retain Legible Copies.

For MasterCard and Visa:  You must retain legible copies of all Sales and Credit Drafts or any other transaction records for a period of eighteen (18) months from the date of each transaction.

For Discover Network:  You must retain legible copies of all Sales and Credit Drafts or any other transaction records for the longer of (i) 365 days or (ii) the resolution of any pending or threatened disputes, claims, disagreements or litigation involving the Card transaction. You must also keep microfilm or other copies of Sales Drafts for no less than three (3) years from the date of the Discover Network transaction.

9.2.   Provide Sales and Credit Drafts.  You must provide all Sales and Credit Drafts or other transaction records requested by us within the shortest time limits established by Association Rules. You are responsible for any deficiencies in Card transaction data transmitted or otherwise delivered to us.

9.3.   Ensure Proper Retrieval Fulfillment.  To ensure proper Retrieval fulfillments and/or Chargeback processing, Sales and Credit Drafts must contain the full sixteen (16) digit account number and expiration date. Failure to retain this information could result in a future Chargeback to your account.

### Chargebacks and Other Debits

10.1.   Chargebacks.

10.1.1.   Generally.  Both the Cardholder and the Card Issuer have the right to question or dispute a transaction. If such questions or disputes are not resolved, a Chargeback may occur. A Chargeback is a Card transaction that is returned to us by the Card Issuer. As a result, we will debit your Settlement Account or settlement funds for the amount of the Chargeback. It is strongly recommended that, whenever possible, you contact the Cardholder directly to resolve a disputed transaction or Chargeback, unless the dispute involves a Discover Network Cardholder, in which case Discover Network rules and regulations expressly prohibit you from contacting the Discover Network Cardholder regarding the dispute. You are responsible for all Chargebacks and related costs arising from your transactions.

10.1.2.   Transaction Documentation Requests.  In some cases, before a Chargeback is initiated, the Card Issuer will request a copy of the Sales Draft, via a request for transaction documentation. We will forward the request to you. You must respond to the request within the time frame and manner set forth in the request. We will then forward your response to the Card Issuer. If you fail to timely respond, we will so notify the Card Issuer and a Chargeback may result. Upon receipt of a transaction documentation request, immediately retrieve the requested Sales Draft(s) using the following guidelines:

• Make a legible copy, centered on 8-1/2 x 11-inch paper (only one (1) Sales Draft per page).

• Write the 'case number' from the request for transaction documentation on each copy/page.

• If applicable, make copies of a hotel folio, car rental agreement, mail/phone/internet order form, or other form of receipt.

• If a Credit transaction has been processed, a copy of the Credit Draft is also required.

• Letters are not acceptable substitutes for Sales Drafts.

• Fax or mail legible copies of the Sales Draft(s) to the fax number or mail address provided on the request form.

• If you fax your response, please set your fax machine to print your fax number and name on the documents that you send. We can use this information to help know immediately where the documentation received originated from and to know whom to contact in the event the transmission is not clear or complete.

• Additionally, please set the scan resolution on your fax machine to the highest setting. The higher resolution setting improves the clarity of characters and graphics on the Sales Drafts transmitted and helps reduce the number of illegible fulfillments and/or Chargebacks.

If we do not receive a clear, legible and complete copy of the Sales Draft within the timeframe specified on the request, you may be subject to a Chargeback.

A handling fee may be charged by the Issuer and will be debited from your Settlement Account or settlement funds if, a transaction documentation request results from a difference in the following information on the Sales Draft and the transmitted record: Merchant name or an incorrect city, state, foreign country and/or transaction date.

You need to respond to all transaction documentation requests within the specified timeframe indicated on the request, or you may be without recourse for a Chargeback. You must respond to all requests related to fraud investigations. Subsequent Chargebacks for "non receipt of requested item relating to a transaction for fraud request" cannot be contested or represented.

10.1.3.   Chargeback Process.  Regardless of whether you respond to a transaction documentation request, a Chargeback may be debited to your Settlement Account for numerous reasons (see below). If the Card Issuer submits a Chargeback, we will send you a Chargeback notification, which may also include a request for transaction documentation. Due to the short time requirements imposed by MasterCard, Visa and Discover Network, it is extremely important that you respond to a Chargeback notification and transaction documentation request within the time frame set forth in the notification. Do not process a Credit transaction once the Chargeback is received; the Card Issuer will credit the Cardholder's account (unless the Chargeback is reversed).

If the information you provide is both timely and, in our sole discretion, sufficient to warrant a representation of the transaction and/or reversal of the Chargeback, we will do so on your behalf. However, representment and/or reversal is ultimately contingent upon the Card Issuer and/or Cardholder accepting the transaction under applicable Association guidelines. Representment or reversal is not a guarantee that the Chargeback has been resolved in your favor.

For Visa Chargebacks:  If we reverse the Chargeback and represent the transaction to the Card Issuer, the Card Issuer, at its sole discretion, may elect to submit the matter for arbitration before Visa. Visa charges a $150 filing fee and a $250 review fee. If a decision is made in favor of the Cardholder and/or Card Issuer, and the Chargeback is upheld, you will be responsible for all such fees and any other applicable fees and penalties imposed by Visa; such fees and penalties will be debited from your Settlement Account or settlement funds, in addition to the Chargeback.

For MasterCard Chargebacks:  If MasterCard refuses to accept our representment, it may resubmit the Chargeback. In such event, at the discretion of Processor, we will submit your Settlement Account or settlement funds for the Chargeback. However, if you feel strongly that it is an invalid Chargeback, we may, on your behalf and at your request, submit the matter for arbitration before MasterCard. MasterCard charges a $150 filing fee and a $250 review fee. If a decision is made in favor of the Cardholder and/or Card Issuer, and the Chargeback is upheld, you will be responsible for all such fees and any other penalties imposed by MasterCard; such fees and penalties will be debited from your Settlement Account or settlement funds, in addition to the Chargeback.

For Discover Network Chargebacks:  If Discover Network rejects our representment request and you feel strongly that the Chargeback is invalid, we may, at the discretion of Processor and on your behalf and at your request, submit the matter for dispute arbitration before Discover Network. Discover Network charges fees for representment requests and an arbitration fee as published in their fee schedule.

If the Chargeback is not disputed within the applicable time limits set forth by MasterCard, Visa, and Discover Network Association Rules, reversal rights are lost. Our only alternative, on your behalf, is to attempt a "good faith collection" from the Card Issuer. This process can take from 30 to 100 days. Good faith collections must meet the Card Issuer's criteria (e.g., above a set dollar amount, usually $100.00; within a specified time limit; etc.). Sometimes Card Issuers will only accept good faith collections after assessing collection fees. A good faith collection is not a guarantee that any funds will be collected on your behalf. If the good faith collection case is accepted by the Card Issuer, you will receive the amount that we are able to recover from the Card Issuer (which may be reduced by fees Card Issuers sometimes impose for accepting good faith collection claims).

MasterCard and Visa Association Rules require that a merchant make a good faith attempt and be willing and able to resolve any disputes directly with the Cardholder. Discover Network rules and regulations, however, prohibit you and/or us from contacting the Cardholder (directly regarding dispute(s) or any other matter, except as required for acceptance of Discover Network transactions, and require you and/or us to submit any responses to dispute notices directly to Discover Network.

Due to Association Rules, you may not re-bill a Cardholder after a Chargeback is received for that transaction, even with Cardholder authorization.

We strongly recommend that you include a detailed rebuttal letter along with all pertinent documents when responding to a transaction request or a Chargeback notification (e.g., rental agreement, imprinted portion of the invoice or Sales Draft; the portion signed by the Cardholder; and the area where the authorization codes, with amounts and dates, are located).

Due to the short time frames and the supporting documentation necessary to successfully (and permanently) reverse a Chargeback in your favor, we strongly recommend the following:

• Avoid Chargebacks by adhering to the guidelines and procedures outlined in these Operating Procedures.

• If you do receive a Chargeback, investigate, and if you dispute the Chargeback, submit the appropriate documentation within the required time frame.

- Whenever possible, contact the Cardholder directly to resolve the dispute, unless the dispute relates to a Discover Network Cardholder, in which case direct contact with the Discover Network Cardholder regarding the dispute is prohibited by Discover Network Association Rules.
- If you have any questions, call Customer Service.

10.1.4. Chargeback Reasons.  The following section outlines the most common types of Chargebacks. This list is not exhaustive. For ease of understanding, we have combined like Chargebacks into seven groupings. We have included recommendations on how to reduce the risk of Chargebacks within each group. These are recommendations only, and do not guarantee that you will be able to prevent Chargebacks.

1. Authorization Issues. The following scenarios could cause an Authorization related Chargeback to occur:
- No account number verification (for transaction below the floor limit).
- Negative account number verification.
- Full Authorization not obtained.
- Fraudulent transaction -- no authorization.
- Fraudulent transaction prior to embossed valid date.
- Authorization request declined.
- Expired Card.
- Early Warning Bulletin.
- Non-matching account number.
- Mail order transaction on expired or never issued account number.

To reduce your risk of receiving an Authorization-related Chargeback:
- Authorize all transactions and use the proper method of authorization.
- A valid approval authorization response indicates the Card is valid and can be accepted for payment. An approval code is usually a 4-6 digit number, along with an authorization response of "approval."
- A decline authorization response indicates the Card should not be accepted for payment. Request a different form of payment from the Cardholder or do not release the merchandise.
- "Pick-up" authorization response from the Issuer indicates the Credit Card account number is lost or stolen. The Credit Card should not be accepted for payment. Additionally, you can choose to retain the Credit Card and return it to the Acquirer for a reward.
- Referral authorization response prompts you to call the Voice Authorization Center for further instructions.
- If you used a third party to authorize, you must contact them immediately for proof of authorization and submit such proof to us.

2. Cancellations and Returns.  The following scenarios could cause a cancellation and return related Chargeback to occur:
- Credit transaction not processed.
- Cancelled recurring transaction.
- Cancelled/guaranteed reservation.
- Advance deposit service.
- Cardholder not aware of your cancellation/return policies.

To reduce your risk of receiving a cancellation and return related Chargeback:
- For recurring transactions -- ensure your customers are fully aware of the conditions of this type of transaction.
- Process Credits daily.
- All Credits must be applied to the account to which the debit originally posted.
- Pre-notify the Cardholder of billing within 10 days (domestic) and 15 days (international) prior to billing, allowing the Cardholder time to cancel the transaction.
- Do not continue to bill after proper cancellation or after receipt of Chargeback.
- Ensure proper disclosure of your refund policy is on the Sales Draft; if applicable, the words "NO EXCHANGE, NO REFUND," etc. must be clearly printed (in 1/4" letters) on the Sales Draft (or electronic equivalent, i.e., the receipt printed when a Card is swiped through a terminal) near or above the Cardholder's signature.
- Do not issue Credit in the form of cash, a check or in-store/merchandise Credit.
- Do not issue in-store or merchandise Credit.
- For travel and entertainment transactions, provide the cancellation policy at the time of reservation.
- For Internet transactions ensure that there is an area on the web page where the Cardholder must acknowledge an understanding of the cancellation policy prior to completing the transaction.

3. Fraud.  The following scenarios could cause a fraud related Chargeback to occur:
- Unauthorized or fictitious account number.
- Unauthorized ATM transaction.
- Fraudulent processing of a transaction.
- Fraudulent mail/phone order transaction.
- Counterfeit transaction.
- Fraudulent transaction -- no imprint obtained.
- Fraudulent transaction -- no signature obtained.
- Risk Identification Service.
- Advance deposit service.

To reduce your risk of receiving a fraud-related Chargeback:
For Face to Face (Card Present) Transactions:
- If you are an electronic merchant, swipe the Card through the electronic authorization device to capture Cardholder information and ensure the displayed Card number matches the number on the Card.
- If you are unable to swipe a Card through an electronic authorization device to capture the Cardholder's information via the Magnetic Stripe, you must imprint the Card to prove the Cardholder was present at the time of transaction. Do not alter the imprint on the draft in any way. Manually entering the information into the terminal does not protect you from this type of Chargeback. All pertinent information relating to the transaction must be written on the manually imprinted ticket (date, dollar amount, authorization code, and merchandise description). This information ties the imprinted ticket to the transaction.
- Obtain the Cardholder's signature on the Draft.
- Carefully examine the front and back of the Card at the time of transaction, check the signature and compare it to the signature on the Card.
- If you swipe the transaction and receive a Referral response and a subsequent voice Authorization, you must manually imprint the Cardholder's Credit Card to prove Card presence.
- Do not imprint the Cardholder's Credit Card on the back of the transaction receipt or a separate document unless all transaction elements are present.
For Mail/Telephone/Internet (Card Not Present) Orders:
- Follow recommended procedures -- use Verified by Visa (VBV) for Internet transactions, obtain the 3-digit Card Validation Code (CVV2/CVC2/CID), and/or AVS. While transactions utilizing the AVS may still be disputed, the service may alert you to certain fraudulent transactions.
- Obtain a signed proof of delivery for shipped merchandise.
- Obtain the Cardholder's account number, name and address with city and state. At the time of the transaction advise the Cardholder of any extra cost that they are responsible for (shipping, handling, insurance etc.).
- Confirm the account number provided by the customer by repeating the number back to the customer.
- Obtain the required Data Elements on the folio/registration documentation for a GNS (Guaranteed No Show) Transaction.

4. Non-Receipt of Goods and Services. The following scenarios could cause a Non Receipt of Goods and Services related Chargeback to occur:
- Services not rendered.
- Services not rendered at ATM.
- Non receipt of merchandise.
- Advance deposit service.

To reduce your risk of receiving a Non Receipt of Goods and Services related Chargeback:
- Do not process a transaction until the merchandise is shipped.
- Do not process any Credit Card transaction where the Cardholder has already paid for the goods or services using another method of payment.
- Inform the Cardholder of any specific cancellation policies or advance deposits.
- Obtain a signed proof of delivery.

5. Processing Errors. The following scenarios could cause a processing error related Chargeback to occur:
- Late presentment of Sales Draft.
- Services or merchandise paid by other means.
- Addition or transposition error.
- Altered amount.

- Incorrect account number, code or amount.
- Duplicate processing.
- Transaction exceeds limited amount.
- Services not rendered.
- Unauthorized ATM transaction.
- Credit posted as Debit.
- Incorrect transaction amount.
- Transaction amount changed.
- Merchandise paid by other means.

To reduce your risk of receiving a processing error related Chargeback:

- Settle and reconcile your batches on your terminal/register daily. Ensure that the total amount settled and submitted (displayed on terminal) balances with, and matches to, the Credit Card receipts of the transaction.
- Obtain a Card Imprint (or swipe the Card through an electronic authorization device to capture Cardholder information) and Cardholder signature.
- If you are a paper merchant or the Card cannot be magnetically stripe read, please clearly imprint the Card using the imprinter machine and do not alter in any way.
- If you are an electronic merchant, swipe the Card through the electronic authorization device and ensure the displayed Card number matches the number on the Card. The Card must be imprinted if the Magnetic Stripe cannot be read or the electronic equipment is inoperable.
- Carefully examine the front and back of the Card at the time of transaction.
- Compare the signature on the back of the Credit Card with the signature on the Sales Draft.
- Telephone orders -- confirm the account number provided by the customer by repeating the number back to the customer.
- Properly authorize all transactions.
- If you used a third party to authorize, you must contact them immediately for proof of Authorization and submit to us.
- If the terminal does not display the Card number, call the POS Help Desk for a terminal upgrade.

6. **Quality of Goods and Services.** The following scenarios could cause a Quality of Goods and Services related Chargeback to occur:

- Defective merchandise.
- Not as described.

To reduce your risk of receiving a Quality of Goods and Services related Chargeback:

- Ensure all merchandise is shipped properly.
- Ensure all return policies are properly disclosed to the Cardholder at the time of sale.

7. **Non Receipt of Information.** The following scenarios could cause a Non Receipt of Information related Chargeback to occur:

- Transaction receipt not received.
- Copy illegible.
- Cardholder does not recognize the transaction.
- T&E document not fulfilled.

To reduce your risk of receiving a Non Receipt of Information related Chargeback:

- Prepare clean, legible Sales Drafts at the point of sale and send in your Media daily and/or respond to Media Retrieval requests within the required time frame (failure to properly respond to a fraud related Media Retrieval request eliminates any opportunity for a Chargeback reversal).
- Retain copies of transaction documents for MasterCard and Visa transactions for a minimum of eighteen (18) months from the original sales/post date, and for Discover Network transactions, the longer of (i) 365 days from the original sales/post date or (ii) the resolution of any pending or threatened disputes, claims, disagreements or litigation involving the Card transaction.
- Ensure that the most recognizable merchant name, location, and/or customer service phone number is provided on all transaction documentation.
- Timely respond to all notifications and requests.

10.2. **Other Debits.** We may also debit your Settlement Account or your settlement funds in the event we are required to pay Association fees, charges, fines, penalties or other assessments as a consequence of your sales activities. Such debits shall not be subject to any limitations of time specified elsewhere in the Agreement. The following is a list of reasons for other debits. We may add to or delete from this list as changes occur in the Association Rules or our operational requirements:

- Association fees, charges, fines, penalties, registration fees, or other assessments including any fees levied against us or any amount for which you are obligated to indemnify us.
- Currency conversion was incorrectly calculated. NOTE! For Discover Network transactions, you are not permitted to convert from your local Discover Network approved currency into another currency, nor may you quote the price of a transaction in U.S. Dollars if completed in another approved currency.
- Discount not previously charged.
- Reversal of deposit posted to your account in error.
- Debit for Summary Adjustment not previously posted.
- Reversal of Credit for deposit previously posted.
- Debit for Chargeback never posted to your account.
- Debit for EDC Batch error fee.
- Association Merchant Chargeback/Fraud Monitoring Fee -- Excessive Chargeback Handling Fee.
- Failure of transaction to meet Member Controller Authorization Service ("MCAS") -- Cardholder account number on exception file.
- Original transaction currency (foreign) not provided.
- Travel Voucher exceeds maximum value.
- Debit and/or fee for investigation and/or Chargeback costs related to our termination of the Agreement for cause, or for costs related to our collection activities.
- Costs arising from replacement or damage to equipment rented.
- Payment of current or past due amounts for any equipment purchase, rental or lease.
- Incorrect merchant descriptor (name and/or city, state) submitted.
- Incorrect transaction date submitted.
- Shipping and handling interchange fees.
- Costs or expenses associated with responding to any subpoena, garnishment, levy or other legal process associated with your account.

10.3. **Summary (Deposit) Adjustments/Electronic Rejects.** Occasionally, it is necessary to adjust the dollar amount of your summaries/Submissions (deposits) and credit or debit your Settlement Account or settlement funds accordingly. The following is a list of the most frequent reasons for Summary (Deposit) Adjustments/Electronic Rejects:

- Your summary reflected an arithmetic error.
- Submitted sales not included in your Agreement (e.g., American Express, JCB).
- The dollar amount is unreadable/illegible.
- The Cardholder's account number is unreadable/illegible.
- Duplicate Sales Draft submitted.
- Credit Card number is incorrect/incomplete.
- Summary indicated credits, but no credits were submitted.

10.4. **Disputing Other Debits and Summary Adjustments.** In order to quickly resolve disputed debits and Summary Adjustments, it is extremely important that the items listed in this section be faxed or sent to the address listed on the notification.

If the Summary Adjustment is for an unreadable or incorrect Cardholder number, resubmit the corrected Sales Draft with your next deposit. Also, if the transaction is over thirty (30) calendar days old, you must reauthorize and obtain a valid Authorization Approval Code.

A clear and legible copy of the Sales Draft containing the following should be obtained from your files:

- Date of sale/Credit;
- Cardholder's account number, name and signature;
- Total amount of the sale and description of goods and services; and
- Date and Authorization Approval Code.

Include a detail cover letter detailing the reasons for requesting a review of the debit or Summary Adjustment and documentation to support your dispute. (You should retain a copy of the correspondence and all documentation for your files.) If the inquiry is related to prior correspondence, be sure to include the control number we previously used.

- Immediately fax or mail the Sales or Credit Drafts to the fax number or address provided on your notification letter.

If you have any questions, please call the Customer Service number provided on the last page of this Program Guide. If a Customer Service Representative informs you that additional documentation is required in order to fully review the item, please immediately submit your rebuttal and transaction documentation to the fax number or address listed on the debit notification.

### 11. ACCOUNT MAINTENANCE

**11.1. Change of Settlement Number.** If you change the Settlement Account in which you receive the proceeds of your transactions, you must call Customer Service or your Relationship Manager immediately. If you accept payment types other than Visa, MasterCard and Discover Network (such as the American Express Card, JCB and TeleCheck Services), you are also responsible for contacting the Associations or companies governing those Cards to notify them of this change.

**11.2. Change in Your Legal Name or Structure.** You must call Customer Service or your Relationship Manager and request a new Agreement.

**11.3. Change in Company DBA Name, Address or Telephone/Facsimile Number.** To change your company DBA name, address or telephone/facsimile number, you must send the request in writing to the address on your statement.

**11.4. Other Change(s) in Merchant Profile.** You must immediately notify us of any change to the information on file with us in your merchant profile, including: (i) any new lines or types of business; (ii) change in ownership; (iii) closing or liquidation of business or any location; (iv) change in Card processing method (i.e., paper Sales Drafts to POS Device); (v) voluntary or involuntary party in a bankruptcy case; (vi) entry into a loan or other agreement with a third party that seeks to affect this Merchant Agreement; and/or (vii) change from a business that exclusively conducts card-present retail sales to one that accepts Card sales by mail, telephone or Internet transactions. We retain the right to terminate this Agreement if you fail to notify us of any change to the information in your merchant profile.

### 12. ASSOCIATION COMPLIANCE

MasterCard, Visa and Discover Network have established guidelines, merchant monitoring programs and reports to track merchant activity such as, but not limited to excessive Credits and Chargebacks, and increased deposit activity. In the event you exceed the guidelines or submit suspicious transactions as identified by an Association or any related program or reports, you may be subject to: (i) operating procedure requirement modifications; (ii) incremental Chargebacks and/or fees; (iii) settlement delay or withholding; (iv) termination of your Agreement; or (v) audit and imposition of fines.

### 13. SUPPLIES

**Placing Orders.**

- To order additional supplies, call Customer Service when you have two months' inventory left. We will ship you an adequate amount of supplies. The amount of supplies (based on usage) on hand should not exceed a three- to six-month supply.

- In an EMERGENCY, please contact Customer Service using the number provided on the last page of this Program Guide. If supplies are sent via an express delivery service, the delivery charges will be debited to your account.

- You are responsible for unauthorized use of sales/Credit and summary Media. We recommend that you store all supplies in a safe location.

- You may be charged for supplies and applicable shipping and handling charges.

### B. CARD GENERAL TERMS

In addition to the preceding Operating Procedures, our Agreement with you includes the following General Terms. If you fail to follow any of the provisions of the Operating Procedures or General Terms, you may incur certain liabilities or we may terminate our Agreement.

### 14. SERVICES

Subject to Association Rules, Services may be performed by one or more of our affiliates, including the provision of terminals or other equipment and local support functions in connection with this Agreement.

### 15. CREDIT CARD OPERATING PROCEDURES / ASSOCIATION RULES

You agree to follow all requirements of this Agreement in connection with each Card transaction and to comply with all applicable Association Rules. From time to time, we may amend the Operating Procedures, by providing you with at least 30 days' prior written notice, and those provisions will be deemed incorporated into this Agreement. However, for changes in the Association Rules or for security reasons, certain changes in Card procedures may become effective on shorter notice. If there are any inconsistencies between the General Terms and the Operating Procedures, the General Terms will govern.

### 16. SETTLEMENT OF CARD TRANSACTIONS

**16.1.** We will only be required to settle Card transactions for Card types specified in your Application. Promptly after presentment of Sales Drafts pursuant to the Operating Procedures, we will initiate a transfer of the applicable settlement funds to you.

**16.2.** All settlements for Visa, MasterCard and Discover Network Card transactions will be net of Credits/refunds, adjustments, applicable discount fees when due, Chargebacks and any other amounts then due from you. We may also set off from any payments otherwise due, any amounts owed to our affiliates (and/or affiliates of Bank) whether or not arising out of or related to this Agreement.

**16.3.** All Credits to your Settlement Account or other payments to you are provisional and are subject to, among other things, our final audit, Chargebacks (including our related losses), fees and fines imposed by the Associations. You agree that we may debit or credit your Settlement Account for any deficiencies, overages, fees and penalties and Chargebacks, or may deduct such amounts from settlement funds due to you. Alternatively, we may elect to invoice you for any such amounts, net due 30 days after the invoice date or on such earlier date as may be specified.

**16.4.** We will not be liable for any delays in receipt of funds or errors in debit and credit entries caused by third parties including but not limited to any Association or your financial institution.

**16.5.** In addition to any other remedies available to us under this Agreement, you agree that should any Event of Default (see Section 23.4) occur, we may, with or without notice, change processing or payment terms and/or suspend Credits or other payments of any and all funds, money and amounts now due or hereafter to become due to you pursuant to the terms of this Agreement, until we have had reasonable opportunity to investigate such event.

### 17. EXCLUSIVITY

During the term of this Agreement, you shall use us as your exclusive provider of all Services.

### 18. FEES; ADJUSTMENTS; COLLECTION OF AMOUNTS DUE

**18.1.** You shall be charged fees for the Services, which shall be calculated and payable pursuant to this Agreement and any additional pricing supplements. You acknowledge that the fees agreed to are based on the assumption that your transactions will qualify for certain Interchange levels (your Anticipated Interchange Levels), as set by the applicable Association. If a transaction fails to qualify for your Anticipated Interchange Levels, then the Association will downgrade the transaction and process it at a more costly Interchange level for which it does qualify. In that event, you shall be charged a Non-Qualified Interchange Fee, which is the difference in the Interchange fee associated with the Anticipated Interchange Level and the Interchange fee associated with the Interchange level at which the transaction actually was processed; plus, any applicable Non-Qualified Surcharge for each non-qualifying transaction, the amount of which is set forth in the service fee schedule. For more information on Visa's and MasterCard's Interchange rates, please go to www.visa.com and www.mastercard.com.

**18.2.** All authorization fees will be charged for each transaction that you attempt to authorize. All capture fees will be charged for each transaction that you transmit to us for settlement.

**18.3.** The fees for Services set forth in this Agreement are based upon assumptions associated with the anticipated annual volume and average transaction size for all Services as set forth in this Agreement and your method of doing business. If the actual volume or average transaction size are not as expected or if you significantly alter your method of doing business, we may adjust your discount fee and transaction fees without prior notice.

**18.4.** The fees for Services set forth in this Agreement may be adjusted to reflect increases or decreases by Associations in Interchange, assessments and other Association fees or to pass through increases charged by third parties for on-line communications and similar items. All such adjustments shall be your responsibility to pay and shall become effective upon the date any such change is implemented by the applicable Association or third party.

**18.5.** Subject to Section 23.3, we may also increase our fees for any other reason by notifying you thirty (30) days prior to the effective date of any such change.

**18.6.** If you receive settlement funds by wire transfer, we may charge a wire transfer fee per wire.

**18.7.** To the extent the Automated Clearing House ("ACH") settlement process is used to effect debits or Credits to your Settlement Account, you agree to be bound by the terms of the operating rules of the National Automated Clearing House Association, as in effect from time to time. You hereby authorize us to initiate credit and debit entries and adjustments to your account through the ACH settlement process and/or through direct instructions to the financial institution where your Settlement Account is maintained for amounts due under this Agreement and under any agreements with us or our affiliates for any related services, as well as for any credit entries in error. You hereby authorize the financial institution where your Settlement Account is maintained to effect all such debits and credits to your account. This authority will remain in full force and effect until we have given written notice to the financial institution where your Settlement Account is maintained that all monies due under this Agreement and under any other agreements with us or our affiliates for any related services have been paid in full.

18.8.  You agree to pay any fines imposed on us by any Association resulting from Chargebacks and any other fees or fines imposed by an Association with respect to your acts or omissions. You are also responsible for any fines or fees imposed by your agents or third parties.

18.9.  If your Chargeback percentage for any line of business exceeds the estimated industry Chargeback percentage, you shall, in addition to the Chargeback fees and any applicable Chargeback handling fees or fines, pay us an excessive Chargeback fee for all Chargebacks occurring in such month in such line(s) of business. Each estimated industry Chargeback percentage is subject to change from time to time by us in order to reflect changes in the industry Chargeback percentages reported by Visa, MasterCard or Discover Network. Your Chargeback Percentage will be calculated as the larger of (a) the total Visa, MasterCard and Discover Network Chargeback Items in any line of business in any calendar month divided by the number of Visa, MasterCard and Discover Network transactions in that line of business estimated that month, or (b) the total dollar amount of Visa, MasterCard and Discover Network Chargebacks in any line of business received in any calendar month divided by the total dollar amount of your Visa, MasterCard and Discover Network transactions in that line of business submitted in that month.

18.10.  If you believe any adjustments should be made with respect to your Settlement Account, you must notify us in writing within 45 days after any debit or Credit is or should have been effected. If you notify us after such time period, we may, in our discretion, assist you, at your expense, in investigating whether any adjustments are appropriate and whether any amounts are due to or from other parties, but we shall not have any obligation to investigate or effect any such adjustments. Any voluntary efforts by us to assist you in investigating such matters shall not create any obligation to continue such investigation or any future investigation.

### 19. Chargebacks

19.1.  You shall be responsible for reimbursing us for all transactions you submit that are charged back. See the Operating Procedures for additional information regarding Chargebacks and Chargeback procedures.

19.2.  You shall reimburse us for any Chargeback, return items, or other losses resulting from your failure to produce a Card transaction record requested by us within the applicable time limits.

### 20. Representations; Warranties; Limitations of Liability; Exclusion of Consequential Damages

20.1.  Without limiting any other warranties hereunder, you represent and warrant as to each Card transaction submitted under our Agreement that:

20.1.1.  the Card transaction represents a bona fide sale/rental of merchandise or services not previously submitted;

20.1.2.  the Card transaction represents an obligation of the Cardholder for the amount of the Card transaction;

20.1.3.  the amount charged for the Card transaction is not subject to any dispute, setoff or counterclaim;

20.1.4.  the Card transaction amount is only for the merchandise or services (including taxes, but without any surcharge) sold or rented and, except for any delayed delivery or advance deposit Card transactions expressly authorized by this Agreement, the merchandise or service was actually delivered to or performed for the person entering into the Card transaction simultaneously upon your accepting and submitting the Card transaction for processing;

20.1.5.  the Card transaction does not represent the refinancing of an existing obligation of the Cardholder (including any obligation otherwise owed to you by a Cardholder or arising from the dishonor of a personal check);

20.1.6.  you have no knowledge or notice of any fact, circumstances or defense which would indicate that the Card transaction was fraudulent or not authorized by the Cardholder or which would otherwise impair the validity or collectibility of the Cardholder's obligation arising from such Card transaction or relieve the Cardholder from liability with respect thereto;

20.1.7.  the Card transaction submitted to us was entered into by you and the Cardholder;

20.1.8.  the Card transaction was made in accordance with these General Terms, Association Rules and the Operating Procedures; and

20.1.9.  the Card transaction is not a payment for a product or service that violates federal, state or local law in any jurisdiction that may be applicable.

20.2.  THIS AGREEMENT IS A SERVICE AGREEMENT. WE DISCLAIM ALL REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, MADE TO YOU OR ANY OTHER PERSON, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES REGARDING QUALITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE OF ANY SERVICES OR ANY GOODS PROVIDED INCIDENTAL TO THE SERVICES PROVIDED UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY SERVICES OR ANY GOODS PROVIDED BY A THIRD PARTY.

20.3.  IN NO EVENT SHALL EITHER PARTY, OR THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL THEORY FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER ANY PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. CLIENT ACKNOWLEDGES AND AGREES THAT PAYMENT OF ANY EARLY TERMINATION FEE OR LIQUIDATED DAMAGES AS PROVIDED ELSEWHERE IN THIS AGREEMENT SHALL NOT BE PROHIBITED BY THIS PARAGRAPH.

20.4.  NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY (INCLUDING BUT NOT LIMITED TO SECTIONS 26 or 20.5), OUR CUMULATIVE LIABILITY FOR ALL LOSSES, CLAIMS, SUITS, CONTROVERSIES, BREACHES OR DAMAGES FOR ANY CAUSE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, THOSE ARISING OUT OF OR RELATED TO THIS AGREEMENT) AND REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY SHALL NOT EXCEED, (I) $50,000; OR (II) THE AMOUNT OF FEES RECEIVED BY US PURSUANT TO THE AGREEMENT FOR SERVICES PERFORMED IN THE IMMEDIATELY PRECEDING 12 MONTHS, WHICHEVER IS LESS.

20.5.  NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY (INCLUDING BUT NOT LIMITED TO SECTION 26), OUR LIABILITY FOR ANY DELAY IN FUNDING TRANSACTIONS, FOR ANY REASON WILL BE LIMITED TO INTEREST COMPUTED FROM THE DATE THAT YOU SUBMIT THE TRANSACTION TO THE DATE THAT WE FUND THE TRANSACTION AT THE RATE OF THE FEDERAL FUNDS, AS ESTABLISHED BY THE FEDERAL RESERVE BOARD FROM TIME TO TIME, LESS ONE PERCENT (1%).

20.6.  NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, BANK IS NOT RESPONSIBLE, AND SHALL HAVE NO LIABILITY, TO YOU IN ANY WAY WITH RESPECT TO DISCOVER NETWORK CARD, AMERICAN EXPRESS CARD, JCB CARD, PIN DEBIT CARD, AND ELECTRONIC BENEFITS TRANSFER TRANSACTIONS, TELECHECK CHECK SERVICES, TRS COLLECTION SERVICES, GIFT CARD SERVICES, AND TRANSACTIONS INVOLVING CARDS FROM OTHER NON-BANK CARD ASSOCIATIONS SUCH AS VOYAGER FLEET SYSTEMS, INC., WRIGHT EXPRESS CORPORATION AND WRIGHT EXPRESS FINANCIAL SERVICES CORPORATION.

### 21. Confidentiality

21.1.  Unless you obtain consents from us and each applicable Association, Card Issuer and Cardholder, you must not use, disclose, store, sell or disseminate any Cardholder information obtained in connection with a Card transaction (including the names, addresses and Card account numbers of Cardholders) except for purposes of authorizing, completing and settling Card transactions and resolving any Chargebacks, Retrieval Requests or similar issues involving Card transactions, other than pursuant to a court or governmental agency request, subpoena or order. You shall use proper controls for and limit access to, and render unreadable prior to discarding, all records containing Cardholder account numbers and Card imprints. You may not resell or store Magnetic Stripe data or Card Validation Codes after a transaction has been authorized. If you store any electronically captured signature of a Cardholder, you may not reproduce such signature except upon our specific request.

21.2.  You acknowledge that you will not obtain ownership rights in any information relating to and derived from Card transactions. Cardholder account numbers, personal information and other Card transaction information, including any databases containing such information, may not be sold or disclosed to a third party as an asset upon a bankruptcy, insolvency or failure of CLIENT's business. Upon a bankruptcy, insolvency or failure of CLIENT's business all Card transaction information must be returned to SERVICERS or acceptable proof of the destruction of all Card transaction information must be provided to SERVICERS.

### 22. Assignments

22.1.  Any transfer or assignment of this Agreement by you, without our prior written consent, by operation of law or otherwise, is voidable by us. Furthermore, you shall indemnify and hold us harmless from all liabilities, Chargebacks, expenses, costs, fees and fines arising from such transferee's or assignee's Submission of Card transactions to us for processing. For purposes of this Section 22, any transfer of voting control shall be considered an assignment or transfer of this Agreement.

22.2.  The payment services provided by us require access to a single bank account in which we may initiate both Credits and debits. You may not enter into any agreement that would require, in any circumstance or event, the transfer of any payments or proceeds from Credit Card transactions covered by this Agreement to the custody or control of any third party. You may not assign any rights, including the right of payment under this Agreement, to any other person. In the event that you make an assignment (or provide a security interest) of receivables covered by this Agreement, then we may, at our option, elect to (a) refuse to acknowledge such assignment unless accompanied by an Authorization to both initiate debits or Credits to the bank account

14

of the assignee, (b) terminate this Agreement immediately, or (c) charge for any transfers that we are called upon to make manually to fulfill such an assignment at the rate of $100 per transfer.

**22.3.** Upon notice to you, another Visa and MasterCard member may be substituted for Bank under whose sponsorship this Agreement is performed with respect to Visa and MasterCard transactions. Upon substitution, such other Visa and MasterCard member shall be responsible for all obligations required of Bank for Visa and MasterCard transactions, including without limitation, full responsibility for its bank Card program and such other obligations as may be expressly required by applicable Association Rules.

Subject to Association Rules, we may assign or transfer this Agreement and our rights and obligations hereunder and/or may delegate our duties hereunder, in whole or in part, to any third party, whether in connection with a change in sponsorship, as set forth in the preceding sentence, or otherwise, without notice to you or your consent.

**22.4.** Except as set forth elsewhere in this Section and as provided in the following sentence, this Agreement shall be binding upon successors and assigns and shall inure to the benefit of the parties and their respective permitted successors and assigns. No assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, debtor in possession, or other person charged with taking custody of a party's assets or business, shall have any right to continue, assume or assign this Agreement.

### 23. Term/Event of Default

**23.1.** This Agreement shall become effective upon the date this Agreement is approved by our Credit Department.

**23.2.** The initial term of this Agreement shall commence and shall continue in force for three years after it becomes effective. Thereafter, it shall continue until either party terminates the Agreement upon written notice to the other.

**23.3.** Notwithstanding the above or any other provisions of this Agreement, we may terminate this Agreement at any time and for any reason by providing 30 days' advance notice to you. We may terminate this Agreement immediately or with shorter notice upon an Event of Default as provided under Section 23.4 of this Agreement. In the event we provide notice to you of an increase in the fees for Services, pursuant to Section 18.5, you may terminate this Agreement without further cause or penalty by providing us 30 days advance written notice of termination. You must terminate within 30 days after we provide notice of the Section 18.5 fee increase. The Section 18.5 fee increase shall not take effect in the event you provide timely notice of termination. However, your continued use of our Services after the effective date of any increase shall be deemed acceptance of the increased fees for Services, throughout the term of this Agreement.

**23.4.** If any of the following events shall occur (each an "Event of Default"):

23.4.1. a material adverse change in your business, financial condition, business procedures, prospects, products or services; or

23.4.2. any assignment or transfer of voting control of you or your parent; or

23.4.3. a sale of all or a substantial portion of your assets; or

23.4.4. irregular Card sales by you, excessive Chargebacks, noncompliance with any applicable data security standards, as determined by Servicers, of any Card Association, or any other entity, or an actual or suspected data security breach, or any other circumstances which, in our sole discretion, may increase our exposure for your Chargebacks or otherwise present a financial or security risk to us; or

23.4.5. any of your representations or warranties in this Agreement are breached in any material respect or are incorrect in any material respect when made or deemed to be made; or

23.4.6. you shall default in any material respect in the performance or observance of any term, covenant, condition or agreement contained in this Agreement, including, without limitation, the establishment or maintenance of funds in a Reserve Account, as detailed in Section 24; or

23.4.7. you shall default in any material respect in the performance or observance of any term, covenant or condition contained in any agreement with any of our affiliates; or

23.4.8. you shall default in the payment when due, of any material indebtedness for borrowed money; or

23.4.9. you shall file a petition or have a petition filed by another party under the Bankruptcy Code or any other laws relating to bankruptcy, insolvency or similar arrangement for adjustment of debts; consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under such laws; apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of a substantial part of its property; or make a general assignment for the benefit of creditors; or take any corporate action for the purpose of authorizing any of the foregoing; or

23.4.10. your independent certified accountants shall refuse to deliver an unqualified opinion with respect to your annual financial statements and your consolidated subsidiaries; or

23.4.11. a violation by you of any applicable law or Association Rule or our reasonable belief that termination of this Agreement or suspension of Services is necessary to comply with any law including without limitation the rules and regulations promulgated by the Office of Foreign Assets Control of the US Department of the Treasury or your breach, as determined by Servicers, of Section 35.2 ("Compliance with Laws");

then, upon the occurrence of (1) an Event of Default specified in subsections 23.4.4, 23.4.9 or 23.4.11, we may consider this Agreement to be terminated immediately, without notice, and all amounts payable hereunder shall be immediately due and payable in full without demand or other notice of any kind, all of which are expressly waived by you, and (2) any other Event of Default, this Agreement may be terminated by us giving not less than 10 days' notice to you, and upon such notice all amounts payable hereunder shall be due and payable on demand.

**23.5.** Neither the expiration nor termination of this Agreement shall terminate the obligations and rights of the parties pursuant to provisions of this Agreement which by their terms are intended to survive or be perpetual or irrevocable. Such provisions shall survive the expiration or termination of this Agreement. All obligations by you to pay or reimburse us for any obligations associated with transactions you have submitted to us are intended to survive termination of this Agreement.

**23.6.** If any Event of Default shall have occurred and regardless of whether such Event of Default has been cured, we may, in our sole discretion, exercise all of our rights and remedies under applicable law, and this Agreement including, without limitation, exercising our rights under Section 24.

**23.7.** In the event you file for protection under the Bankruptcy Code or any other laws relating to bankruptcy, insolvency, assignment for the benefit of creditors or similar laws, and you continue to use our services, it is your responsibility to open new accounts to distinguish pre and post filing obligations. You acknowledge that as long as you utilize the accounts you established prior to such filing, we will not be able to systematically segregate your post-filing transactions or prevent set-off of the pre-existing obligations. In that event, you will be responsible for submitting an accounting supporting any adjustments that you may claim.

**23.8.** The Associations often maintain lists of merchants who have had their Merchant Agreements or Card Acceptance rights terminated for cause. If this Agreement is terminated for cause, you acknowledge that we may be required to report your business name and the names and other information regarding its principals to the Associations for inclusion on such list(s). You expressly agree and consent to such reporting if you are terminated as a result of the occurrence of an Event of Default or for any reason specified as cause by Visa, MasterCard or Discover Network. Furthermore, you agree to waive and hold us harmless from and against any and all claims which you may have as a result of such reporting.

**23.9.** After termination of this Agreement for any reason whatsoever, you shall continue to bear total responsibility for all Chargebacks, fees, Credits and adjustments resulting from Card transactions processed pursuant to this Agreement and all other amounts then due or which thereafter may become due under this Agreement.

### 24. Reserve Account/Security Interest

**24.1.** You expressly authorize us to establish a Reserve Account pursuant to the terms and conditions set forth in this Section 24. The amount of such Reserve Account shall be set by us, in our sole discretion, based upon your processing history and the potential risk of loss to us as we may determine from time to time.

**24.2.** The Reserve Account shall be fully funded upon three (3) days' notice to you, or in instances of fraud or suspected fraud or an Event of Default, Reserve Account funding may be immediate. Such Reserve Account may be funded by all or any combination of the following: (i) one or more debits to your Settlement Account or any other accounts held by Bank or any of its affiliates, at any financial institution vested in the name of Client, any of its principals, or any of its guarantors, or if any of same are authorized signers on such account; (ii) any payments otherwise due to you, including any amount due from TeleCheck; (iii) your delivery to us of a letter of credit; or (iv) if we so agree, your pledge to us of a freely transferable and negotiable certificate of deposit. Any such letter of credit or certificate of deposit shall be issued or established by a financial institution acceptable to us and shall be in a form satisfactory to us. In the event of termination of this Agreement by any party, an immediate Reserve Account may be established without notice in the manner provided above. Any Reserve Account will be held by us for the greater of ten (10) months after termination or expiration of this Agreement or for such longer period of time as is consistent with our liability for Card transactions and Chargebacks in accordance with Association Rules. Your funds will be held in an account commingled with reserve funds of our other Clients, without involvement by an independent escrow agent. Unless specifically agreed in writing by us or specifically required by applicable law, funds held by us in a Reserve Account shall not accrue interest.

**24.3.** If your funds in the Reserve Account are not sufficient to cover the Chargebacks, adjustments, fees and other charges due from you, or if the funds in the Reserve Account have been released, you agree to promptly pay us such sums upon request.

**24.4.1.** To secure your obligations to Servicers and our affiliates under this Agreement and any other agreement for the provision of related equipment or related services (including any obligations for which payments on account of such obligations are

subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause), you grant to Servicers a first priority lien and security interest in and to (i) the Reserve Account and (ii) any of your funds pertaining to the Card transactions contemplated by this Agreement now or hereafter in the possession of Servicers, whether now or hereafter due or to become due to you from Servicers. Any such funds, money or amounts now or hereafter in the possession of Servicers may be commingled with other funds of Servicers, or, in the case of any funds held pursuant to the foregoing paragraphs, with any other funds of other customers of Servicers. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, Servicers are hereby authorized by you at any time and from time to time, without notice or demand to you or to any other person (any such notice and demand being expressly waived), to set off, recoup and to appropriate and to apply any and all such funds against and on account of your obligations to Servicers and their affiliates under this Agreement and any other agreement with Servicers or any of Servicers' affiliates for any related equipment or related services (including any check services), whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. You agree to duly execute and deliver to Servicers such instruments and documents as Servicers may reasonably request to perfect and confirm the lien, security interest, right of set off, recoupment and subordination set forth in this Agreement.

24.4.2.   To the extent funds are held in a separate reserve account, the Reserve Account shall be subject to (i) Servicers' security interest pursuant to this subsection 24.4, and (ii) an account control agreement (as defined by the applicable sections of the Uniform Commercial Code, hereinafter referred to as "Control Agreement") among you, the institution at which the reserve account is held (such institution hereinafter referred to as "Depository") and Servicers (such investment account hereinafter referred to as the "Control Account"). The Control Agreement shall be in form and substance satisfactory to Servicers. The Depository shall be a National Association bank which is mutually acceptable to you and Servicers.

24.4.3.   For sake of clarification and notwithstanding anything in the Agreement to the contrary, in the event Servicers deduct, holdback, suspend, off set or set off (collectively "Set Off Funds") any settlement monies or amounts otherwise due you pursuant to the terms of this Agreement, you acknowledge that such Set Off Funds will be held in a commingled reserve account(s) of Servicers (as described in this subsection 24.4) unless such Set Off Funds are wired or deposited by Servicers into any Control Account, pursuant to a Control Agreement in which case Servicers will transfer Set Off Funds from their commingled reserve account(s) to the Control Account as soon as practicable using commercially reasonable efforts.

24.4.4.   If in replacement of or in addition to the first priority lien and security interest in the Reserve Account, you grant to Servicers a first priority lien and security interest in and to one or more certificates of deposit, the certificates of deposit shall be uncertificated and shall be subject to an Acknowledgement of Pledge of Certificate of Deposit and Control Agreement (the "Certificate of Deposit Control Agreement") by, between and among Customers, Servicers and the financial institution that has established and issued the certificate of deposit. The form of the Certificate of Deposit Control Agreement and the financial institution that will establish and issue the certificate of deposit shall be satisfactory and acceptable to Servicers.

**25 Financial Information**

25.1.   Upon request, you will provide us quarterly financial statements within 45 days after the end of each fiscal quarter and annual audited financial statements within 90 days after the end of each fiscal year. Such financial statements shall be prepared in accordance with generally accepted accounting principles. You will also provide such other financial statements and other information concerning your business and your compliance with the terms and provisions of this Agreement as we may reasonably request. You authorize us to obtain from third parties financial and credit information relating to you in connection with our determination whether to accept this Agreement and our continuing evaluation of the financial and credit status of you. We may also access and use information which you have provided to Bank for any other reason. Upon request, you shall provide to us or our representatives reasonable access to your facilities and records for the purpose of performing any inspection and/or copying of your books and/or records deemed appropriate.

25.2.   You will provide us with written notice of any judgment, writ, warrant of attachment, execution or levy against any substantial part (25% or more in value) of your total assets not later than three (3) days after you become aware of same.

**26 Indemnification**

26.1.   You agree to indemnify and hold us harmless from and against all losses, liabilities, damages and expenses: (a) resulting from any breach of any warranty, covenant or agreement or any misrepresentation by you under this Agreement; (b) arising out of your or your employees' or your agents' negligence or willful misconduct, in connection with Card transactions or otherwise arising from your provision of goods and services to Cardholders; (c) arising out of your use of our Service; or (d) arising out of any third party indemnifications we are obligated to make as a result of your actions (including indemnification of any Association or Issuer).

26.2.   We agree to indemnify and hold you harmless from and against all losses, liabilities, damages and expenses resulting from any breach of any warranty, covenant or agreement or any misrepresentation by us under this Agreement or arising out of our or our employees' gross negligence or willful misconduct in connection with this Agreement; provided that this indemnity obligation shall not apply to Bank with respect to Discover Network Card Transactions, American Express Card Transactions and Other Services, including JCB Card, PIN Debit Card, and Electronic Benefits Transfer Transactions, TeleCheck check services, TRS collection services and Transactions involving Cards from other Non-Bank Card Associations such as Voyager Fleet Systems, Inc., Wright Express Corporation and Wright Express Financial Services Corporation.

**27 Special Provisions Regarding Non-Bank Cards**

27.1.   Non-Bank Card transactions are provided to you by Processor and not by Bank. Bank is not a party to this Agreement insofar as it relates to Non-Bank Card services, and Bank is not liable to you in any way with respect to such services. For the purposes of this section, the words "we," "our," and "us" refer only to the Processor and not to the Bank. You authorize us to share information from your Application with American Express, JCB, or any other Non-Bank Card Association.

27.2.   You understand that American Express transactions are processed, authorized and funded by American Express. American Express will provide you with its own agreement that governs those transactions. You understand and agree that we are not responsible and assume absolutely no liability with regard to any such transactions, including but not limited to the funding and settlement of American Express transactions, and that American Express will charge additional fees for the services they provide.

27.3.   If you accept JCB Cards, you must retain original JCB Sales Drafts and JCB Credit Drafts for a period of at least 120 days from the date of the JCB Card transaction and you must retain microfilm or legible copies of JCB Sales Drafts and JCB Credit Drafts for a period of at least three (3) years following the date of the transaction.

27.4.   If you accept JCB Cards, you agree to be bound by JCB rules. You also agree to be bound by all other provisions of this Agreement which are applicable to JCB.

27.5.   If you accept Voyager and/or WEX Cards, you agree to be bound by the WEX and/or Voyager rules. Your also agree to be bound by all other provisions of this Agreement which are applicable to WEX and/or Voyager.

27.6.   If you execute a WEX Merchant Agreement, you understand that we will provide such agreement to WEX, but that neither we nor WEX shall have any obligation whatsoever to you with respect to processing WEX Cards unless and until WEX executes your WEX Merchant Agreement. If WEX executes your WEX Merchant Agreement and you accept WEX Cards, you understand that WEX transactions are processed, authorized and funded by WEX. You understand that WEX is solely responsible for all agreements that govern WEX transactions and that we are not responsible and assume absolutely no liability with regard to any such agreements or WEX transactions, including but not limited to the funding and settlement of WEX transactions. You understand that WEX will charge additional fees for the services that it provides.

27.7.   If you accept Voyager Cards

- In addition to the information stated in Section 1 (MasterCard and Visa Acceptance) of the Operating Procedures, you should check Cards for any printed restrictions at the point of sale.

- In addition to the information provided under Section 1.5 (Special Terms) of the Operating Procedures, you shall establish a fair policy for the exchange and return of merchandise. You shall promptly submit credits to us for any returns that are to be credited to a Voyager Cardholder's account. Unless required by law, you shall not give any cash refunds to any Voyager Card holder in connection with a sale.

- In addition to the information required under Section 3.1 (Information Required) of the Operating Procedures, the following information must be contained on the single page document constituting the Sales Draft for Voyager transactions:
  - Time of transaction
  - Type of fuel sold
  - As permitted by the applicable POS device, odometer reading
  - For all cashier-assisted Sales Drafts and credit vouchers processed manually using a card imprinter if required, the identification number

- If an increase in the number of Voyager transaction authorization calls from you not due to our or Voyager system outages in excess of 15% for a given month as compared to the previous month occurs, we may, in our discretion, deduct telephone charges, not to exceed $.25 (25 cents) per call, for the increased calls, from your settlement of your Voyager transactions.

- In addition to the information provided under Section 7 (Settlement) of the Operating Procedures, settlement of Voyager transactions will generally occur by the fourth banking day after we process the applicable card transactions. We shall reimburse you for the dollar amount of sales submitted for a given day by you, reduced by the amount of chargebacks, tax exemptions, discounts, credits, and the Fees set forth in the Service Fee Schedule Addendum. Neither we nor Voyager shall be required to reimburse you for sales submitted more than sixty (60) days from the date of purchase.

- For daily transmission of sales data, you shall maintain true and complete records in connection with the information required to be provided under this paragraph for a period of not less than thirty-six (36) months from the date of the generation of the data. You may store records on electronic media. You are responsible for the expense of retaining sales data records and Sales Drafts.

- In addition to the scenario identified in Section 10.1.4 of this Program Guide that could cause an authorization related Chargeback to occur, with respect to Voyager transactions, Chargebacks shall be made in accordance with any other Voyager rules. Notwithstanding termination or expiration of this paragraph or the Agreement, you shall remain liable for all outstanding chargebacks on Voyager transactions.

- In addition to the information provided under Section 20 (Representations; Warranties; Limitations of Liability; Exclusion of Consequential Damages) of the General Terms, in no event shall our cumulative liability to you for losses, claims, suits, controversies, breaches or damages for any cause whatsoever in connection with Voyager transactions exceed the lesser of $10,000.00 or the Voyager transaction fees paid by you to us for the two months prior to the action giving rise to the claim.

- Notwithstanding anything in this Agreement to the contrary, our obligation to provide services to you relating to any Fleet Card will terminate automatically without penalty to us or the related Association upon the earlier of (i) the termination or expiration of our agreement with such Association, (ii) at least twenty (20) days prior written notice by us to you; (iii) your failure to comply with material terms relating to such Fleet Card transactions, or (iv) written notice, if an Association discontinues its Card.

### 28. Special Provisions For PIN Debit Card

The special provisions outlined in this Section 28 apply only to those PIN Debit Card transactions that are processed by a Cardholder entering a PIN. These provisions do not apply to Non-PIN Debit Card transactions which do not involve entry of a PIN.

**28.1. PIN Debit Card Acceptance.** Most, but not all, ATM Cards (Debit Cards) can be accepted at the point of sale at participating locations. Examine the back of the PIN Debit Card to determine if the Card participates in a network that you are authorized to accept. Network mark(s) are usually printed on the back of the Card. If the PIN Debit Card is valid and issued by a participating network, you must comply with the following general requirements for all participating networks, in addition to the specific requirements of the network:

- You must honor all valid PIN Debit Cards when presented that bear authorized network marks.

- You must treat transactions by Cardholders from all issuers in the same manner.

- You may not establish a minimum or maximum transaction amount for PIN Debit Card acceptance.

- You may not require additional information, besides the Personal Identification Number, for the completion of the transaction unless the circumstances appear suspicious. A signature is not required for PIN Debit Card transactions.

- You shall not disclose transaction related information to any party other than your agent, a network, or issuing institution and then only for the purpose of settlement or error resolution.

- You may not process a Credit Card transaction in order to provide a refund on a PIN Debit Card transaction.

**28.2. Transaction Processing.** The following general requirements apply to all PIN Debit Card transactions:

- All PIN debit transactions must be authorized and processed electronically. There is no Voice Authorization or Imprinter procedure for PIN Debit Card transactions.

- You may not complete a PIN Debit Card transaction that has not been authorized. If you cannot obtain an Authorization at the time of sale, you should request another form of payment from the customer or process the transaction as a Store and Forward or Resubmission, in which case you assume the risk that the transaction fails to authorize or otherwise declines. The Cardholder should be instructed to contact the Issuer to find out why a transaction has been declined.

- You may not complete a PIN Debit Card transaction without entry of the Personal Identification Number (PIN) by the Cardholder. The PIN must be entered into the PIN pad only by the Cardholder. You cannot accept the PIN from the Cardholder verbally or in written form.

- The PIN Debit Network used to process your transaction will depend upon, among other things, the availability of the network at the time of the transaction, whether a particular PIN Debit Card is enabled for a particular network and the routing requirements established by the networks and the card Issuers. We may, at our sole discretion, utilize any PIN Debit Network available to us for a given transaction.

- You must issue a receipt to the Cardholder upon successful completion of a transaction. The Cardholder account number must be masked so that only the last four digits will appear. The masked digits must appear as a non-numeric character such as an asterisk. This is referred to as PAN truncation.

- You may not manually enter the account number. The account number must be read electronically from the Magnetic Stripe. If the Magnetic Stripe is unreadable, you must request another form of payment from the customer.

- Any applicable tax must be included in the total transaction amount for which Authorization is requested. Tax may not be collected separately in cash.

- **YOU ARE RESPONSIBLE TO SECURE YOUR TERMINALS AND TO INSTITUTE APPROPRIATE CONTROLS TO PREVENT EMPLOYEES OR OTHERS FROM SUBMITTING REFUNDS AND VOIDS THAT DO NOT REFLECT BONA FIDE RETURNS OR REIMBURSEMENTS OF PRIOR TRANSACTIONS.**

**28.3. Cash Back From Purchase.**

You have the option of offering cash back to your customers when they make a PIN Debit Card purchase. You may set a minimum and maximum amount of cash back that you will allow. If you are not now offering this service, your terminal may require additional programming to begin offering cash back.

**28.4. Settlement.** Within one Business Day of the original transaction, you must balance each location to the system for each Business Day that each location is open.

**28.5. Adjustments.** An adjustment is a transaction that is initiated to correct a PIN Debit Card transaction that has been processed in error. You will be responsible for all applicable adjustment fees that may be charged by a Debit Card network. Some networks may have established minimum amounts for adjustments.

There are several reasons for adjustments being initiated:

- The Cardholder was charged an incorrect amount, either too little or too much.

- The Cardholder was charged more than once for the same transaction.

- A processing error may have occurred that caused the Cardholder to be charged even though the transaction did not complete normally at the point of sale.

All parties involved in processing adjustments are regulated by time frames that are specified in the operating rules of the applicable Debit Card network, The Electronic Funds Transfer Act, Regulation E, and other applicable law.

### 29. Special Provisions Regarding Electronic Benefit Transfer (EBT)

If you elect to engage in EBT transactions, the terms and conditions of this Section 29 shall apply.

EBT transactions are provided to you by Processor and not by Bank. Bank is not a party to this Agreement insofar as it relates to EBT Transactions, and Bank is not liable to you in any way with respect to such services. For the purposes of this section, the words "we," "our," and "us" refer only to the Processor and not to the Bank.

If you have agreed to issue Cash Benefits and will provide cash back or cash only transactions, you agree to maintain adequate cash on hand to issue confirmed Cash Benefits and will issue Cash Benefits to EBT customers in the same manner and to the same extent cash is provided to your other customers. You may not require that any EBT customers purchase goods or services as a condition to receiving Cash Benefits, unless such condition applies to other customers as well. You may not designate special checkout lanes restricted to use by EBT customers unless you also designate special checkout lanes for other Credit or Credit Cards and/or other payment methods.

**29.1. Acceptance of EBT Benefits.** You agree to issue benefits to EBT customers in accordance with the procedures specified in all documentation provided to you by us, as amended from time-to-time and pursuant to all applicable law, rules and regulations. You must provide each EBT customer a receipt for each EBT transaction.

You will issue EBT benefits to EBT customers, in accordance with our then current procedures, in the amount authorized through a point-of-sale terminal, with personal identification number and and printer. In the event of an equipment failure, you must comply with applicable procedures regarding manual voucher authorization. You must also comply with the procedures set forth in the Quest Operating Rules, as amended from time-to-time, issued by the National Automated Clearing House Association and approved by the Financial Management Service of the U.S. Treasury Department, and any additional rules, regulations and procedures specified by any additional state or federal government or agency regarding lost EBT Cards, forgotten PINs, discrepancies in benefits authorized and similar matters by referring EBT customers to their applicable EBT customer service center.

You may not accept any EBT Card for any purpose other than the acceptance of benefits, including without limitation acceptance of any EBT Card as security for repayment of any customer obligation. In the event of any violation of this provision, you will be obligated to reimburse the applicable state or us for any benefits unlawfully received. Cash should never be dispensed for Food Stamp Benefits.

**29.2. Manual EBT Vouchers.** All manual voucher authorizations must be cleared on your POS terminal for payment of voucher to be made to you. Vouchers must be cleared within 10 business days of voice authorization. Vouchers cannot be cleared by any manner except by your POS terminal therefore you should never mail vouchers requesting payment. If a voucher expires before it has been cleared by your POS for payment, no further action can be taken to obtain payment for the voucher. You must

not attempt to voice authorize a manual EBT transaction if the EBT customer is not present to sign the voucher. A copy of the voucher should be given to the EBT customer at the time of authorization and you should retain one copy for your records.

**29.3. Acceptance of EBT Cash Benefits.** If you have agreed to issue Cash Benefits and will provide cash back or cash only transactions, you agree to comply with all applicable laws, rules and regulations and maintain adequate cash on hand to issue confirmed Cash Benefits and will issue Cash Benefits to EBT customers in the same manner and to the same extent cash is provided to your other customers. You may not require that any EBT customers purchase goods or services as a condition to receiving Cash Benefits, unless such condition applies to other customers as well. You may not designate special checkout lanes restricted to use by EBT customers unless you also designate special checkout lanes for debit or Credit Cards and/or other payment methods.

**29.4. Interoperability.** If you issue EBT benefits (Food Stamps and/or Cash Benefits), you must issue EBT benefits from EBT customers from all states.

**29.5. Required Licenses.** If you issue benefits under this Agreement, you represent and warrant to us that you are properly authorized to enter such transactions and are not currently disqualified or withdrawn from redeeming food stamp coupons or otherwise disqualified or withdrawn by any applicable agency. You agree to secure and maintain at your own expense all necessary licenses, permits, franchises, or other authorities required to lawfully effect the issuance and distribution of benefits under this Agreement, including without limitation, any applicable franchise tax certificate and non-governmental contractor's certificate, and covenant that you will not issue benefits at any time during which you are not in compliance with the requirements of any applicable law.

**29.6. Term and Termination.** If you are disqualified or withdrawn from the food stamp program, your authority to issue benefits will be terminated contemporaneously therewith. Such disqualification or withdrawal will be deemed a breach of this Agreement with respect to your authority to issue Cash Benefits and, in the event of such disqualification, we shall have the right to immediately terminate the provision of service under this Section 29.6 or the Agreement in its entirety. With respect to the issuance of Cash Benefits only, your authority to issue Cash Benefits may be suspended or terminated immediately at the sole discretion of us, the state or its EBT service provider, effective upon delivery of a notice of suspension or termination specifying the reasons for such suspension or termination if there shall be: (i) any suspension, injunction, cessation, or termination of the EBT service provider's authority to provide EBT services to the state; (ii) failure by you, upon not less than thirty (30) days prior written notice, to cure any breach by you of the provisions of these terms and conditions, including without limitation, your failure to support the issuance of benefits during your normal business hours consistent with your normal business practices, your failure to comply with issuance procedures, impermissible acceptance of an EBT Card, or your disqualification or withdrawal from the food stamp program; or (iii) based on a state's or its EBT service provider's investigation of the relevant facts, evidence that you or any of your agents or employees are committing, participating in, or have knowledge of fraud or theft in connection with the dispensing of benefits, in the event you fail to cure any breach as set forth above, you may appeal such suspension of termination to the applicable state for determination in its sole discretion.

In the event that your authority to accept benefits is suspended or terminated by a state or its EBT service provider, and you successfully appeal such suspension or termination to the state or its EBT service provider, we shall be under no obligation to reinstate the services previously provided.

The provision of services under this Section 29.6 shall terminate automatically in the event that our Agreement or our service provider's agreement with any applicable state's EBT service provider terminates for any reason.

**29.7. Confidentiality of EBT System Information.** All information related to EBT recipients and/or the issuance of benefits shall be considered confidential information.

Individually identifiable information relating to a benefit recipient or applicant for benefits will be held confidential and will not be disclosed by you or your directors, officers, employees or agents, without prior written approval of the applicable state.

The use of information obtained by you in the performance of your duties under this Section 29.7 will be limited to purposes directly connected with such duties.

**29.8. EBT Service Marks.** You will adequately display any applicable state's service marks or other licensed marks, including the Quest mark, and other materials supplied by us (collectively the "Protected Marks") in accordance with the standards set by the applicable state. You will use the Protected Marks only to indicate that benefits are issued at your location(s) and will not indicate that we, any state or its EBT service provider or we endorse your goods or services. Your right to use such Protected Marks pursuant to this Agreement will continue only so long as this Agreement remains in effect or until you are notified by us, any state or its EBT service provider to cease their use or display.

**29.9. Miscellaneous.**

**29.9.1. Amendments.** If any of these terms and conditions are found to conflict with federal or state law, regulation or policy of the rules, these terms and conditions are subject to reasonable amendment by a state or its EBT service provider to address

such conflict upon thirty (30) days written notice to you provided that you may, upon written notice, terminate your obligation under this Section 29 upon receipt of notice of such amendment.

**29.9.2. State Action.** Nothing contained herein shall preclude a state from commencing appropriate administrative or legal action against you for violating any referral for such action to any appropriate federal, state, or local agency.

**30. SPECIAL PROVISIONS REGARDING WIRELESS SERVICES**

If you elect to purchase any Wireless Equipment from us as indicated on the Application, then the following terms and conditions of this Section 30, referred to as the Wireless Services Terms, shall apply. THE WIRELESS SERVICES ARE NOT BEING SOLD TO YOU FOR HOME OR PERSONAL USE. Sale of Wireless Services is made by Processor and not the Bank. Bank is not a party to this Agreement insofar as it relates to Wireless Services, and Bank is not liable to you in any way with respect to such services. For the purposes of this section, the words "we," "our," and "us" refer only to the Processor and not to the Bank.

Through our affiliates, we have acquired the right to resell and sublicense certain wireless POS terminals and accessories (the "Wireless Equipment") and wireless data communication services using radio base stations and switching offered by the various cellular telephone and data networks throughout the country (the "Wireless Networks") in order to allow you to capture and transmit to us certain Wireless Credit and Debit Card Authorization transactions or to transmit other communications to our system.

You acknowledge that one or more independent third party vendors ("Wireless Vendor(s)") has developed and provides the Wireless Networks' service and Wireless Services to us through our affiliates under separate agreement(s).

In the event you elect to purchase voice and/or data services directly from a third party provider for use with the Wireless Equipment as permitted by Processor, you acknowledge and agree that the Agreement does not address or govern those voice and/or data services or your relationship with that third party provider, and Servicers are in no way responsible for providing, maintaining, servicing or supporting such third party voice and/or data services.

**30.1. Purchase of Wireless Services.** In connection with your purchase of Wireless Equipment, you will purchase the Wireless Networks' service and obtain sublicenses to use any Wireless Software (as defined in Section 30.2) associated therewith (collectively "Wireless Services"). The prices that you will pay for the Wireless Services are set forth on the Service Fee Schedule.

- **Licenses.** You agree to obtain any and all licenses, permits or other authorizations required by the Federal Communications Commission ("FCC") or any other regulatory authority, if any, for the lawful operation of Wireless Equipment used by you in connection with your receipt of Wireless Services. You will promptly provide us with all such information as we may reasonably request with respect to matters relating to the rules and regulations of the FCC.

- **Improvements/General Administration.** We and the Wireless Vendor(s) reserve the right to make changes, from time to time, in the configuration of the Wireless Services, Wireless Networks, Wireless Equipment, Wireless Software, rules of operation, accessibility periods, identification procedures, type and location of equipment, allocation and quantity of resources utilized, programming languages, administrative and operational algorithms and designation of the control center serving you at the particular address. In addition, we reserve the right to schedule, from time to time, interruptions of service for maintenance activities.

**30.2. Software Licenses.** We hereby grant to you a non-exclusive, non-transferable limited sublicense to use any Wireless Software solely in connection with your purchase and use of the Wireless Services. As used in this Section 30, "Wireless Software" means all software used in, for or in connection with the Wireless Equipment, the Wireless Services or the access thereto in whatever form, including without limitation source code, object code and microcode, including any computer programs and any documentation relating to or describing the Wireless Software. You acknowledge that the only right you obtain to the Wireless Software is the right to use the Wireless Software in accordance with the terms in this Section.

**30.3. Limitation on Liability.** We shall have no liability for any warranties by any party with respect to uninterrupted Wireless Services, as set forth in Section 30.10, or for any third party's unauthorized access to Client's data transmitted through either your purchase and use of the Wireless Services, or Wireless Networks, regardless of the form of action (whether in contract, tort (including negligence), strict liability or otherwise). The foregoing notwithstanding, for any other liability arising out of or in any way connected with these Wireless Services terms, including liability resulting solely from loss or damage caused by partial or total failure, delay or nonperformance of the Wireless Services or relating to or arising from your use of or inability to use the Wireless Services, Processors, Bank's and Vendor(s)' liability shall be limited to your direct damages, if any, and, in any event, shall not exceed the amount paid by you for the particular Wireless Services during any period of failure, delay, or nonperformance of the Wireless Services. In no event shall Servicers, Wireless Vendor(s) or our respective affiliates be liable for any indirect incidental, special or consequential damages. The remedies available to you under these Wireless Services Terms will be your sole and exclusive remedies.

**30.4. Indemnification.** In addition to any other indemnifications as set forth in this Agreement, you will indemnify and hold Services, Vendor(s) and our respective officers, directors, employees, and affiliates harmless from against any and all losses, claims, liabilities, damages, costs or expenses arising from or related to: (a) the purchase, delivery, acceptance, rejection, ownership, possession, use condition, liens against, or return of the Wireless Services; (b) your negligent acts or omissions; (c) any breach by you of any of your obligations under this Section 30; or (d) any third party's unauthorized access to Client's data and/or unauthorized financial activity occurring on your Merchant Account Number hereunder, except to the extent any losses, liabilities, damages or expenses result from our gross negligence or willful misconduct.

**30.5. Confidentiality.** All information or materials which could reasonably be considered confidential or competitively sensitive that you access from or relate to either Vendor(s) or Services related to the subject matter of these Wireless Services Terms will be considered confidential information. You will safeguard our confidential information with at least the same degree of care and security that you use for your confidential information, but not less than reasonable care.

**30.6. Termination.** In addition to any other provision in this Agreement, the Wireless Services being provided under this Section 30 may terminate:

a) immediately upon termination of the agreement between us (or our affiliates) and Vendor(s), provided that we will notify you promptly upon our notice or knowledge of termination of such agreement, provided further that if Vendor(s) loses its authority to operate less than all of the Wireless Services or if the suspension of any authority or non-renewal of any license relates to less than all of the Wireless Services, then these Wireless Services Terms will terminate only as to the portion of the Wireless Services affected by such loss of authority, suspension or non-renewal; or

b) immediately if either we or our affiliates or Vendor(s) are prevented from providing the Wireless Services by any law, regulation, requirement, ruling or notice issued in any form whatsoever by judicial or governmental authority (including without limitation the FCC).

**30.7. Effect of Termination.** Upon termination of this Wireless Services Terms for any reason, you will immediately pay to us all fees due and owing to us hereunder. If these Wireless Services Terms terminates due to a termination of the agreement between us or our affiliates and Vendor(s), then we may, in our sole discretion, continue to provide the Wireless Services through Vendor(s) to you for a period of time to be determined as long as you continue to timely payment of fees due under these Wireless Services Terms.

**30.8. Third Party Beneficiaries.** Our affiliates and Vendor(s) are third party beneficiaries of these Wireless Services Terms and may enforce its provisions as if a party hereto.

**30.9. Other Applicable Provisions.** You also agree to be bound by all other terms and conditions of this Agreement.

**30.10. Disclaimer.** Wireless Services use radio transmissions, so Wireless Services can't be provided unless your Wireless Equipment is in the range of one of the available Wireless Networks' transmission sites and there is sufficient network capacity available at that moment. There are places, particularly in remote areas, with no service at all. Weather, topography, buildings, your Wireless Equipment, and other conditions we don't control may also cause failed transmissions or other problems. PROCESSOR, BANK, AND VENDOR(S) DISCLAIM ALL REPRESENTATIONS AND WARRANTIES RELATING TO WIRELESS SERVICES. WE CANNOT PROMISE UNINTERRUPTED OR ERROR-FREE WIRELESS SERVICE AND DO NOT AUTHORIZE ANYONE TO MAKE ANY WARRANTIES ON OUR BEHALF.

### 31. Choice of Law, Venue, Waiver of Jury Trial

**31.1. Choice of Law.** Our Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to its choice of law provisions).

**31.2. Venue.** We have substantial facilities in the State of New York and many of the services provided under this Agreement are provided from these facilities. The exclusive venue for any actions or claims arising under or related to this Agreement shall be in the appropriate state or federal court located in Suffolk County, New York.

**31.3. Waiver of Jury Trial.** ALL PARTIES IRREVOCABLY WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY CLAIM RELATING TO OR ARISING UNDER THIS AGREEMENT.

### 32. Other Terms

**32.1. Force Majeure.** No party shall be liable for any default or delay in the performance of its obligations under this Agreement if and to the extent such default or delay is caused, directly or indirectly, by (i) fire, flood, earthquake, elements of nature or other acts of God; (ii) any terrorist attacks or outbreak or escalation of hostilities, war, riots or civil disorders in any country; (iii) any act or omission of the other party or any government authority; (iv) any labor disputes (whether or not employees' demands are reasonable or within the party's power to satisfy); or (v) the nonperformance by a third party for any similar cause beyond the reasonable control

of such party, including without limitation, failures or fluctuations in telecommunications or other equipment. In any such event, the non-performing party shall be excused from any further performance and observance of the obligations so affected only for as long as such circumstances prevail and such party continues to use commercially reasonable efforts to recommence performance or observance as soon as practicable. Notwithstanding anything to the contrary in this paragraph, your failure to receive payment or funds from a third party shall not excuse the performance of your obligations to us under this Agreement.

**32.2. Compliance with Laws.** In performing its obligations under this Agreement, each party agrees to comply with all laws and regulations applicable to it. You further agree to cooperate and provide information requested by Servicers, as Servicers determine necessary, to facilitate Servicers compliance with any applicable law including without limitation the rules and regulations promulgated by the Office of Foreign Assets Control of the US Department of the Treasury.

**32.3. Notices.** Except as otherwise specifically provided, all notices and other communications required or permitted hereunder (other than those involving normal operational matters relating to the processing of Card transactions) shall be in writing, shall be sent by mail, courier or facsimile (facsimile notices shall be confirmed in writing by courier), if to you at your address appearing in the Application and if to us at our address appearing on the Additional Important Information page, with a copy to Attention: General Counsel's Office, 3975 N.W. 120th Avenue, Coral Springs, FL 33065, and shall be deemed to have been given, (i) if sent by mail or courier, when received, and (ii) if sent by facsimile machine, when the courier confirmation copy is actually received. Notice given in any other manner shall be effective when actually received. Notices sent to the Merchant's last known address, as indicated in our records, shall constitute effective notice to the Merchant under this Agreement.

**32.4. Headings.** The headings contained in this Agreement are for convenience of reference only and shall not in any way affect the meaning or construction of any provision of this Agreement.

**32.5. Severability.** The parties intend every provision of this Agreement to be severable. If any part of this Agreement is not enforceable, the remaining provisions shall remain valid and enforceable.

**32.6. Entire Agreement; Waiver.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter thereof, and supersedes any previous agreements and understandings. A party's waiver of a breach of any term or condition of this Agreement shall not be deemed a waiver of any subsequent breach of the same or another term or condition.

**32.7. Amendment.** We may modify any provision of this Agreement by providing written notice to you. You may choose not to accept the requirements of any such change by terminating the Agreement within thirty (30) days of receiving notice. If you choose to do so, notify us that you are terminating for this reason so that we may waive any early termination fee that might otherwise apply. For purposes of this section, an electronic or "click-wrap" notice intended to modify or amend this Agreement and which you check "I Accept" or "I Agree" or otherwise accept through an electronic process, shall constitute a writing as required herein.

**32.8. No Third Party Beneficiaries.** Nothing in this Agreement is intended to confer upon any person or entity other than the parties any rights or remedies, and the parties do not intend for any third parties to be third-party beneficiaries of this Agreement.

**32.9. Association Rules.** The parties acknowledge that the Visa, MasterCard and Discover Network Association Rules give Visa, MasterCard and Discover Network certain rights to require termination or modification of this Agreement with respect to transactions involving Visa, MasterCard and Discover Network Cards and the Visa, MasterCard and Discover Network Card systems and to investigate you. The parties also acknowledge that issuers of other Cards, for which we perform services on your behalf, may have similar rights under their applicable Association Rules with respect to this Agreement's applicability to transactions involving such other Cards.

## 14. Glossary

As used in this Agreement, the following terms mean as follows:

**Acquirer:** Banks in the case of MasterCard, Visa and certain debit transactions or network acquirers in the case of Discover Network transactions that acquire Card sale transactions from merchants such as yourself.

**Address Verification:** A service provided through which the merchant verifies the Cardholder's address, in whole or in part. Primarily used by Mail/Telephone/Internet order merchants, Address Verification is intended to deter fraudulent transactions. However, it is not a guarantee that a transaction is valid.

**Agreement:** The agreements among Client, Processor, and Bank, contained in the Application, the Program Guide and the Schedules thereto and documents incorporated therein, each as amended from time to time, which collectively constitute the Agreement among the parties. Bank is a party to this Agreement for Visa, MasterCard and non-PIN debit purposes only.

**Application:** See Merchant Processing Application.

**Association:** Any entity formed to administer and promote Cards, including without limitation MasterCard International, Incorporated ("MasterCard"), Visa U.S.A., Inc. and Visa International ("Visa"), DFS Services, LLC ("Discover Network") and any applicable debit networks.

**Association Rules:** The rules, regulations, releases, interpretations and other requirements (whether contractual or otherwise) imposed or adopted by any Association.

**Authorization:** Approval by or on behalf of, the Card Issuer to validate a transaction for a merchant or another affiliate bank. An Authorization indicates only the availability of the Cardholder's credit limit at the time the Authorization is requested.

**Authorization Approval Code:** A number issued to a participating merchant by the Authorization Center which confirms the Authorization for a sale or service.

**Authorization Center:** A department that electronically communicates a merchant's request for Authorization on Credit Card transactions to the Cardholder's bank and transmits such Authorization to the merchant via electronic equipment or by voice Authorization.

**Bank:** The bank identified on the application signed by you.

**Bankruptcy Code:** Title 11 of the United States Code, as amended from time to time.

**Batch:** A single Submission to us of a group of transactions (sales and credits) for settlement. A Batch usually represents a day's worth of transactions.

**Business Day:** A day (other than Saturday or Sunday) on which Bank is open for business.

**Card:** See either Credit Card or Debit Card.

**Cardholder:** Means the individual whose name is embossed on a Card (or Debit Card, as applicable) and any authorized user of such Card.

**Card Issuer:** The bank or Association that issues a Card to an individual.

**Card Not Present Sale/Transaction:** A transaction that occurs when the Card is not present at the point-of-sale, including Internet, mail-order and telephone-order Card sales.

**Cash Benefits:** An EBT account maintained by an Issuer that represents pre-funded or day-of-draw benefits, or both, administered by one or more Government entities, and for which the Issuer has agreed to provide access under the EBT program. Multiple benefits may be combined in a single cash benefit account.

**Cash Over Transaction:** Dispensing of cash by a merchant in connection with a Card sale, other than a PIN Debit Card transaction, for the purchase of goods or services.

**Chargeback:** The procedure by which a Sales Draft or other indicia of a Card transaction (or disputed portion) is returned to Bank, the Acquirer or the Issuer. Client is responsible for reimbursing us for all Chargebacks.

**Client:** The party identified as "Client" on the Application. The words "Subscriber," "you" and "your" refer to Client.

**Credit:** A refund or price adjustment given for a previous purchase transaction.

**Credit Card:** A valid Card authorizing the cardholder to buy goods or services on credit and bearing the service mark of Visa, MasterCard or Discover Network and, to the extent the Schedules so provide, a valid Card authorizing the cardholder to buy goods or services on credit and issued by any other Association specified on such Schedules.

**Credit Card Operating Procedures:** The manual prepared by Processor, containing operational procedures, instructions and other directives relating to Card transactions. The current Operating Procedures are set forth in the Program Guide.

**Credit Draft:** A document evidencing the return of merchandise by a Cardholder to a Client, or other refund made by the Client to the Cardholder.

**Credit Limit:** The credit line set by the Card Issuer for the Cardholder's account.

**Customer Activated Terminal (CAT):** A magnetic stripe terminal or chip-reading device (such as an automatic dispensing machine, Limited Amount Terminal, or Self-Service Terminal) that is not an ATM.

**Debit Card:** See either PIN Debit Card or Non-PIN Debit Card.

**Dial-Up Terminal:** An Authorization device which, like a telephone, dials an Authorization Center for validation of transactions.

**Discount Rate:** An amount charged a merchant for processing its qualifying daily Credit Card transactions. Transactions that fail to meet the applicable interchange requirements will be charged additional amounts as set forth in Section 18.1.

**Electronic Benefit Transfer (EBT):** An electronic system that allows a government benefit recipient to authorize the transfer of their benefits from a Federal, State or local government account to a merchant account to pay for products and services received.

**Electronic Draft Capture (EDC):** A process which allows a merchant's Dial-Up Terminal to receive Authorization and capture transactions, and electronically transmit them to a Card processor. This eliminates the need to submit paper for processing.

**Enhanced Recovery Reduced Rate:** A surcharge applied to any transaction that fails to qualify for the anticipated discounted interchange program in the MasterCard/Visa/Discover Network Qualified Rate referenced in the Service Fee Schedule and is therefore downgraded to a lower discounted interchange program. This is in addition to the difference between the MasterCard/Visa/Discover Network Discount Qualified Rate agreed to in the Service Fee Schedule and the actual discounted interchange rate assessed to the downgraded transaction, which is also your responsibility.

**Factoring:** The submission of authorization requests and/or Sales Drafts by a merchant for Card sales or Cash Advances transacted by another business.

**General Terms:** Section of the Program Guide, including any amendments or modifications.

**Gross:** When referred to in connection with transaction amounts or fees, refers to the total amount of Card sales, without set-off for any refunds or Credits.

**Imprinter:** A manual or electric machine used to physically imprint the merchant's name and ID number as well as the Cardholder's name and Card number on Sales Drafts.

**Issuer:** The bank or Association which has issued a Card to an individual. MasterCard and Visa only issue Cards through banks ("Issuing Banks") while Discover Network may issue Cards directly or issue Cards through an Issuing Bank.

**Limited Amount Terminal:** A Customer Activated Terminal that has data capture only capability, and accepts payment for items such as parking garage fees, road tolls, motion picture theater entrance, or magnetic-stripe telephones.

**Magnetic Stripe:** A stripe of magnetic information affixed to the back of a plastic Credit or debit Card. The Magnetic Stripe contains essential Cardholder and account information.

**Card Validation Codes:** A three-digit value printed in the signature panel of most Cards and a four-digit value printed on the front of an American Express Card. Visa's Card Validation Code is known as CVV2; MasterCard's Card Validation Code is known as CVC2; Discover Network's Card Validation Code is known as a CID. Card Validation Codes are used to deter fraudulent use of an account number in a non-face-to-face environment, (e.g. mail orders, telephone orders and Internet orders).

**Card Verification Value (CVV)/Card Validation Code (CVC):** A unique value encoded on the Magnetic Stripe of a Card used to validate Card information during the Authorization process.

**Media:** The documentation of monetary transactions (i.e., Sales Drafts, Credit Drafts, computer printouts, etc.).

**Merchant Identification Card:** A plastic embossed Card supplied to each merchant to be used for imprinting information to be submitted with each Batch of paper Sales Drafts. Embossed data includes Merchant Account Number, name and sometimes merchant ID code and terminal number.

**Merchant Account Number (Merchant Number):** A number that numerically identifies each merchant, outlet, or line of business to the Processor for accounting and billing purposes.

**Merchant Processing Application:** The application executed by Client, Processor and Bank, which is one of the documents comprising the Agreement.

**Non-PIN Debit Card:** A debit Card with either a Visa, MasterCard or Discover Network mark that is tied to a Cardholder's bank account or a prepaid account and which is processed without the use of a PIN.

**Non-Qualified Interchange Fees:** The difference between the interchange fee associated with the Anticipated Interchange Level and the Interchange fee associated with the more costly interchange level at which the transaction actually processed.

**Non-Qualified Surcharge:** A surcharge applied to any transaction that fails to qualify for the Anticipated Interchange Level and is therefore downgraded to a more costly interchange level. The Non-Qualified Surcharge (the amount of which is set forth on the Service Fee Schedule) is in addition to the Non-Qualified Interchange Fee, which is also your responsibility (see above and Section 18.1).

**Other Services:** Other Services include all services related to , JCB Card, PIN Debit Card, and Electronic Benefits Transfer Transactions, TeleCheck check services, TRS collection services, Gift Card Services, and Transactions involving Cards from other Non-Bank Card Associations such as Voyager Fleet Systems, Inc., Wright Express Corporation and Wright Express Financial Services Corporation.

**PAN Truncation:** A procedure by which a Cardholder's copy of a Sales or Credit Draft will only reflect the last four digits of the Card account number.

**PIN:** A Personal Identification Number entered by the Cardholder to submit a PIN Debit Card transaction.

**PIN Debit Card:** A debit Card used at a merchant location by means of a Cardholder-entered PIN in the merchant PIN Pad. PIN Debit Cards bear the marks of ATM networks (such as NYCE, Star).

**PIN Debit Sponsor Bank:** The PIN Debit Sponsor bank(s) identified on the application signed by you that is/are the sponsoring or acquiring bank(s) for certain PIN Debit networks.

**Point of Sale (POS) Terminal:** A device placed in a merchant location which is connected to the Processor's system via telephone lines and is designed to authorize, record and transmit settlement data by electronic means for all sales transactions with Processor.

**Processor:** The entity identified on this application (other than the Bank) which provides certain services under this Agreement.

**Program Guide:** The booklet which contains Operating Procedures, General Terms, Third Party Agreements and Confirmation Page, which together with the Merchant Processing Application and the Schedules thereto and documents incorporated therein, constitute your Agreement with Processor and Bank.

**Recurring Payment Indicator:** A value used to identify transactions for which a consumer provides permission to a merchant to bill the consumer's Card account at either a predetermined interval or as agreed by the Cardholder for recurring goods or services.

**Referral:** This message received from an issuer when an attempt for Authorization requires a call to the Voice Authorization Center or Voice Response Unit (VRU).

**Reserve Account:** A fund established and managed by us to protect against actual or contingent liability arising from Chargebacks, adjustments, fees and other charges due to or incurred by us.

**Resubmission:** A transaction that the merchant originally processed as a Store and Forward transaction but received a soft denial from the respective debit network or Association. The resubmission transaction allows the merchant to attempt to obtain an approval for the soft denial, in which case you assume the risk that the transaction fails.

**Retrieval Request/Transaction Documentation Request:** A request for documentation related to a Card transaction such as a copy of a Sales Draft or other transaction source documents.

**Sales Draft:** Evidence of a purchase of goods or services by a Cardholder from Client using a Card, regardless of whether the form of such evidence is in paper or electronic form or otherwise, all of which must conform to Association Rules.

**Sales/Credit Summary:** The identifying form used by a paper Submission merchant to indicate a Batch of Sales Drafts and Credit Drafts (usually one day's work). Not a Batch header, which is used by electronic merchants.

**Schedules:** The attachments, addenda and other documents, including revisions thereto, which may be incorporated into and made part of this Agreement.

**Self-Service Terminal:** A Customer Activated Terminal that accepts payment of goods or services such as prepaid cards or video rental, has electronic capability, and does not accept PINs.

**Services:** The activities undertaken by Processor and Bank to authorize, process and settle all United States Dollar denominated Visa and MasterCard transactions undertaken by Cardholders at Client's location(s) in the United States, and all other activities necessary for Processor to perform the functions required by this Agreement for Discover Network and all other Cards covered by this Agreement.

**Servicers:** For Visa and MasterCard Credit and non-PIN debit Card transactions, Bank and Processor collectively. For all other Card transactions, Processor. The words "us" and "we" refer to Servicers.

**Settlement Account:** An account at a financial institution designated by Client as the account to be debited and credited by Processor or Bank for Card transactions, fees, Chargebacks and other amounts due under the Agreement or in connection with the Agreement.

**Split Dial:** A process which allows the Authorization terminal to dial directly to different Card processors (e.g., Amex) for Authorization. In this instance, the merchant cannot be both EDC and Split Dial. Split Dial is also utilized for Check Guarantee companies.

**Split Dial/Capture:** Process which allows the Authorization terminal to dial directly to different Card processors (e.g., Amex) for Authorization and Electronic Draft Capture.

**Store and Forward:** A transaction that has been authorized by a merchant when the merchant cannot obtain an Authorization while the customer is present, typically due to a communications failure. The merchant will store the transaction electronically in their host system and retransmit the transaction when communications have been restored.

**Submission:** The process of sending Batch deposits to Processor for processing. This may be done electronically or by mail.

**Summary Adjustment:** An adjustment to your Submission and/or Settlement Accounts in order to correct errors. (See Sections 10.3 and 10.4).

**Telecommunication Card Sales:** Individual local or long-distance telephone calls, for which the telephone service provider is paid directly by use of a Card. These do not include, however, calls paid for with pre-paid telephone service cards. Telecommunication Card Sales are considered Card Not Present sales.

**Transaction Fees:** Service costs charged to a merchant on a per transaction basis.

**Us, We:** See Servicers.

**You, Your:** See Client.

---

## PART III: THIRD PARTY AGREEMENTS

The following Agreements are Third Party Agreements entered into between Client and the Third Parties identified in the Third Party Agreements.

If Client desires to receive the products and/or services offered under a Third Party Agreement, Client must check the appropriate box or otherwise indicate such desire in the Merchant Processing Application, in which case the terms and conditions of the Third Party Agreement shall be binding upon Client. The Signature page in the Merchant Processing Application or any Schedule thereto shall also serve as a signature page to the Third Party Agreements.

Client acknowledges that the Third Parties are relying upon the information contained on the Merchant Processing Application and the Schedules thereto, all of which are incorporated by reference into the Third Party Agreements.

## 34. Equipment Lease Agreement

This Equipment Lease Agreement ("Lease Agreement") is being entered into by and between First Data Merchant Services Corporation (through its business unit First Data Global Leasing) and the Lessee identified on the signature panel of this Merchant Processing Application ("MPA"). In this Lease Agreement, the words "we," "our" and "us" refer to First Data Merchant Services Corporation and its successors and assigns and the words "you" and "your" refer to Lessee and its permitted successors and assigns.

Lessee hereby authorizes us or our designees, successors or assigns (hereinafter "Lessor") to withdraw any amounts including any and all sales taxes now due or hereinafter imposed, owed by Lessee in conjunction with this Lease Agreement by initiating debit entries to the bank account designated by Lessee on the MPA (the "Settlement Account"). In the event of default of Lessee's obligation hereunder, Lessee authorizes debit of its account for the full amount due under this Lease Agreement. Further, Lessee authorizes its financial institution to accept and to charge any debit entries initiated by Lessor to Lessee's account. In the event that Lessor withdraws funds erroneously from Lessee's account, Lessee authorizes Lessor to credit Lessee's account for an amount not to exceed the original amount of the debit. This authorization is to remain in full force and effect until Lessor has received written notice from Lessee of its termination in such time and in such manner as to afford Lessor a reasonable opportunity to act. Lessee also authorizes Lessor from time to time to obtain investigative credit reports from a credit bureau or a credit agency concerning Lessee.

**34.1.  Equipment.**  We agree to lease to you and you agree to lease from us the equipment identified on the MPA or such other comparable equipment we provide you (the "Equipment"), according to the terms and conditions of this Lease Agreement. We are providing the Equipment to you "as is" and make no representations or warranties of any kind as to the suitability of the Equipment for any particular purpose. The term Equipment includes the Equipment initially deployed under the Lease Agreement and/or any additions, replacements, substitutions, or additions thereto.

**34.2.  Effective Date, Term and Interim Rent.**

a)  This Lease Agreement becomes effective on the earlier of the date we deliver any piece of Equipment to you (the "Delivery Date") or acceptance by us. This Lease Agreement remains in effect until all of your obligations and all of our obligations under it have been satisfied. We will deliver the Equipment to the site designated by you.

b)  The term of this Lease Agreement begins on a date designated by us after receipt of all required documentation and acceptance by us (the "Commencement Date"), and continues for the number of months indicated on the MPA. THIS IS A NON-CANCELABLE LEASE FOR THE TERM INDICATED.

c)  You agree to pay an interim Lease Payment in the amount of one-thirtieth (1/30th) of the monthly lease charge for each day from and including the Delivery Date until the date preceding the Commencement Date.

d)  YOU ACKNOWLEDGE THAT THE EQUIPMENT AND/OR SOFTWARE YOU LEASE UNDER THIS LEASE AGREEMENT MAY NOT BE COMPATIBLE WITH ANOTHER PROCESSOR'S SYSTEMS AND THAT WE DO NOT HAVE ANY OBLIGATION TO MAKE SUCH SOFTWARE AND/OR EQUIPMENT COMPATIBLE IN THE EVENT THAT YOU ELECT TO USE ANOTHER SERVICE PROVIDER. UPON TERMINATION OF YOUR MERCHANT PROCESSING AGREEMENT, YOU ACKNOWLEDGE THAT YOU MAY NOT BE ABLE TO USE THE EQUIPMENT AND/OR SOFTWARE LEASED UNDER THIS LEASE AGREEMENT WITH SAID SERVICE PROVIDER.

**34.3.  Site Preparation.**  You will prepare the installation site(s) for the Equipment, including but not limited to the power supply circuits and phone lines, in conformance with the manufacturer's and our specifications and will make the site(s) available to us by the confirmed shipping date.

**34.4.  Payment of Amounts Due.**

a)  The monthly lease charge is due and payable monthly, in advance. You agree to pay all assessed costs for delivery and installation of Equipment.

b)  In addition to the monthly lease charge, you shall pay, or reimburse us for, amounts equal to any taxes, assessments on or arising out of this Lease Agreement or the Equipment, and related supplies or any services, use or activities hereunder, including without limitation, state and local sales, use, property, privilege and excise tax, tax preparation, compliance expenses, but exclusive of taxes based on our net

income. Property taxes are calculated and charged based on the average of the estimated annual property taxes over the course of the term of the lease. You will also be charged an annual Tax Handling Fee, as set forth in the MPA and/or applicable Fee Schedule.

c)  Your lease payments will be due despite dissatisfaction with the Equipment for any reason.

d)  Whenever any amount is not made by you in full when due, you shall pay us as a late charge, an amount equal to ten percent of the amount due but no less than $10.00 for each month during which it remains unpaid (prorated for any partial month), but in no event more than the maximum amount permitted by law. You shall also pay to us an administrative charge of $25.00 for any debit we attempt to make against your Settlement Account that is rejected.

e)  In the event your account is placed into collections for past due lease amounts, you agree that we can recover a collection expense charge of $50.00 for each aggregate payment requiring a collection effort.

**34.5.  Use and Return of Equipment; Insurance.**

a)  You shall cause the Equipment to be operated by competent and qualified personnel in accordance with any operating instructions furnished by us or the manufacturer. You shall maintain the Equipment in good operating condition and protect it from deterioration, normal wear and tear excepted.

b)  You shall not permit any physical alteration or modification of the Equipment, or change the installation site of the Equipment, without our prior written consent.

c)  You shall not create, incur, assume or allow to exist any consensually or judicially imposed liens or encumbrances on, or part with possession of, or sublease the Equipment without our prior written consent.

d)  You shall comply with all governmental laws, rules and regulations relating to the use of the Equipment. You are also responsible for obtaining all permits required to operate the Equipment at your facility.

e)  We or our representatives may, at any time, enter your premises for purposes of inspecting, examining or repairing the Equipment.

f)  The Equipment shall remain our personal property and shall not under any circumstances be considered to be a fixture affixed to your real estate. You shall permit us to affix suitable labels or stencils to the Equipment evidencing our ownership.

g)  You shall keep the Equipment adequately insured against loss by fire, theft, and all other hazards.

h)  You shall provide proof of insurance. The loss, destruction, theft or damage of or to the Equipment shall not relieve you from your obligation to pay the full purchase price or total monthly lease charges hereunder.

**34.6.  Title to Equipment.**  The Equipment is, and shall at all times be and remain, our sole and exclusive property, and you shall have no right, title or interest in or to the Equipment except as expressly set forth in this Lease Agreement or otherwise agreed in writing. Except as expressly provided in Section 8, no transference of intellectual property rights is intended by or conferred in this Lease Agreement. You agree to execute and deliver to us any statement or instrument that we may request to confirm or evidence our ownership of the Equipment, and you irrevocably appoint us as your attorney-in-fact to execute and file the same in your name and on your behalf. If a court determines that the leasing transaction contemplated by this Lease Agreement does not constitute a financing and is not a lease of the Equipment, then we shall be deemed to have a first lien security interest on the Equipment as of the date of this Lease Agreement, and you will execute such documentation as we may request to evidence such security interest. If this Lease Agreement is deemed a loan despite the intention of the parties, then in no contingency or event whatsoever shall interest deemed charged hereunder, however such interest may be characterized or computed, exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.

**34.7.  Return or Purchase of Equipment at End of Lease Period.**  Upon the completion of your lease term or any extension, you will have the option to: (a) return the Equipment to us, or (b) purchase the Equipment from us for the lesser of fair market value at the time (as determined in good faith by us) or an amount equal to ten-percent (10%) of the total lease payments under this Lease Agreement with

respect to each Item of Equipment. If you wish to purchase the Equipment from us, you must give notice to us in writing prior to the end of the lease term in order to ascertain the purchase price. In the absence of an affirmative election by you to return or purchase the Equipment, this lease will continue on a month-to-month basis at the existing monthly lease payment. If we terminate this Lease Agreement pursuant to Section 12 (b) due to a default by you, then you shall immediately return the Equipment to us no later than the tenth Business Day after termination, or remit to us the fair market value of the Equipment as determined in good faith by us. We may collect any amounts due to us under this Section 7 by debiting your Settlement Account, and to the extent we are unable to obtain full satisfaction in this manner, you agree to pay the amounts owed to us promptly upon our request.

34.8.  Software License.  We retain all ownership and copyright interest in and to all computer software, related documentation, technology, know-how and processes embodied in or provided in connection with the Equipment other than those owned or licensed by the manufacturer of the Equipment (collectively "Software"), and you shall have only a nonexclusive license to use the Software in your operation of the Equipment.

34.9.  Limitation on Liability.  We are not liable for any loss, damage or expense of any kind or nature caused directly or indirectly by the Equipment, including any damage or injury to persons or property caused by the Equipment. We are not liable for the use or maintenance of the Equipment, its failure to operate, any repairs or service to it, or by any interruption of service or loss of use of the Equipment or resulting loss of business. Our liability arising out of or in any way connected with this Lease Agreement shall not exceed the aggregate lease amount paid to us for the particular Equipment involved. In no event shall we be liable for any indirect, incidental, special or consequential damages. The remedies available to you under this Lease Agreement are your sole and exclusive remedies.

34.10.  Warranties.

a)  All warranties, express or implied, made to you or any other person are hereby disclaimed, including without limitation, any warranties regarding quality, suitability, merchantability, fitness for a particular purpose, quiet enjoyment, or infringement.

b)  You warrant that you will only use the Equipment for commercial purposes and will not use the Equipment for any household or personal purposes.

34.11.  Indemnification.  You shall indemnify and hold us harmless from and against any and all losses, liabilities, damages and expenses resulting from (a) the operation, use, condition, liens against, or return of the Equipment or (b) any breach by you of any of your obligations hereunder, except to the extent any losses, liabilities, damages or expenses result from our gross negligence or willful misconduct.

34.12.  Default; Remedies.

a)  If any debit of your Settlement Account initiated by us is rejected when due, or if you otherwise fail to pay us any amounts due hereunder when due, or if you default in any material respect in the performance or observance of any obligation or provision of this Lease Agreement or any agreement with any of our affiliates or joint ventures, any such event shall be a default hereunder. Without limiting the foregoing, any default by you under a processing agreement with us or with an affiliate or joint venture to which we are a party will be treated as a default under this Lease Agreement. Such a default would include a default resulting from early termination of the MPA.

b)  Upon the occurrence of any default, we may at our option, effective immediately without notice, either (i) terminate this lease and our future obligations under this Lease Agreement, repossess the Equipment and proceed in any lawful manner against you for collection of all charges that have accrued and are due and payable, or (ii) accelerate and declare immediately due and payable all monthly lease charges for the remainder of the applicable lease period together with the fair market value of the Equipment (as determined by us), not as a penalty but as liquidated damages for our loss of the bargain. Upon any such termination for default, we may proceed in any lawful manner to obtain satisfaction of the amounts owed to us and, if applicable, our recovery of the Equipment, including entering onto your premises to recover the Equipment. In any case, you shall also be responsible for our costs of collection, court costs, as well as applicable shipping, repair and refurbishing costs of recovered Equipment. You agree that we shall be entitled to recover any amounts due to us under this Lease Agreement by charging your Settlement Account or any other funds of yours that come into our possession or control, or within the possession or control of our affiliates or joint ventures, or by setting off amounts that you owe to us against any amounts we may owe to you, in any case without notifying you prior to doing so. Without limiting the foregoing, you agree that we are entitled to recover amounts owed to us under this Lease Agreement by obtaining directly from an affiliate or joint venture to which we are a party and which you have entered into an MPA any funds held or available as security for payment under the terms of the MPA, including funds available under the "Reserve Account; Security Interest" section of the MPA, if applicable.

34.13.  Assignment.  You may not assign or transfer this Lease Agreement, by operation of law or otherwise, without our prior written consent. For purposes of this Lease Agreement, any transfer of voting control of you or your parent shall be considered an assignment or transfer of this Lease Agreement. We may assign or transfer this Lease

Agreement and our rights and obligations hereunder, in whole or in part, to any third party without the necessity of obtaining your consent.

34.14.  Lease Guaranty.  No guarantor shall have any right of subrogation to any of our rights in the Equipment or this Lease Agreement or against you, and any such right of subrogation is hereby waived and released. All indebtedness that exists now or arises after the execution of this Lease Agreement between you and any guarantor is hereby subordinated to all of your present and future obligations, and those of your guarantor, to us, and no payment shall be made or accepted on such indebtedness due to you from a guarantor until the obligations due to us are paid and satisfied in full.

34.15.  Governing Law; Venue; Miscellaneous.  This Lease Agreement shall be governed by and will be construed in accordance with the laws of the State of New York (without applying its conflicts of laws principles). The exclusive venue for any actions or claims arising under or related to this Lease Agreement shall be in the appropriate state of federal court located in Suffolk County, New York. If any part of this Lease Agreement is not enforceable, the remaining provisions will remain valid and enforceable.

34.16.  Notices.  All notices must be in writing, and shall be given (a) if sent by mail, when received, and (b) if sent by courier, when delivered; if to you at the address appearing on the MPA, and if to us at 4000 Coral Ridge Drive, Coral Springs, Florida 33065, Attn: Lease Department. Customer Service toll free number 1-877-257-2094.

34.17.  Entire Agreement.  This Lease Agreement constitutes the entire Agreement between the parties with respect to the Equipment, supersedes any previous agreements and understandings and can be changed only by a written agreement signed by all parties. This Lease Agreement may be executed in any number of counterparts and all such counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Lease Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Lease Agreement.

## 35. TeleCheck/TRS Services Agreement

**35.1. Term, Termination and Amendment.** TeleCheck will provide the services, and any specified equipment and maintenance, to this Agreement for an initial term of 36 months as specified on the face of this Agreement from the Effective Date; provided, however, that hereunder may terminate this Agreement if Subscriber gives and TeleCheck receives written notice of termination within the first 60 days of the Agreement. Thereafter, this Agreement shall automatically renew for successive 12 month terms until terminated as provided for herein. Subscriber may terminate this Agreement at the end of the initial term or any renewal term upon at least thirty days' prior written notice to TeleCheck. In the event TeleCheck changes the rates, fees or warranty limits hereunder, Subscriber may terminate this Agreement upon written notice received by TeleCheck from Subscriber within thirty days of Subscriber's receipt of notice of such change. TeleCheck may terminate this Agreement at any time upon notice to Subscriber. TeleCheck reserves the right to amend, at its discretion, the terms and conditions herein, including, without limitation, any addenda, Operational Procedures, rates and fees, by providing Subscriber notice thereof and such amendments shall be effective 30 days from the date notice is mailed to Subscriber.

**35.2. Definitions.** As used herein the following definitions apply: "check writer" means the drawer of a check; "Claim" means any arbitration award, assessment, charge, citation, claim, damage, demand, directive, expense, fine, interest, joint or several liability, lawsuit or other litigation, notice, infringement or misappropriation of any patent, trademark, copyright or other intellectual property right or violation of any law, and any consequential, indirect, special, incidental or punitive damages and any attorney's fees and expenses incurred in connection therewith. For purposes of the foregoing Claim definition, a Claim shall be considered to exist even though it may be conditional, contingent, indirect, potential, secondary, unaccrued, unasserted, unknown, unliquidated, or unmatured; "consumer" means a check writer, person, or entity that authorizes an item; "Dishonored Item" means an item having received a valid TeleCheck Approval Code pursuant to a Warranty Service Business Transaction, but which is dishonored upon presentment for payment; "Item" means an outstanding financial obligation pursuant to a check, including a check processed as an ECA Business Transaction; "ECA Business Transaction" means a transaction for the contemporaneous purchase of goods or services (including, without limitation, taxes), the payment for which is processed as an ECA transaction; provided, however, it does not include any ECA transactions for cash or payment on an account, debt or check already due Subscriber; "ECA batch" means a collection of saved ECA transactions; "Operational Procedures" means Tele-Check's published policies and procedures contained in various documents provided to Subscriber concerning the services, equipment and maintenance provided pursuant to this Agreement, the terms of which are incorporated in this Agreement as if fully set forth herein; "Returned Item" means any item not paid by Subscriber's financial institution or that fails to comply with the terms and conditions of this Agreement or meet the Warranty Requirements; "TeleCheck Approval Code" means that TeleCheck has authorized an item for warranty coverage under this Agreement pursuant to a Warranty Service Business Transaction; "TeleCheck Parties" means TeleCheck, its officers, directors, employees, shareholders, agents and attorneys; "Warranty Maximum":

a) for an item processed as a non-ECA transaction means the lower of (i) the face amount of the item; or (ii) the lesser amount set forth on the face of this Agreement; and

b) for an item processed as an ECA transaction means the lower of (i) the face amount of the item; or (ii) $20,000.00; and "Warranty Service Business Transaction" means a transaction for the contemporaneous purchase of goods or services pursuant to TeleCheck's warranty service program and shall not include checks written for cash or for payment on an account, debt or check already due Subscriber.

**35.3. Fees, Rates and Warranty Changes.** Subscriber shall pay TeleCheck the fees and rates set forth on the face of this Agreement, attached Rate Schedule, if any, or in the terms and conditions herein, as changed from time to time by TeleCheck, plus all applicable taxes. The Set Up Fees First Location and Additional Location(s) are fees related to the establishment and set up of the first and subsequent locations on the TeleCheck service. The ECA Conversion Fee is the fee charged to convert an existing Subscriber to the ECA service.The "Inquiry Rate"is the percentage rate set forth in the Rate Schedule which shall apply to each item which is entered into the TeleCheck system whether by telephone, electronically or otherwise. "December Risk Surcharge" is an additional charge for each December that is: (i) 10 basis points (0.10%); or (ii) the percentage set forth on the face of this Agreement. The "Monthly Minimum Fee" is the minimum amount of inquiry fees that Subscriber shall pay on a monthly basis. If the total fees for Subscriber's inquiries for any month are less than the Minimum Monthly Fee, then the Minimum Monthly Fee shall apply. "Additional Inquiry Fees" are those fees for inquiries exceeding the dollar volume of inquiries included in the Monthly Minimum Fee. The "Processing Fee" is a monthly fee for handling Subscriber's account. The "Charge Per Transaction" is the per transaction charge for all transactions determined by the method by which the transaction is delivered to TeleCheck. The "ECA Charge Per Transaction" is the additional per transaction charge for all ECA transactions for an ECA Subscriber. The "Non-Imaging Surcharge" is a per transaction charge for every ECA transaction that is not processed using a TeleCheck approved imaging device. The "POS Support Charge" is a monthly fee for point of sale support services.

The "Transaction Surcharge" is an additional charge for transactions going over third party networks. The "ECA Chargeback Fee" is a $5.00 handling fee for each charge-back of an ECA transaction. The "ECA Funding Report Fee" is an additional fee to receive daily or weekly ECA funding reports. The "ECA Correction Fee" is a $5.00 fee payable on each item in an ECA batch that must be corrected due to Subscriber error or at the request of the Subscriber. The "Customer Requested Operator Call Charge" is an additional charge of $2.50 per operator-assisted call not requested by TeleCheck. The "Recovery Processing Fee" is a $5.00 charge for each check that fails to meet Warranty Requirements for which TeleCheck elects, in its discretion, to reimburse Subscriber as a "Goodwill item" for a specific Returned Item. A "Warranty Research Fee" of $7.50 will be charged each time Subscriber requests substantiation of a warranty payment/non-payment. These above fees are in addition to any fees charged by TeleCheck to Subscriber under any other agreement.

**35.4.1. Payment, Reserve Account, Security Interest.** All fees and charges are due upon receipt. Subscriber authorizes TeleCheck to debit from Subscriber's financial institution account as provided to TeleCheck by Subscriber, all payments and other amounts owed (including, without limitation, all chargebacks, ECA Chargeback Fees and Returned Item Fees) to TeleCheck or its affiliates under this Agreement or any other agreement between Subscriber and TeleCheck or its affiliates, and to credit all amounts owing to Subscriber under this Agreement to Subscriber's financial institution account. If there are insufficient funds in Subscriber's financial institution account to pay amounts owed to TeleCheck or its affiliates, or if there are any amounts otherwise not paid by Subscriber when due, including, without limitation, delinquent fees, charge-backs or rejected and reassigned warranty items, Subscriber shall immediately reimburse TeleCheck or its affiliates upon demand, or at TeleCheck's option, TeleCheck may offset such amounts against any amounts due Subscriber from TeleCheck or its affiliates under this Agreement or any other agreement between Subscriber and TeleCheck or its affiliates. A delinquency charge of 1-1/2% per month or the highest amount permitted by law, whichever is lower, shall be added to the outstanding balance of any account over fifteen (15) days delinquent. TeleCheck shall have the right to suspend all services and obligations to Subscriber, including the payment of all warranties due and all transactions previously authorized, during any period in which Subscriber's account is delinquent. Subscriber agrees to pay to TeleCheck a $25.00 fee for any check or ACH debit that is not paid by Subscriber's financial institution upon presentment.

**35.4.2.** Subscriber expressly authorizes TeleCheck to establish a reserve account ("Reserve Account") for ECA Business Transactions. The amount of the Reserve Account shall be set by TeleCheck, in its sole discretion, based upon Subscriber's processing history and the estimated risk of loss to TeleCheck.

**35.4.3.** The Reserve Account shall be fully funded upon three (3) days' notice to Subscriber, or in instances of fraud or breach of this Agreement, the Reserve Account may be funded immediately at TeleCheck's election. The Reserve Account may be funded by all or any combination of the following: (i) one or more debits to Subscriber's financial institution (and TeleCheck is hereby authorized to make such debits); (ii) one or more deductions or offsets to any payments otherwise due to Subscriber from Tele-Check or any of its affiliates; or (iii) Subscriber's delivery to TeleCheck of a letter of credit. Any such letter of credit shall be issued or established by a financial institution acceptable to TeleCheck and in a form satisfactory to TeleCheck, both in TeleCheck's discretion. In the event of termination of this Agreement by either Subscriber or TeleCheck, an immediate Reserve Account may be established without notice in the manner provided above. Any Reserve Account will be held by TeleCheck for ten (10) months after termination of this Agreement. Subscriber's funds held in a Reserve Account may be held in a commingled Reserve Account for the reserve funds of TeleCheck's Subscribers, without involvement by an independent escrow agent, and shall not accrue interest.

**35.4.4.** If Subscriber's funds in the Reserve Account are not sufficient to cover the delinquent fees, chargebacks or rejected and reassigned warranty items, or any other fees and charges due from Subscriber to TeleCheck or its affiliates, or if the funds in the Reserve Account have been released, Subscriber shall immediately pay TeleCheck such sums upon request. In the event of a failure by Subscriber to fund the Reserve Account, TeleCheck may fund such Reserve Account in the manner set forth in Subsection 4.3, above.

**35.4.5.** To secure Subscriber's obligations to TeleCheck and its affiliates under this Agreement and any other agreement for the provision of related equipment or services (including any check or credit card processing services), Subscriber grants to TeleCheck a lien and security interest in and to any of Subscriber's funds pertaining to the transactions contemplated by this Agreement now or hereafter in the possession of TeleCheck or its affiliates, whether now or hereafter due or to become due to Subscriber from TeleCheck. Any such funds, money or amounts may be commingled with other funds of TeleCheck, or, in the case of any funds held pursuant to the foregoing paragraphs, with any other funds of other Subscribers of TeleCheck. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, TeleCheck is hereby authorized by Subscriber at any time and from time to time, without notice or demand to Subscriber or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and to

24

and the terms of this Agreement, the terms of this Agreement shall govern. Subscriber is authorized to use TeleCheck-owned or -supplied equipment and/or ECA services pursuant to this Agreement only for the processing of expressly filled out checks (i.e., negotiable instruments). Any other use of TeleCheck-owned or -supplied equipment or ECA services is unauthorized and Subscriber covenants not to make any such use of the equipment or ECA services. Should Subscriber make any use of TeleCheck-owned or -supplied equipment or ECA services other than those expressly authorized by this Agreement, Subscriber agrees to indemnify, defend and hold harmless TeleCheck as set out in paragraph 23.

35.22.  Assignment of Agreement. This Agreement may be assigned by Subscriber only with the prior written consent of TeleCheck. TeleCheck may freely assign this Agreement, its rights, benefits or duties hereunder. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the successors and assigns of TeleCheck and the heirs, executors, administrators, successors and assigns of Subscriber.

35.23.  Legal Responsibility. In the event Subscriber violates any terms or conditions of this Agreement, Subscriber shall indemnify, defend and hold harmless TeleCheck and its affiliates from and against any and all Claims arising therefrom, including, payment of all costs and reasonable attorneys' fees, for actions taken by TeleCheck, whether by suit or otherwise, to defend TeleCheck or its affiliates from any Claim related thereto or to preserve or enforce TeleCheck's rights under this Agreement, and TeleCheck shall have the right to immediately repossess all equipment owned by TeleCheck. In the event of any legal action with third parties or regulatory agencies concerning any transaction or event arising under this Agreement, Subscriber shall: (i) promptly notify TeleCheck of the Claim(s) or legal action; (ii) reasonably cooperate with TeleCheck in the making of any Claim(s) or defense(s); and (iii) provide information, assist in the resolution of the Claim(s) and make available at least one employee or agent who can testify regarding said Claim(s) or defense(s). Subscriber shall indemnify, defend, and hold harmless the TeleCheck Parties from any Claim(s) arising from any false or inaccurate representation made by Subscriber or from Subscriber's failure to strictly comply, in whole or in part, with any: (i) terms and conditions pursuant to this Agreement and any addenda hereto or Operational Procedures; or (ii) applicable law. Upon written notice from TeleCheck to Subscriber, Subscriber shall immediately undertake the defense of such Claim by representatives of its own choosing, subject to TeleCheck's reasonable approval; provided, however, that TeleCheck shall have the right to control and undertake such defense by representatives of its own choosing, but at Subscriber's cost and expense, if the Claim arises out of patent, trademark, or other intellectual property rights or laws.

In no event shall TeleCheck be liable to Subscriber, or to any other person or entity, under this Agreement, or otherwise, for any punitive, exemplary, special, incidental or consequential damages, including, without limitation, any loss or injury to earnings, profits or goodwill. Notwithstanding anything to the contrary contained in this Agreement, in no event shall TeleCheck's liability under this Agreement for all Claims arising under, or related to, this Agreement exceed, in the aggregate (inclusive of any and all Claims made by Subscriber against TeleCheck, whether related or unrelated), the lesser of: (i) the total amount of fees paid to TeleCheck by Subscriber pursuant to this Agreement during the 12-month period immediately preceding the date the event giving rise to such Claim(s) occurred; or (ii) $75,000.00.

35.24.  DISCLAIMER. EXCEPT AS EXPRESSLY SET FORTH IN PARAGRAPH 6.1, TELECHECK MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AND NO IMPLIED AT LAW WARRANTY SHALL ARISE FROM THIS AGREEMENT, THE SALE OF ANY EQUIPMENT BY TELECHECK TO SUBSCRIBER, OR FROM PERFORMANCE BY TELECHECK, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE, ALL OF WHICH ARE EXPRESSLY WAIVED BY SUBSCRIBER. All decisions to reject any check or ECA transaction, driver's license or other form of identification or payment for Subscriber's products or services are solely Subscriber's responsibility. Subscriber assumes all risks that any and all checks (including checks processed as ECA Transactions) accepted by Subscriber may be dishonored, whether or not TeleCheck has issued a TeleCheck Approval Code with respect to such check(s).

35.25.  Notices. Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be hand delivered or delivered by facsimile transmission or overnight courier or certified or registered mail (and if sent by Subscriber by mail, postage prepaid return receipt requested) addressed or transmitted to the party to be notified at such party's address or number as provided on the front of this Agreement at such party's last known address or number. Any notice delivered hereunder shall be deemed effective upon delivery, if hand delivered or sent by overnight courier, and upon receipt, as evidenced by the date of transmission indicated on the transmitted material if by facsimile transmission, or the date of delivery indicated on the return receipt, if mailed as aforesaid. The parties' addresses may be changed by written notice to the other party as provided herein.

35.26.  Force Majeure. TeleCheck shall not be held responsible for any delays in or failure or suspension of service caused by mechanical or power failure, computer malfunctions (including, without limitation, software, hardware and firmware malfunctions), strikes, labor difficulties, fire, inability to operate or obtain service for its equipment, unusual delays in transportation, act of God, or other causes reasonably beyond the control of TeleCheck.

35.27.  Governing Law and Integration. Subscriber shall comply with all applicable laws, regulations and rules, including NACHA rules and guidelines, relating to the services provided hereunder. This Agreement, plus any addenda attached hereto, constitute the entire Agreement between the parties concerning subject matter hereof and supersedes all prior and contemporaneous understandings, representations and agreements in relation to its subject matter. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.

35.28.  Severability and Interpretation. If any provision, in whole or in part, of this Agreement is held invalid or unenforceable for any reason, the invalidity shall not affect the validity of the remaining provisions of this Agreement, and the parties shall substitute for the invalid provision a valid provision which most closely approximates the intent and economic effect of the invalid provision. Neither this Agreement, nor any addenda or Operational Procedures, shall be interpreted in favor or against any party because such party or its counsel drafted this Agreement, or such addenda or Operational Procedures. No course of dealing, usage, custom of trade or communication between the parties shall modify or alter any of the rights or obligations of the parties under this Agreement. This Agreement is solely for the benefit of TeleCheck (and its affiliates) and Subscriber and no other person or entity shall have any right, interest or claim under this Agreement. As used in this Agreement, (i) the term "include," or any derivative of such term, shall not mean that the items following such item are the only types of such items; (ii) the term "shall" indicates a mandatory obligation; (iii) the term "may" indicates a permissive election and does not imply any duty to exercise such election; and (iv) the term "discretion" means the sole and absolute discretion of the party granted the discretion, absent an express limitation on such discretion.

35.29.  Amendment and Waiver. No modification, amendment or waiver of any of the terms and conditions of this Agreement shall be binding upon TeleCheck, whether written, oral, or in any other medium, unless made in writing and approved and signed by TeleCheck. All rights and duties within this Agreement are material and time is of the essence; no waiver of any rights hereunder shall be deemed effective unless in writing executed by the waiving party; no waiver by either party of a breach or any provision of this Agreement shall constitute a waiver of any prior or subsequent breach of the same or any other provision of this Agreement; no failure to exercise, and no delay in exercising, any right(s) hereunder on the part of either party shall operate as a waiver of any such right; all of TeleCheck's rights are cumulative; and, no single or partial exercise of any right hereunder shall preclude further exercise of such right or any other right.

35.30.  Damages. Upon Subscriber's breach or unauthorized termination of this Agreement, TeleCheck shall be entitled to recover from Subscriber liquidated damages in an amount equal to ninety percent (90%) of the total aggregate charges payable for the unexpired portion of the then current term of this Agreement. TeleCheck and Subscriber hereby acknowledge and agree that, after giving due consideration to the costs TeleCheck may incur by reason of Subscriber's breach or unauthorized termination of this Agreement, to the possibility that TeleCheck will not be able to mitigate its damages, and to the expense savings that TeleCheck may obtain by not having to provide services, equipment or maintenance, the liquidated damages specified herein constitute a realistic pre-estimate of the loss to TeleCheck in the event of such breach or unauthorized termination of this Agreement and will not be construed as a penalty.

35.31.  Survivability. All representations, warranties, indemnities and covenants made herein shall survive the termination of this Agreement and shall remain enforceable after such termination.

## 26. ADDITIONAL IMPORTANT INFORMATION FOR CARDS

### 26.1 Electronic Funding Authorization

All payments to Client shall be through the Automated Clearing House ("ACH") and shall normally be electronically transmitted directly to the Demand Deposit Account ("DDA") you have designated or any successor account designated to receive provisional funding of Client's Card sales pursuant to the Agreement. Client agrees that any DDA designated pursuant to the preceding sentence will be an account primarily used for business purposes. Neither Wells Fargo Bank, N.A. nor First Data Merchant Services Corporation can guarantee the time frame in which payment may be credited by Client's depository institution (DEPOSITORY).

Client hereby authorizes Wells Fargo Bank, N.A. and its authorized representative, including First Data Merchant Services Corporation, to access information from the DDA and to initiate credit and/or debit entries by bankwire or ACH-transfer and to authorize DEPOSITORY to block or to initiate, if necessary, reversing entries and adjustments for any original entries made to the DDA and to authorize DEPOSITORY to provide such access and to credit and/or debit or to block the same to such account. This authorization is without respect to the source of any funds in the DDA, is irrevocable and coupled with an interest. This authority extends to any equipment rental or purchase agreements which may exist with Client as well as to any fees and assessments and Chargeback amounts of whatever kind or nature due to First Data Merchant Services Corporation or Wells Fargo Bank, N.A. under terms of this Agreement whether arising during or after termination of the Agreement. This authority is to remain in full force and effect at all times unless and until First Data Merchant Services Corporation and Wells Fargo Bank, N.A. have consented to its termination at such time and in such a manner as to afford them a reasonable opportunity to act on it. In addition, Client shall be charged twenty dollars ($20.00) for each ACH which cannot be processed, and all subsequent funding may be suspended until Client either (i) notifies First Data Merchant Services Corporation that ACH's can be processed or (ii) a new electronic funding agreement is signed by Client. Client's Depository must be able to process or accept electronic transfers via ACH.

### 26.2 Funding Acknowledgment

Your funds for MasterCard, Visa and Discover Network transactions will be processed and transferred to your financial institution within two (2) business days from the time a batch is received by Processor if your financial institution is the Bank. If your financial institution is not the Bank, your MasterCard, Visa and Discover Network transactions will be processed via the Federal Reserve within two (2) business days from the time a batch is received by Processor. The Federal Reserve will transfer such amounts to your financial institution, unless otherwise directed by FDMS Credit Underwriting.

### 26.3 Additional Fees and Early Termination

If Client's MasterCard, Visa and Discover Network transaction(s) fail to qualify for the discount level contemplated in the rates set forth in the Application, Client will be billed the fee indicated in the Mid-Qualified Discount field or Non-Qualified Discount field. If you are utilizing the Enhanced Recovery Reduced Discount option, the Client will be charged the Enhanced Recovery Reduced Rate on the volume of said transaction that failed to qualify, in addition to the difference between the MasterCard/Visa/Discover Network Qualified Rate agreed to in Section 9 of the Service Fee Schedule and the actual interchange rate assessed to the downgraded transaction.

Your initial MasterCard, Visa and Discover Network rates are stated on your Application and may be adjusted from time to time including to reflect:

a.  Any increases or decreases in the interchange and/or assessment portion of the fees;

b.  The appropriate interchange level as is consistent with the qualifying criteria of each transaction submitted by Client;

c.  Increases in any applicable sales or telecommunications charges or taxes levied by any state, federal or local authority related to the delivery of the services provided by First Data Merchant Services Corporation when such costs are included in the Service or other fixed fees.

The discount fees shown in Section 9, Service Fee Schedule, shall be calculated based on the gross sales volume of all Visa, MasterCard and Discover Network volume.

A Monthly Minimum Processing Fee will be assessed immediately after the date Client's Application is approved. (Refer to Section 9, Service Fee Schedule, if applicable.)

In addition to the PIN Debit Card transaction fees set forth on the Application, Client shall be responsible for the amount of any fees imposed upon a transaction by the applicable debit network.

The parties further agree and acknowledge that, in addition to any remedies contained herein or otherwise available under applicable law and, if (a) CLIENT breaches this Agreement by improperly terminating it prior to the expiration of the applicable term of the Agreement, or (b) this Agreement is terminated prior to the expiration of the applicable term of the Agreement due to an Event of Default, then SERVICERS will suffer a substantial injury that is difficult or impossible to accurately estimate. Accordingly, the parties have agreed that the amount described below is a reasonable pre-estimate of SERVICERS' probable loss. Such amount shall be paid to SERVICERS within 15 days after CLIENT's receipt of SERVICERS' calculation of the amount due.

In the event that Client terminates this Agreement within three (3) years from the date of approval by First Data Merchant Services Corporation and Wells Fargo Bank, N.A., Client will be charged a fee for such early termination, if so indicated on the Application in Section 9, Service Fee Schedule. Client's obligation with respect to the Monthly Minimum Processing Fee will end simultaneously with First Data Merchant Services' receipt of Termination Fee.

### 26.4 Address for Notices

| First Data Merchant Services Corporation | Important Phone Numbers: (see also Sections 3.3 and 5.4) |
|---|---|
| 1307 Walt Whitman Road Melville, NY 11747 Attn: Merchant Services (FACS) | Customer Service 1-800-858-1166 |
| Wells Fargo Bank, N.A.: 1200 Montego Way Walnut Creek, CA 94598 1-800-451-5817 | |

If this application for business credit is denied you may obtain a written statement of the specific reasons for denial. To obtain the statement, please contact Credit Initiation, 1307 Walt Whitman Road, Melville, NY 11747, 1-800-767-2484 ext. 32900, within sixty (60) days from the date you are notified of our decision. We will send you a written statement of reasons for denial within thirty (30) days of receiving your request.

OmahaWF1108

## DUPLICATE CONFIRMATION PAGE

Please read the Merchant Processing Program Guide in its entirety. It describes the terms under which we will provide merchant processing services to you.

From time to time you may have questions regarding the contents of your Agreement with Bank and/or Processor or the contents of your agreement with TeleCheck and/or its affiliate, TRS. The following information summarizes portions of your Agreement in order to assist you in answering some of the questions we are most commonly asked.

1. Your discount rates are assessed on transactions that qualify for certain reduced interchange rates imposed by MasterCard and Visa. Any transactions that fail to qualify for these reduced rates will be charged an additional fee (see Section 18 of the Card Processing Program Guide).

2. We may debit your bank account from time to time for amounts owed to us under the Agreement.

3. There are many reasons why a Chargeback may occur. When they occur we will debit your settlement funds or settlement account. For a more detailed discussion regarding Chargebacks see Section 10.

4. If you dispute any charge or funding, you must notify us within 45 days of the date of the statement where the charge or funding appears, or should have appeared.

5. The Agreement limits our liability to you. For a detailed description of the limitation of liability see Section 19.

6. We have assumed certain risks by agreeing to provide you with Card processing. Accordingly, we may take certain actions to mitigate our risk, including termination of the Agreement, and/or hold monies otherwise payable to you (see Section 23, Events of Default and Section 23, Reserve Account; Security Interest under certain circumstances.

7. By executing this Agreement with us, you are authorizing us to obtain financial and credit information regarding your business and the signer and guarantors of the Agreement until all your obligations to us are satisfied.

8. The Agreement contains a provision that in the event you terminate the Agreement early you will be responsible for the payment of an early termination fee as set forth in Section 16 and in Section 9 of this Application under "Service Fee Schedule."

9. If you lease equipment from Processor, it is important that you read Section 34. This lease is a non-cancelable lease for the full term indicated.

**10. Association Disclosure**

Visa and MasterCard Member Bank Information: Wells Fargo Bank, N.A.
The Bank's mailing address is Wells Fargo Bank, N.A., 1200 Montego Dr., Walnut Creek, CA 94598 and its phone number is 1-800-451-5817.

**Important Member Bank Responsibilities:**

a) The Bank is the only entity approved to extend acceptance of Visa and MasterCard products directly to a Merchant.

b) The Bank must be a principal (signer) to the Merchant Agreement.

c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard rules with which Merchant must comply; but this information may be provided to you by Processor.

d) The Bank is responsible for and must provide settlement funds to the Merchant.

e) The Bank is responsible for all funds held in reserve that are derived from settlement.

**Important Merchant Responsibilities:**

a) Ensure compliance with cardholder data security and storage requirements.

b) Maintain fraud and chargebacks below Association thresholds.

c) Review and understand the terms of the Merchant Agreement.

d) Comply with Association rules.

Print Client's Business Legal Name:

By its signature below, Client acknowledges that it received (either in person, by facsimile, or by electronic transmission) the complete Program Guide (Version OmahaWF1108) consisting of 30 pages (including this confirmation).

Client further acknowledges reading and agreeing to all terms in the Program Guide, which shall be incorporated into Client's Agreement. Upon receipt of a signed facsimile or original of this Confirmation Page by us, Client's Application will be processed.

Client understands that a copy of the Program Guide is also available for downloading from the Internet at:

**www.fdms.com/ISO/merchant_forms**

NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM GUIDE WILL BE ACCEPTED AND, IF MADE, ANY SUCH ALTERATIONS OR STRIKE-OUTS SHALL NOT APPLY.

Client's Business Principal:
Signature *(Please sign below)*

X _____     Title _____     Date _____

Please Print Name of Signer:

OmahaWF1108                                         29

# Exhibit C

# MERCHANT PROCESSING APPLICATION

PLEASE PRINT LEGIBLY AND FILL OUT COMPLETELY

1725 Winward Concourse, Suite 100
Alpharetta, GA 30005
Tel: (866) 873-2200

**Representative Name** _Peter Alan_  # _____  **Sales Office #** _211_  **Phone #** _____

## GENERAL INFORMATION

**Merchant's Legal Business Name:** (for Sole Proprietorships, enter Principal's name) _Bridges Windows Inc_  **Doing Business As Name:** _Bridges Windows_

**Business Address:** (no P.O. Boxes) _9 Birch Rd_  **City/State/Zip:** _Parsippany NJ_  **County:** _Suffolk_  **How Long:** _16_

**Mailing Address:** _9 Birch Rd_  **City/State/Zip:** _Parsippany NJ 07054_  **Federal Tax ID:** ☐ SSN ☐ EIN _____

**Business Phone:** _(973) 627-4919_  **Customer Service Phone:** _____  **Business Fax:** _(973) 627-4919_

**Contact Name:** _John Alan_  **# of Locations:** _____  **Time in Business:** Years: _16_ Months: ____  **Business Hours:** _9-5 M_

**Business E-Mail:** _____  **Business Website:** _____

## BUSINESS INFORMATION

| | |
|---|---|
| Retail Swiped % _100_ | **Merchant Type:** |
| Retail Keyed % ____ | ☒ Retail ☐ Restaurant ☐ Utility |
| Internet % ____ | ☐ Retail w/ Tip ☐ Lodging ☐ Petroleum |
| Mail Order % ____ | ☐ Mail/Phone ☐ Fast Food ☐ Convenience |
| TOTAL % _100_ | ☐ Internet ☐ QSR ☐ Public Sector |
| | ☐ Business to Business: B-2-B ____% B-2-C ____% |

**Type of Ownership:**
☐ Sole Prop. ☐ Partnership ☐ Tax Exempt
☒ Corp. ☐ Non-Profit ☐ Trust/Estate/Assn.
☐ LLC ☐ Gov't. ☐ Legal/Medical Corp.
☐ Other (specify):

**Business Location:**
☒ Store Front
☐ Office
☐ Home
☐ Other (specify):

**Methods of Marketing:** (attach examples)
☐ Newspaper ☐ Magazine / Catalog ☐ Internet
☐ Direct Mail ☐ Yellow Pages
☐ TV / Radio ☐ Outbound Telemarketing

**Specific Type of Product(s)/Service(s) Sold:** _Windows_

**Mail, Telephone or Internet Sales:**
Who performs product/service fulfillment?
☐ Merchant ☐ Vendor/Fulfillment House
Vendor/Fulfillment House Information:
Name: _____
Address: _____
Phone: _____

**Does Merchant use third party to store, process or transmit cardholder data?** ☐ Yes ☒ No
Third Party Information:
Name: _____
Address: _____
Phone: _____
Software Used by Third Party: _____

☐ Seasonal Merchant
Months Merchant will process: _____

**Customer Return Policy:**
☐ Refund w/in 30 days ☐ Exchange Only ☐ None
☐ Other (specify): _____

**Number of Days Until Product/Service is Delivered:** ____
MasterCard®/Visa®/Discover®/American Express® sales transactions are settled:
☐ Date of Order ☐ Date of Shipment ☐ Other (specify):

## PROCESSING HISTORY

Has Applicant ever accepted credit cards before? ☐ Yes ☒ No
(If Yes, provide 3 months merchant statements.)
If Yes, who was your processor? _____

Has Applicant ever had a previous credit card processor terminate its merchant account?
☐ Yes ☒ No  If Yes, by whom? _____
Explanation for prior closure (attach additional pages if necessary): _____

## PRINCIPAL 1

**Name:** _John Alan_  **Social Security Number:** _____  **% Ownership:** _100%_  **Title:** _Owner_

**Residential Address:** _9 Birch Rd_  ☒ Own ☐ Rent  **City:** _Parsippany_  **State:** _NJ_  **Zip:** _07054_

**How Long at This Address?** _16_  **Home Phone:** _(973) 627-4919_  **Date of Birth:** ____  **Drivers License Number / State:** _____

## PRINCIPAL 2

**Name:** _____  **Social Security Number:** _____  **% Ownership:** ____  **Title:** _____

**Residential Address:** _____  ☐ Own ☐ Rent  **City:** ____  **State:** ____  **Zip:** ____

**How Long at This Address?** ____  **Home Phone:** ____  **Date of Birth:** ____  **Drivers License Number / State:** _____

## EQUIPMENT

☐ VeriFone ☐ Hypercom ☐ Nurit ☐ Other: _____    ☐ Printer    ☐ PIN Pad
Model: _____    Model: _____    Model: _____

**Additional Terminals:** _____

| Wireless: | Phone Code for Dial Out: | Terminal Automatic Close: | Front-end: | |
|---|---|---|---|---|
| ☐ Cingular | ☒ None | ☒ Yes ☐ No | ☐ Omaha ☐ North | ☒ New Equipment: _Nuritex_ |
| ☐ GPRS | ☐ "8" | Time: ____ ☐ AM ☒ PM | ☐ Nashville ☐ Buypass | |
| ☐ CDMA | ☐ "9" | Time Zone: ☐ Pacific ☐ Mountain | ☐ Other: ____ | ☐ Reprogram: _____ |
| | ☐ Other: ____ | ☐ Central ☒ Eastern | | |

**Download:**
Tips: ☐ Yes ☐ No  If Yes: ☐ Counter Tip (Before Sale) ☐ Restaurant Tip (After Sale)
☐ Multi-Merchant / Main MID: _____
☐ Ethernet/IP File Required

## LEASE

**Lease Term:** ____ Months
FDGL Annual Tax Handling Fee: $10.20
☒ Equipment Service Program (if applicable, see Program Guide)

**Total monthly lease charge:** $ _51??_  w/o Tax

This is a non-cancelable lease for the full term indicated. **(Merchant Initials:** _JA_ **)**

The Equipment Lease Agreement in Paragraph 33 is a contract between the Merchant/Lessee, Merchant Lynx Services, and First Data Global Leasing.

Merchant Lynx Services, is a registered ISO/MSP of Wells Fargo Bank, N.A., Walnut Creek, CA

## VISA/MASTERCARD/DISCOVER RISK EVALUATION
**** Your Visa/MasterCard/Discover processing will be based upon the below criteria ****

Average Ticket Size For Visa/MasterCard/Discover Only: $ _____  Monthly Visa/MasterCard/Discover Sales Volume: $ _____

Each applicant certifies that the above average ticket size and monthly sales volume are accurate and acknowledge that any significant variance from this information could result in delay or withheld settlement of funds and/or assessment of additional fees. Upon request, merchant may supply information to substantiate the delivery of goods and/or services and/or acknowledgement of the customer's satisfaction.

**SCHEDULE OF FEES / PROCESSING LIMITS** (TO BE COMPLETED BY SALES REPRESENTATIVE)

**Retail, Restaurants, and/or 80%+ Swiped Transactions**

Visa/MasterCard/Discover Qualified Discount Rate............. _____%
Authorization/Batch Closure Fee (Per Attempt)............... $ _____
Monthly Customer Service/Statement Fee (Per Month)...... $ 5.00
Debit Card Authorization Fee (Per Transaction
 + Network Fees)............ $ _____
Debit Card Monthly Network Gateway Fee (Per Month)...... $ _____
EBT Transaction Fee (Per Transaction)...................... $ _____
WEX/Voyager Transaction Fee (Per Transaction).......... $ _____

**MidQualified Fee = Qualified Fee + fifty basis points; NonQualified Fee = Qualified Fee + two-hundred and seventy-five basis points + twenty cents per item**

**MCC/SIC:**

The following fees will be passed through to all merchants if applicable: VISA ACQ ISA, APF, Misuse of Auth, Zero Floor Limit, and Int'l Acquiring Fees; MasterCard Acquirer Support, Cross Border, and NABU Fees; and Discover Int'l Processing and Service Fees.

**Merchant Fee Acknowledgement (Merchant initials):** _____

**Home Business, Trade Fairs, MO/TO, Internet, Outside Sales/Services, and/or Over 20% Keyed Transactions**

Visa/MasterCard/Discover Qualified Discount Rate............... _____%
Authorization/Batch Closure Fee (Per Attempt)................ $ _____
Monthly Customer Service/Statement Fee (Per Month)...... $ 5.00

**MidQualified Fee = Qualified Fee + fifty basis points; NonQualified Fee = Qualified Fee + two-hundred and seventy-five basis points + twenty cents per item**

**OTHER FEES** (applies to all merchant types)
Visa/MasterCard Monthly Minimum Discount Fee: $25.00/month

| | | | |
|---|---|---|---|
| Chargeback Fee: | $35.00 each | AVS Fee: | $0.10 each |
| Request for Copy Fee: | $15.00 each | ACH Returned Item Fee: | $25.00 each |
| Voice Authorization Fee: | $1.50 each | Application/Approval Fee: | $99.99 |
| Checking Account Change Fee: | $25.00 | Annual Fee: | $159.00 |
| (Access Fee: | $14.95/month | Monthly Wireless Access Fee: | $20.00 |

Early Termination Fee: Please refer to Paragraph 22.1 of the Merchant Services' Program Guide; A PCI compliance and data security fee will be assessed on an annual basis; Changes in Fees: Please refer to Section 17 of the Merchant Services' Program Guide.

Comments: _____

---

## ADDED SERVICE ENROLLMENT

☐ Debit Card Services  ☐ Electronic Benefits Transfer (EBT): EBT/FNS#: _____  ☐ WEX / Voyager
☐ Check Services  ☐ Gift Card Services  ☐ Lease Services

## CARD ACCEPTANCE

Accept all MasterCard, Visa, and Discover Transactions (presumed, unless any selections below are checked)

MasterCard Acceptance:
☐ Accept MC Credit transactions only
☐ Accept MC Non-PIN Debit transactions only

Visa Acceptance:
☐ Accept Visa Credit transactions only
☐ Accept Visa Non-PIN Debit transactions only

Discover Acceptance:
☐ Accept Discover Credit transactions only
☐ Accept Discover Non-PIN Debit transactions only

See Paragraph 1.9 of the Merchant Services' Program Guide for details regarding limited acceptance.

## AMERICAN EXPRESS CARD ACCEPTANCE

Existing American Express (AXP) Merchant Number (if applicable): _____  Service Requested: ☐ AXP Direct ☐ AXP OnePoint®

☐ Discount Rate: _____% or ☐ Monthly Flat Fee: $ 7.95* (AXP Direct only)
Transaction Fees: Retail** = + $0.10 per transaction; Restaurant** = + $0.05 per transaction; Services, Wholesale & All Other = + $0.15 per transaction
* Applies to merchants whose annual American Express charge volume is $4,999.00 or less.

Est. Annual Volume: $ _____  Est. Average Tkt: $ _____
☐ Monthly Gross Pay  ☐ Daily Gross Pay
Pay Frequency (for AXP Direct only): ☐ 3 Day ☐ 15 Day ☐ 30 Day

**0.30% downgrade will be charged for transactions whenever a Card Not Present (CNP) Charge occurs. CNP means a Charge for which the Card is not presented at the point of purchase (e.g., Charges by mail, telephone, fax or the Internet), is used at unattended Establishments (e.g., customer activated terminals, called CATs), or for which the transaction is key-entered.

Upon approval by American Express (AXP), approval will be for standard program serviced by AXP (AXP Direct) or for full-service program supported by Merchant Service Provider (AXP One Point®). Fees disclosed above will be billed by AXP if merchant is under standard program.  Merchant Initials _____

## ***IMPORTANT – COMPLETE SECTION AND INCLUDE A VOIDED BUSINESS CHECK FROM ACCOUNT***

**BANK INFORMATION**

Bank Name: _____  Bank Address: _____  City: _____  State: _____  Zip: _____
Branch: _____  Bank Phone: _____  Contact Name: _____
Transit # (ABA Routing): _____  Account # (DDA): _____

## MERCHANT SITE SURVEY (Photograph of business location (interior & exterior) are required. (Completed by Sales Representative))

Date: _____  Type of Building: _____  Square Footage (approximate): _____

Inspector's Comments: _____

I have verified the identification of the above listed principal(s). Under the penalty of perjury and accountability, I hereby certify I personally conducted this premises inspection described above and hereby certify that this business is legitimate.

Sales Representative/Inspector's Signature: _____

The undersigned, and each of them, if more than one, acknowledges and agrees that this Merchant Processing Application ("Application") is to obtain payment settlement services offered by Wells Fargo Bank, N.A. ("Bank"), a member of Visa USA, Inc. ("Visa") and MasterCard International, Inc. ("MasterCard"). In order for Merchant to obtain the settlement services described in this Application and as may be selected by Merchant (collectively and individually, as applicable, the "Services"), Merchant must agree to and accept the terms and conditions under which Bank and Merchant Lynx Services and its processing affiliate iPayment, Inc. ("iPayment") (collectively, "Servicers" or "we" or "us") will agree to provide them. Discover Network is not a bank card network. Bank is not a sponsor of Discover Network card transactions under this Agreement and is not a party to this Agreement insofar as it relates to Discover Network Card transactions. The provisions of this Agreement regarding Discover Network Card constitute an agreement solely between you and iPayment.

By signing below, the undersigned Merchant (and each individual) hereby acknowledges and confirms that: a.) The terms and conditions that Merchant must agree to and accept to obtain the Services include the terms of this Application together with all terms contained in the Merchant Services' Program Guide ("Program Guide") including any information or terms that are incorporated by reference in the Program Guide, and together contain the terms and conditions of the agreement for the Services (collectively the "Agreement"). b.) You understand that certain terms used in the Agreement (including this Application) are fully defined in the Program Guide, that you have received and reviewed this Agreement including all the documents and information which are incorporated herein by reference, (including the Program Guide which is also available for viewing and downloading from the Internet at: www.ipaymentinc.com), that the Agreement sets out the terms and conditions under which Merchant may utilize the Services, and that You have an obligation to promptly contact iPayment or the Bank regarding any questions pertaining to any portion of this Agreement; c.) Upon acceptance of this Agreement, it becomes a legally binding contract enforceable against Merchant and with respect to certain provisions, the individual executing this Agreement on behalf of Merchant, such

making certain representations and promises in his or her personal capacity.

By signing below, the undersigned Merchant warrants and certifies that all information submitted under the Agreement (including the Application) is true, correct, and complete and understands that Bank and iPayment will be relying on such information during the approval process, including in setting the applicable fees, rates, limits and all other terms and conditions. Merchant (and each individual) hereby authorizes Bank and/or iPayment to obtain from third parties financial and credit information relating to Merchant (and each individual) in connection with their determination of whether to accept this Agreement and hereby grants Bank and/or iPayment continuing authority to conduct credit checks and other background investigations and inquiries concerning each of the undersigned including, but not limited to, financial, character and business references of Merchant's owner(s) (if Merchant is an entity). Each of the undersigned expressly authorizes Bank and/or iPayment to request and obtain from Consumer Reporting Agencies (Bureaus) consumer and personal business reports. Each of the undersigned furthermore agrees that all references, including banks and Consumer Reporting Agencies, may release any and all personal and business credit and financial information to Bank and/or iPayment. You further acknowledge and agree that you will not use your merchant account and/or the Services for illegal transactions, for example, those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et seq, as may be amended from time to time.

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record certain identifying information from any business or individual seeking to open a new account. We are required to obtain this information no matter how the account is opened (e.g., by mail, phone, in-person, or online). We may ask to see your driver's license or other identifying documents. The information requested or obtained by us may include your: name; address (residence for individuals and place of business for non-individuals); date of birth (for individuals); US taxpayer identification number for US citizens or companies (for individuals this is usually a Social Security number); or other forms of government issued identification (for example, a passport or alien identification card) for non-US citizens.

By signing below, you agree, understand and acknowledge that: a.) The Agreement will not take effect unless and until Merchant has been approved by Bank and iPayment and Merchant is assigned and issued a Merchant Account Number; b.) Any alteration, strikeover, or modification to the preprinted text of this Application or any part of the Agreement shall be of no effect whatsoever and at Bank's and iPayment's discretion may render the Agreement invalid; c.) You must select and indicate the category of "Cards" you will accept on the Application and will collectively be referred to as "Cards". You acknowledge and agree that Merchant will be furnished with the services and products described and selected by Merchant in the Application (collectively and individually, as applicable, the "Services") and that Servicers will be the sole and exclusive provider of the Services to Merchant during the term of this Agreement; d.) If Merchant is approved, any cancellation by You of this Agreement within three (3) years from the date of approval or is terminated by Servicers due to an Event of Default by Merchant, will be subject to the applicable early termination fee and Merchant will be charged a fee for such early termination equal to $495.00 if terminated before completion of the three (3) year Term (See Section 22.1 of the Agreement - Program Guide). Notwithstanding anything contained herein, Merchant hereby acknowledges and agrees that the termination of this Agreement shall not terminate any other Merchant obligations pursuant to other contracts, nor shall it be deemed to be a termination of any other Merchant obligations pursuant to other contracts, including without limitation, any equipment lease agreements that may be in effect at such time. A PCI compliance and data security fee of $159.00 will be assessed to each Merchant annually.

If information is provided in the "American Express® Card Acceptance" section of the Application, then the following shall apply: By signing below, Merchant represents that Merchant has read and is authorized to sign and submit this Application for the above entity which agrees to be bound by the American Express® Card Acceptance Agreement ("AXP Agreement"), and that all information provided herein is true, complete, and accurate. Merchant authorizes iPayment and American Express Travel Related Services Company, Inc. ("AXP") and AXP's agents and Affiliates to verify the information in this Application and receive and exchange information about Merchant personally, including by requesting reports from consumer reporting agencies, and disclose such information to their agent, subcontractors, Affiliates and other parties for any purpose permitted by law. Merchant authorizes and directs iPayment and AXP and AXP agents and Affiliates to inform Merchant directly, or through the entity above, of reports about Merchant that they have requested from consumer reporting agencies for marketing and administrative purposes. Merchant understands that upon AXP's approval of the Application, the entity will be treated by Servicers (those as different speeds of pay). Merchant understands that if the entity does not qualify for the iPayment servicing program, then the entity may be enrolled in AXP's standard Card acceptance program, and the entity may terminate the AXP Agreement. By accepting the American Express Card for the purchase of goods and/or services, or otherwise indicating its intention to be bound, the entity agrees to be bound by the AXP Agreement.

If Merchant has selected (by checking the appropriate box on the Application) to receive products and/or services offered under one or more of the Third Party Agreements referenced in the Program Guide, they hereby acknowledge and agree that the executed Signature page of the Application shall also serve as a signature page for each of the respective Third Party Agreement(s) and further acknowledge that the Third Parties are relying upon the information contained on the Application all of which are incorporated by reference into the Third Party Agreements. Merchant authorizes iPayment and Bank to share and exchange the information on the Application with the Third Parties and to provide a copy of the executed signature page to the respective Third Party, if requested.

IN WITNESS WHEREOF, the undersigned Merchant has duly executed this Agreement (including the Application) as of the date(s) indicated below, and hereby confirms that Merchant has received a complete copy of the Agreement, including a completed copy of this Application, consisting of pages one (1) through four (4), together with a copy of the Program Guide (the "Agreement").

Applicant/Merchant Legal Name _____

Authorized Signature _____ Date _____

APPROVED/ACCEPTED:

by: _____ Date: _____

Wells Fargo Bank, N.A. 1200 Montego Way, Walnut Creek, CA 94598

Applicant/Merchant DBA Name _____

Print Name _____ Title _____

APPROVED/ACCEPTED:

By: _____ Date: _____

iPayment, Inc. P.O. Box 3429, Thousand Oaks, CA 91359

## CONTINUING PERSONAL GUARANTY PROVISION - PERSONAL GUARANTOR(S):

Each signer below ("You" or "Your") agrees as follows. You, in Your individual capacity (even though You use a title or other designation with Your signature) unconditionally guarantee and promise to pay to Wells Fargo and iPayment all indebtedness of the Applicant at any time arising under or relating to the Agreement, including the related Application and any related agreements or instruments, and any First Data Lease if applicable as well as any extensions, modifications, or renewals thereof. You authorize the Wells Fargo and/or its agent(s) and iPayment to investigate the individual business history of Applicant and each representative signing the Agreement, including Yourself, including investigative credit reports, in order to evaluate acceptability by Wells Fargo and iPayment and if accepted, to conduct further investigations from time to time thereafter and to report credit information to others. The obligations hereunder are joint and several and independent of the obligations of the Applicant, and a separate action or actions may be brought and prosecuted against You whether action is brought against Applicant or any other person, or whether the Applicant or any other person is joined in any such action or actions. You acknowledge that this guaranty is absolute and unconditional, there are no conditions precedent to the effectiveness of this guaranty, and this guaranty is in full force and effect and is binding on You in Your individual capacity as of the date you sign this Application, regardless of whether Wells Fargo and iPayment obtains collateral or any guaranties from others or takes any other action contemplated by You. As guarantor, You waive (i) presentment, demand, protest, notice of protest, and notice of nonpayment; (ii) any defense arising by reason of any defense of the Applicant or other guarantor; and (iii) the right to require Wells Fargo to proceed against Applicant or any other guarantor, to pursue any remedy in connection with the guaranteed indebtedness, or to notify You as guarantor of any additional indebtedness incurred by the Applicant, or any changes in the Applicant's financial condition. You also authorize Wells Fargo and iPayment, without notice or consent, to (a) extend, modify, compromise, accelerate, renew, or other wise change the terms of the guaranteed indebtedness; (b) proceed against one or more guarantors without proceeding against the Applicant or another guarantor; and (c) release or substitute any part to the indebtedness of this guaranty.

You represent and warrant to Wells Fargo and iPayment that: (a) Wells Fargo and iPayment has made no representation to You as to the creditworthiness of the Applicant; and (b) You have established adequate means of obtaining from the Applicant on a continuing basis financial and other information pertaining to Applicant's financial condition. You agree to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Your risks hereunder, and You further agree that Wells Fargo and iPayment shall have no obligation to disclose to You any information or material about the Applicant which is acquired by Wells Fargo and iPayment in any manner. You acknowledge and agree that until all obligations subject to this guaranty shall have been paid in full, You shall have no right of subrogation, and You waive any right to enforce any remedy which Wells Fargo and iPayment now has or may hereafter have against the Applicant or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Wells Fargo and iPayment. You agree that this guaranty will be governed by California law; and shall benefit Wells Fargo, iPayment and its successors and assigns.

You understand that this is a Guaranty of payment and not of collection and that Wells Fargo Bank, N.A., and iPayment are relying on this Guaranty in entering into the Agreement.

Signature _____ An Individual   Print Name _____   Date _____

Signature _____ An Individual   Print Name _____   Date _____

## ASSOCIATION DISCLOSURE

Wells Fargo Bank, N.A. ("Bank") is the Member Bank (Acquirer) named in the Merchant Agreement.

**The Bank's mailing address and phone number are:**

Wells Fargo Bank, N.A.
Map A0347-023
1200 Montego Way
Walnut Creek, CA 94598
Phone number is: 1-925-746-4172

**Important Member Bank Responsibilities:**

(a)    The Bank is the only entity approved to extend acceptance of Association products directly to a merchant.
(b)    The Bank must be a principal (signer) to the Merchant Agreement.
(c)    The Bank is responsible for educating merchants on pertinent Visa and MasterCard Rules with which Merchants must comply; but this information may be provided to you by Processor.
(d)    The Bank is responsible for and must provide settlement funds to the merchant.
(e)    The Bank is responsible for all funds held in reserve that are derived from settlement.

**The Merchant's name, mailing address and phone number are:**

Merchant Name: _____

Merchant Address: _____

Merchant Phone: _____

**Some Important Merchant Responsibilities:**

(a)    Ensure compliance with Cardholder data security and storage requirements.
(b)    Maintain fraud and chargebacks below thresholds.
(c)    Review and understand the terms of the Merchant Agreement.
(d)    Comply with Association Rules.

The responsibilities listed above **do not supersede** terms of the Merchant Agreement and are provided to ensure that Merchant understands some important obligations of each party.  **This Disclosure page must be dated and signed by the Merchant's principal owner or authorized officer, which signature confirms that he/she has reviewed a copy of this document and that Merchant must be (and has been) provided with an executed copy of this Disclosure page at the time it is signed (which Merchant must retain) as well as a copy of the completed Merchant Application executed by Merchant (and Merchant Agreement).**

Sales Representative Name: _____

_____          _____
Merchant's Signature                                     Merchant's Printed Name

_____          _____
Title                                                                Date



# MERCHANT LYNX SERVICES- ADDENDUM
## MERCHANT PROCESSING AGREEMENT ADDENDUM

Legal Name _Budget Limousine_          D/B/A _Budget Limousine_

Sales Agent _Pete Lo_          Date _11/9/11_

**Receipt of Funds:** *if applicable*

| QTY | EQUIPMENT DESCRIPTION OR REPROGRAM INSTRUCTIONS | EACH | TOTAL |
|---|---|---|---|
| 1 | Manual Imprinter (Merchant must initial waiver if not purchasing) | $ 35.00 | $ 35.00 |
| 1 | Welcome Kit | | ✓ |

**Contact Information:**

Hours of Operation: _9-5_

Cell /Tel Phone #:

_— Rep will submit only approximation to $225 if merchant cancel, before length of merchant guarantee agreement_

_11/9/11_

| | |
|---|---|
| **Sub Total** $ | |
| **Total** $ | |

This addendum (the "Addendum") to the Merchant Processing Agreement ("Agreement") is entered into between Merchant Lynx Service ("MLS") and the undersigned merchant ("Merchant") as of the recorded date below. In consideration of the mutual promises contained herein and the consideration contained in the Agreement, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

Merchant hereby authorizes MLS to initiate and/or transmit automatic credit and/or debit entries, via the automated clearing house network ("ACH"), to the Account and Depository identified in the attached voided check (hereafter, "Merchant's Account"). Said authorization includes, but is not limited to, the initiation and transmission of such entries, requests, or orders as may be necessary to charge Merchant's Account for any fees or other amounts payable by Merchant to MLS pursuant to the terms of the Agreement.

Merchant will be charged a fee of ten dollars per month for warranty of all equipment and supplies, which shall be collected electronically on the fifth day of each month. Additional shipping or handling charges may apply on warranty items. MLS shall not be responsible for supply of paper to any point of sale machines ("POS") that are re-programmed by MLS, its agents, employees, representatives, or independent contractors and will have no warranty obligation for any machines not supplied by MLS for lease or sale. Merchant understands that MLS shall have no liability for any negligent design or manufacture of any non-leased POS terminal, printer or other equipment used by Merchant for the acceptance of credit card transactions. MLS shall not be liable for any incidental or consequential or any economic loss by the merchant whatsoever. Merchant acknowledges additional software, equipment charges, and/or any on-site technical support that may be necessary based on the equipment leased and/or program needs shall be the responsibility of the Merchant and authorizes MLS to debit Merchant's account, via ACH, for any such charges. In addition, Merchant acknowledges a minimum trip charge of ninety-five dollars will be charged for post setup onsite technical assistance.

Merchant acknowledges that it may incur additional cancellation fees from ancillary service providers under contract that Merchant has with such service providers. Merchant also acknowledges that any fees paid to MLS at the time of sale are non-refundable in the event Merchant discontinues Agreement for any reason.

Merchant acknowledges that it has fully read and understands each of the terms and conditions in the Agreement, this Addendum, and any other ancillary service provider's agreements and understands that it has and will receive a copy of such agreements, and addendums via it's welcome kit. The Agreement and this Addendum contain the entire agreement of the parties and there are no representations, warranties, covenants, or undertakings of, by or between the parties other than those expressly set forth in the Agreement and/or Addendum. Merchant acknowledges that any oral representations made by the sales agent or representative not contained within the Agreement or Addendum are not binding. Any changes to the Agreement and/or Addendum are invalid unless in writing and signed by MLS and the Merchant. In no event will MLS or its agents, officers, directors or employees be liable for incidental, special or consequential damages. Merchant hereby acknowledges that it has had sufficient and adequate time to review the terms herein, and is voluntarily entering into the Agreement and Addendum. Merchant hereby acknowledges that the person signing this Addendum has the full authority by the Merchant and that such person has had sufficient and adequate time to review the terms herein.

Merchant shall indemnify and hold MLS, its agents, employees, representatives, officers, directors, or independent contractors, harmless from any and all liability, loss and damage, including reasonable attorney's fees and costs which may arise as a result, whether direct or indirect, of any act or failure to act or the breach of any warranty by Merchant pursuant to the terms of the Agreement and/or Addendum.

Merchant's Signature X _____          Title _____          Date _11/9/11_

Please initial here is you are declining to purchase a Manual Imprinter from Merchant Lynx Services._____          Rev. 05-2011

## MERCHANT LYNX SERVICES- ADDENDUM
MERCHANT PROCESSING AGREEMENT ADDENDUM

Legal Name _____     D/B/A _____

Sales Agent _____     Date _____

Receipt of Funds: *if applicable*

| QTY | EQUIPMENT DESCRIPTION OR REPROGRAM INSTRUCTIONS | EACH | TOTAL |
|---|---|---|---|
| 1 | Manual Imprinter (Merchant must initial waiver if not purchasing) | | |
| 1 | Welcome Kit | $ 35.00 | $ 35.00 |

**Contact Information:**

Hours of Operation: _____

Cell/Tel Phone #: _____

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | Sub Total $ | |
|---|---|---|
| | Total $ | |

This addendum (the "Addendum") to the Merchant Processing Agreement ("Agreement") is entered into between Merchant Lynx Service ("MLS") and the undersigned merchant ("Merchant") as of the recorded date below. In consideration of the mutual promises contained herein and the consideration contained in the Agreement, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

Merchant hereby authorizes MLS to initiate and or transmit automatic credit and or debit entries, via the automated clearing house network ("ACH"), to the Account and Depository identified in the attached voided check thereafter, ("Merchant's Account"). Said authorization includes, but is not limited to, the initiation and transmission of such entries, requests, or orders as may be necessary to charge Merchant's Account for any fees or other amounts payable by Merchant to MLS pursuant to the terms of the Agreement.

Merchant will be charged a fee of ten dollars per month for warranty of all equipment and supplies, which shall be collected electronically on the fifth day of each month. Additional shipping or handling charges may apply on warranty items. MLS shall not be responsible for supply of paper to any point of sale machines ("POS") that are re-programmed by MLS, its agents, employees, representatives, or independent contractors and will have no warranty obligation for any machines not supplied by MLS for lease or sale. Merchant understands that MLS shall have no liability for any negligent design or manufacture of any non-leased POS terminal, printer or other equipment used by Merchant for the acceptance of credit card transactions. MLS shall not be liable for any incidental or consequential or any economic loss by the merchant whatsoever. Merchant acknowledges additional software, equipment charges, and or any on-site technical support that may be necessary based on the equipment leased and or program needs shall be the responsibility of the Merchant and authorizes MLS to debit Merchant's account, via ACH, for any such charges. In addition, Merchant acknowledges a minimum trip charge of ninety-five dollars will be charged for post setup onsite technical assistance.

Merchant acknowledges that it may incur additional cancellation fees from ancillary service providers under contract that Merchant has with such service providers. Merchant also acknowledges that any fees paid to MLS at the time of sale are non-refundable in the event Merchant discontinues Agreement for any reason.

Merchant acknowledges that it has fully read and understands each of the terms and conditions in the Agreement, this Addendum, and any other ancillary service provider's agreements and understands that it has and will receive a copy of such agreements, and addendums via it's welcome kit. The Agreement and this Addendum contain the entire agreement of the parties and there are no representations, warranties, covenants, or undertakings of, by or between the parties other than those expressly set forth in the Agreement and or Addendum. Merchant acknowledges that any oral representations made by the sales agent or representative not contained within the Agreement or Addendum are not binding. Any changes to the Agreement and/or Addendum are invalid unless in writing and signed by MLS and the Merchant. In no event will MLS or its agents, officers, directors or employees be liable for incidental, special or consequential damages. Merchant hereby acknowledges that it has had sufficient and adequate time to review the terms herein, and is voluntarily entering into the Agreement and Addendum. Merchant hereby acknowledges that the person signing this Addendum has the full authority by the Merchant and that such person has had sufficient and adequate time to review the terms herein.

Merchant shall indemnify and hold MLS, its agents, employees, representatives, officers, directors, or independent contractors, harmless from any and all liability, loss and damage, including reasonable attorney's fees and costs which may arise as a result, whether direct or indirect, of any act or failure to act or the breach of any warranty by Merchant pursuant to the terms of the Agreement and/or Addendum.

Merchant's Signature X _____     Title _____     Date _____

Please initial here is you are declining to purchase a Manual Imprinter from Merchant Lynx Services. _____

Rev. 05-2011

# Exhibit D

*Lease Upgrade: Current Lease #:*



# EQUIPMENT LEASE AGREEMENT

| Agent Channel | PNC |
| --- | --- |
| Merchant Services | |
| Agent Rep Name: | Jean Malone |
| Agent Rep ID : | KSDV |
| Merchant #: | 373200099993 |

**Lease Number (to be filled out by FDLS)**

## MERCHANT INFORMATION

| Corporate Business Name | | | | DBA Name | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **AIA ENTERPRISES INCORPOR** | | | | **CHESTERFIELD INN-** | | | |
| Business Address | City | State | Zip Code | County | | Business Phone Number | |
| **633 CHESTERFIELD ARNEY T** | **CHESTERFI ELD** | **NJ** | **08515** | | | **609-298-1917** | |
| Type of Business **EATING PLACES, REST. EXCEPT EXPRESS PAY** | | | | Years in Business  15 | | | |
| Billing Address (if different than above) | City | State | Zip Code | Business Type ☒Corporation ☐Partnership ☐Proprietorship ☐Non-Profit | | | |
| Bank Name PNC | Routing # | | | Account # | | **Provide** **Business check with first payment** | |

## DESCRIPTION OF LEASED EQUIPMENT

| Equipment Type | Quantity | Serial Number | Date Deployed | Monthly Lease Payment |
| --- | --- | --- | --- | --- |
| FD 50 TI | 2 | | | $ 30.99 |
| | | | | $ |
| | | | | $ |

Equipment Supplier:

## SCHEDULE OF PAYMENTS

| Lease Term: 48 months | Total Monthly Lease Charge *:     $ 61.98 *All charges subject to applicable tax & surcharges |
| --- | --- |

## LEASE ACCEPTANCE

Undersigned agrees to all terms and conditions contained in this Equipment Lease Agreement.  Lessee authorizes First Data Merchant Services Corp. or its agents, to obtain an investigative credit report from a credit bureau or a credit agency and to investigate the references given on any other statement or data obtained from Lessee.
**THIS IS A NON-CANCELABLE LEASE FOR THE FULL TERM INDICATED HEREIN.**

| X *Iris Alfonse* | *co-owner* | *Iris Alfonse* | *9/30/11* |
| --- | --- | --- | --- |
| Lessee Signature | Title | Print Name | Date |

## PERSONAL GUARANTY

Undersigned unconditionally guarantees performance of this Equipment Lease Agreement by Lessee and payment of all sums due hereunder in the event of default, hereby waiving any modification, amendment or extension and notice thereof, and further agrees to the terms of this Equipment Lease Agreement insofar as they apply to the undersigned as guarantor.

| X | An Individual | ( ) | |
| --- | --- | --- | --- |
| Personal Guarantor's Signature | (No Title Allowed) | Print Name | Home Phone Number | Date |

| Home Address | City | State | Zip Code | Soc. Sec. No. |
| --- | --- | --- | --- | --- |

DO NOT WRITE IN THIS SPACE
Lessor Acceptance:

| Name (please print or type) | Title | Signature | Date |
| --- | --- | --- | --- |

Rev 10/03 42FD0333