**FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| RACHEL EASTMAN and ACADEMIC SOFTWARE, on behalf of themselves and all others similarly situated, | **OPINION** |
| Plaintiffs, | Civ. No. 10-4860 (WHW) |
| v. | |
| FIRST DATA CORPORATION and FIRST DATA MERCHANT SERVICES CORPORATION, | |
| Defendants. | |

**<u>Walls, Senior District Judge</u>**

Plaintiffs Rachel Eastman, Academic Software, Budget Windows, John Pierson and AIA Enterprises (d/b/a Chesterfield Inn) move to certify a class of over 24,000 New Jersey merchants who entered into contracts for the acquisition of credit or debit card point-of-sale ("POS") terminals with Defendants First Data Corporation and First Data Merchant Services (collectively, "First Data" or "Defendants"). The Court heard oral argument on June 18, 2013. Plaintiffs' motion is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

First Data provides merchants with POS hardware and software to process credit card transactions. Am. Compl. ¶ 25. "A POS terminal is a small piece of equipment (roughly the size of a telephone) common in restaurants, retail establishments and other small businesses that accept credit or debit card payments. The customer's card is swiped through the terminal, which

1

**FOR PUBLICATION**

then transmits the card information and sale details to a financial institution to process the payment." First Motion for Class Certification at 3 ("Class Cert. Mot."). First Data manufactures its own line of POS terminals, and also offers its customers a variety of terminals manufactured by third parties. Am. Compl. ¶ 26. The POS terminals are sold by both First Data employees and third party sales agents and banks, none of whom are required to follow a set sales script. Class Cert. Mot. at 6; Opp. at 3-4.

The formation of a business relationship between a merchant and First Data begins when a merchant executes a document known as the Merchant Processing Application. Am. Compl. ¶ 44. The Application is a standard form that is completed by the First Data sales representative, *id.* ¶ 52, and includes the monthly lease price. *Id.*, Ex. A. There is no lease interest rate, finance charge or equipment price included. *Id.* ¶ 54. A Program Manual is generally provided to merchants after the execution of the Application, either in written form or on a CD. *Id.* ¶ 56. First Data also sends merchants a "Welcome Letter," which includes information on the applicable sales tax and its method of calculation. Opp. at 25; *see also* Eastman Decl., Ex. B.

First Data alleges that the agreements include both hardware (the POS terminal) and software services. Opp. at 3-5. First Data's offered services are allegedly not limited to the leased terminal, but can also include:

- Assistance in selecting a terminal appropriate for the merchant's individual needs;
- 24 hour access to a help desk;
- Gift cards;
- Software installation and updates;
- In-person terminal set-up and training;
- Waiver of certain fees and charges;

2

**FOR PUBLICATION**

- Telecheck fee reductions;
- Security software;
- Reductions in processing fees and rates.[1]

*Id.* at 5-6. "Ultimately what's being leased, therefore, is not an un-programmed piece of hardware that can be purchased on the internet. Rather, it is the services, software, hardware, installation and support that enable a merchant to accept credit cards." *Id.* at 2. Plaintiffs dispute the provision of other goods and services, noting that during discovery, "First Data claimed that there was no need to produce all merchant Leases, stating that representative documents would suffice." Reply at 7-8.

Plaintiff Rachel Eastman owns a small business called Academic Software. Am. Compl. ¶ 57. In October 2008, Academic Software entered into a merchant application with First Data to lease a POS terminal. *Id.* The application did not list the price of the terminal, and she was not presented with any additional documentation at the time of execution. *Id.* ¶¶ 58, 60. The contract called for a monthly payment of $69.95 for 48 months, and the Complaint alleges that the retail price of the terminal was approximately $249. *Id.* ¶ 67. Eastman was charged an early termination fee for terminating the merchant application, and First Data allegedly debited her account more than the stated cost of the lease. *Id.* ¶ 64. After Eastman refused to pay additional money, First Data began collection proceedings, and received an additional $1,200 from Eastman. *Id.* ¶ 65.

Plaintiff John Pierson and his wife, Maria, own and operate Budget Windows. *Id.* ¶ 68. On November 11, 2011, they executed a merchant agreement with First Data. *Id.* The application did not list the retail price of the POS terminal. *Id.* ¶ 69. The Complaint alleges that the fair

---

[1] First Data alleges that lease terms are negotiated along with, and therefore directly tied to, processing fees and rates. Defs. Surreply at 1.

3

**FOR PUBLICATION**

market price of the POS terminal in question was less than $250, but under the terms of the agreement, Budget would be charged a total of $2,879.50. *Id.* ¶ 73. Budget, "when it became aware of the true cost of [the] terminal, canceled the agreement." *Id.* ¶ 74.

AIA Enterprises, Inc. (d/b/a Chesterfield Inn) entered into a merchant agreement called "Lease Equipment Agreement" with First Data. *Id.* ¶ 75. The agreement did not list the retail price of the terminal, and charged AIA Enterprises $2,975 for two terminals. *Id.* ¶ 79. AIA alleges that the fair market value of the terminal was less than $250. *Id.* AIA continues to pay Defendants $61.98 each month under the agreement. *Id.* ¶ 80.

Plaintiffs filed a class action complaint against First Data Corporation and First Data Merchant Services Corporation on September 21, 2010. ECF No. 1. Plaintiffs filed an amended complaint on June 21, 2012. ECF No. 62. Plaintiffs allege Defendants defrauded them and "thousands of small businesses by charging an exorbitant and unconscionable fee under a purported lease agreement for credit and debit card equipment." Am. Compl. ¶ 1. In leasing the equipment, Defendants allegedly withheld and concealed material information, "thereby allowing [them] to impose unconscionable charges and excessive fees." *Id.* ¶ 2. Plaintiffs further contend that First Data did not inform them "of the cost of the equipment, the finance rate, finance charge, or lease charge associated with the POS device" and that those extra costs, among others, were not included in the merchant agreement. *Id.* ¶¶ 2-3.

Plaintiffs filed a motion to certify the class on December 21, 2012. ECF No. 77. Eastman and Academic Software seek to represent "[a]ll customers in the State of New Jersey who leased point of sale credit and/or debit card processing equipment from Defendants from the time period set by the applicable statute of limitations prior to the filing of this action to the date of judgment." *Id.* ¶¶ 6, 81. Oral argument was held on June 18, 2013.

FOR PUBLICATION

## STANDARD OF REVIEW

To obtain class action certification, plaintiffs must establish that all four prerequisites of Federal Rule of Civil Procedure 23(a) are met as well as at least one part of Federal Rule of Civil Procedure 23(b). *Neal (Baby) by Kanter v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994). Rule 23(a) requires a showing of (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to all of the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

"Numerosity requires a finding that the putative class is so numerous that joinder of all members is impracticable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182 (3d Cir. 2001); Fed. R. Civ. P. 23(a)(1). "No single magic number exists satisfying the numerosity requirement." *Moskowitz v. Lopp*, 128 F.R.D. 624, 628 (E.D.Pa. 1989).

To satisfy the commonality requirement, Plaintiffs must show the existence of at least one question of law or fact common to the entire class. *See In re the Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 310 (3d Cir.1998). "All that is required is that the litigation involve some common questions and that plaintiffs allege harm under the same legal theory." *Baby Neal*, 43 F.3d at 58. *See also Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988) (holding that it is not necessary that all putative class members share identical claims).

The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work for the benefit of the entire class through the pursuit of their own goals. *See In re Prudential Ins. Co.*, 148 F.3d at 311; *see also Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 923 (3d Cir. 1992).

**FOR PUBLICATION**

Finally, Rule 23 also requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). But where the class includes members with divergent interests because the time of class membership is a factor, the representatives may not adequately represent the class. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir. 1977); *Miller v. Hygrade Food Prods. Corp.*, 198 F.R.D. 638 (E.D.Pa. 2001).

If the requirements of Rule 23(a) are satisfied, the court must also find that the class action is maintainable under one of the sections of Rule 23(b). Rule 23(b)(1) allows certification of a class if prosecuting separate actions would result in prejudice either to Plaintiffs or Defendants. *In re Ikon Office Solutions, Inc. Sec. Litig.*, 191 F.R.D. 457, 466 (E.D.Pa. 2000). Rule 23(b)(2) allows certification of a class where the party opposing the class has acted or refused to act in a manner generally applicable to the class, so that final injunctive or declaratory relief would be appropriate with respect to the class as a whole. Certification under Rule 23(b)(3) is permitted when the court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008) (quoting Federal Rule of Civil Procedure 23(b)(3)). "The twin requirements of Rule 23(b)(3) are known as predominance and superiority." *Id.*

In moving for class certification, the plaintiff has the burden of proving by a preponderance of the evidence that all the requirements of Rule 23 are met. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982); *Hydrogen Peroxide,* 552 F.3d at 307. The Supreme Court has emphasized that Rule 23 does not set forth a mere pleading standard; the plaintiff must in fact prove that the rule's requirements have been satisfied. *Wal-Mart Stores,*

**FOR PUBLICATION**

*Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). In considering a motion for class certification, the court must conduct a rigorous analysis, which will frequently "entail some overlap with the merits of the plaintiff's underlying claims." *Id.* (quoting *Falcon*, 457 U.S. at 160.) "A class certification decision requires a thorough examination of the factual and legal allegations." *Newton*, 259 F.3d at 166. The Rule 23 analysis indeed "may include a preliminary inquiry into the merits" insofar as the merits of the claim may be relevant to the class certification analysis. *Hohider v. United Parcel Svc., Inc.*, 574 F.3d 169, 176 (3d Cir. 2009).

But the court's authority to examine the merits of a case on a motion for class certification should not be overstated. While a district court may delve beyond the pleadings to determine whether the plaintiff has satisfied Rule 23's requirements, it may not inquire into the merits in order to determine whether the elements of each claim may be satisfied. *Sullivan v. D.B. Investments, Inc.*, 667 F.3d 273, 305 (3d Cir. 2011). "A court may inquire whether the elements of asserted claims are capable of proof through common evidence, but lacks authority to adjudge the legal validity or soundness of the substantive elements of asserted claims." *Id.* Consistent with this understanding, the Third Circuit has held that factual findings of the court on a Rule 23 motion are restricted to the question of whether a class may be certified and "do not bind the factfinder on the merits." *Hydrogen Peroxide*, 552 F.3d at 318.

If the Court finds that the action warrants certification, its order must "define the class and the class claims, issues, or defenses . . . ." Fed. R. Civ. P. 23(c)(1)(B). The Third Circuit has explained that a court cannot comply with this Rule 23 requirement unless the "precise parameters defining the class and a complete list of the claims, issues, or defenses to be treated on a class basis are readily discernible from the text either of the certification order itself or of an incorporated memorandum opinion." *Wachtel v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179,

7

184 (3d Cir. 2006). The class certification order must also include "a clear and complete summary of those claims, issues, or defenses subject to class treatment." *Id.*

## DISCUSSION

### I. Federal Rule of Civil Procedure 23(a)

#### 1. Numerosity

In order to be certified, the class must be "so numerous that joinder of its members is impracticable." *In re OSB Antitrust Litig.*, No. 06–826, 2007 U.S. Dist. LEXIS 56584, at *5 (E.D.Pa. Aug. 3, 2007). "Generally, if the named plaintiff demonstrates the potential number of plaintiffs exceeds 40, the numerosity requirement of Rule 23(a) has been met." *Id.* (citations omitted); *see also Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) ("if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.").

Plaintiffs argue that based on the information provided by First Data during discovery, there are over 23,000 class members, which more than satisfies the numerosity requirement. Class Cert. Mot. at 17-18. First Data does not dispute this argument, acknowledging that there are 24,725 potential class members. Opp. at 1. The proposed class satisfies the numerosity requirement of Rule 23(a)(1).

#### 2. Commonality

Plaintiffs maintain that identical claims or facts are not required, merely a "single common question." Class Cert. Mot. at 18. Plaintiffs state that this case is amenable to class treatment because all of the claims focus on First Data's conduct, and all class members signed standard form leases "that are materially the same." *Id.* at 2. More specifically, Plaintiffs contend that there are numerous common questions of law and fact, namely:

8

**FOR PUBLICATION**

(a) Whether First Data's charging of interest exceeding New Jersey's maximum legal interest rate of 50% violated the NJCFA;

(b) Whether First Data's non-disclosure of material information, such as the retail price of terminal, in the lease documents violated the NJCFA;

(c) Whether the price charged for the POS terminals was unconscionable;

(d) Whether First Data's practice of requiring merchants to pay sales tax on the total periodic payments under the lease was unconscionable;

(e) Whether First Data's practice of signing up merchants to long term leases for POS terminals that charge interest about 50% should be enjoined; and

(f) Whether First Data was unjustly enriched by its common business practice of leasing POS terminals to Plaintiffs and all class members with usurious interest and at amounts greatly above the terminals' retail price.

*Id.* at 19-20.

Defendants respond that Plaintiffs are merely reciting legal allegations and labeling them as "common questions." Opp. at 13. Defendants further claim that Plaintiffs fail to offer any evidence in support of commonality; their "bald allegations of a common scheme are insufficient." *Id.* at 15. In addition, First Data alleges that it is impossible to prove the allegations with common evidence or proof. *Id.* at 16. Rather, "[a]n individual, one-by-one analysis and adjudication of each class member's lease would be needed instead[.]" *Id.*

The Supreme Court's observation in *Wal-Mart Stores, Inc. v. Dukes* is instructive:

The crux of this case is commonality—the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131–132 (2009). For example: Do all of us plaintiffs indeed work for Wal–Mart? Do our managers have discretion over pay? Is that an unlawful employment

> practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," *Falcon*, *supra*, at 157, 102 S.Ct. 2364. This does not mean merely that they have all suffered a violation of the same provision of law.

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). The Supreme Court further emphasized that "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (internal quotation marks and citation omitted). *Wal-Mart* also highlights that a party seeking class certification must affirmatively demonstrate compliance. *Id.* Plaintiffs undoubtedly recite a common list of questions, leaving the central question of whether a classwide proceeding can generate "common answers."

### A. Proving Whether Each Class Member Was Charged Usurious Interest Cannot Be Done with Common Evidence

During discovery, First Data supplied Plaintiffs with a spreadsheet listing more than 23,000 New Jersey merchants who entered into lease-to-own contracts for the acquisition of POS terminals that were assigned to and financed by First Data from September 21, 2004 through the date of the class notice. The spreadsheet included information on: (1) the POS terminal model leased; (2) the term of each lease; and (3) the monthly charge to each merchant for the terminal. Class Cert. Mot. at 9. Based on that information, Plaintiffs' expert witness, Dr. Steven Pomerantz,[2] created a standard formula to determine the interest rate First Data charged to each class member. *Id.* at 17-18. Dr. Pomerantz took the alleged retail price of the terminal, and used a standard "amortization schedule" to compute the interest rate. *See id.* at 17-18. Plaintiffs were only able to obtain the retail price of the POS terminal for approximately 9,132 of the 24,725 merchants through prices found on the internet. *Id.* at 17. For the remaining merchants, Dr.

---

[2] The qualifications of Dr. Pomerantz are not in dispute. *See* Pomerantz Decl., Ex. A.

10

**FOR PUBLICATION**

Pomerantz used a regression analysis to provide the retail cost. Pomerantz Decl. at 15-17; Class Cert. Mot. at 18. For the contracts that had a maximum interest rate of over 50%, Dr. Pomerantz computed the magnitude of the excess to determine the alleged damage sustained. *Id.*

The Court observes numerous problems with this analysis. The main one is that Dr. Pomerantz's formula does not take into account the additional goods and services that First Data provides to its customers in addition to the POS terminals. The determination of a retail, or purchase, price is also problematic. As Plaintiffs readily acknowledge, the leases are not "rent-to-own contracts" that list a purchase price. So Plaintiffs hired a researcher, Gregory A. Brown, P.E., to find purchase prices on the internet.[3] In some cases, the prices he found were not for new terminals, and he was unable to find most of the relevant terminals on the internet. First Data also argues that the relevant purchase price is not the price today, as Plaintiffs assume by using today's internet price, but the price as of the date that each lease was executed. Opp. at 17. Finally, First Data contends that POS terminal prices change over time. Opp. at 8-9. Plaintiffs respond that the United States Department of Labor, Bureau of Labor Statistics, publishes a Producer Price Index for POS terminals that accounts for the change in the prices of these terminals over time. Reply at 9 n. 9.

Assuming that purchase prices could be identified, the main issue of the additional goods and services remains. First Data argues that the "roughly 24,000 leases at issue . . . are all different because they all contain different combinations of good and services." Opp. at 18. Furthermore, First Data alleges that these additional goods and services do not have any type of

---

[3] First Data objected to providing discovery on the retail price of the POS terminals it leases, arguing that it was not relevant to the certification inquiry, nor was such information always available. Plaintiffs argue that First Data's wholly-owned subsidiary, TASQ, sells POS terminals into the general marketplace and would be a good source of price data. Reply at 8. First Data responds that TASQ does sell terminals, but only to the general *wholesale* marketplace, as opposed to the retail sales which are at issue here. Opp. at 23 n.75. First Data also sells a variety of POS terminals manufactured not by TASQ, but by third parties.

**FOR PUBLICATION**

stand-alone price that can be easily quantified. *Id.* A value would have to be assigned to services such as a 24-hour help line. First Data also highlights the example of reduced processing fees which allegedly come with all First Data leases. These reduced processing fees are allegedly tied to the processing volume of each individual merchant, and cannot be quantified on any type of common basis. *Id.* at 19. Finally, First Data points out that there is no way to quantify the full benefit of reduced processing fees for merchants whose leases have not yet ended. *Id.* at 21.

Plaintiffs question the existence of these additional goods and services, but, assuming arguendo that they do exist, argue that they can only be proved through the admission of evidence outside the leases – evidence which they claim would be inadmissible under the parol evidence rule. Reply at 4-6. More specifically, Plaintiffs allege that the parol evidence rule prohibits the admission of extrinsic evidence used to suggest that the monthly lease payments were in part consideration for additional services that are not set forth explicitly in the written lease documents. *Id.* at 4.

This Court finds that the parol evidence rule does not exclude evidence of additional services. Under New Jersey law, the parol evidence rule generally "prohibits the introduction of evidence that tends to alter an integrated written document." *Regal-Pinnacle Integrations Indus., Inc. v. Philadelphia Indem. Ins. Co.*, Civ. No. 12-5465, 2013 WL 1737236, at *8 (D.N.J. Apr. 22, 2013) (citing *Nemco Constr. Corp. v. AARK Constr. Grp.*, Civ No. A-4809-07T3, 2009 N.J. Super. Unpub. LEXIS 1305, at *9 (N.J. Super. May 29, 2009)).

But the New Jersey Supreme Court does not apply the parol evidence rule as to bar consideration of all extrinsic evidence for all purposes. *See Atl. N. Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 301 (1953). The rule requires courts to "consider all of the relevant evidence that will assist in determining the intent and meaning of the contract," a process which includes "a

**FOR PUBLICATION**

thorough examination of extrinsic evidence in the interpretation of contracts." *Conway v. 287 Corporate Ctr. Assocs.*, 187 N.J. 259, 269 (2006). "Such evidence may include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." *Id.* (internal quotation marks and citations omitted).

It follows that this Court may consider the evidence of additional services submitted with First Data's Opposition, and finds that these additional goods and services, in conjunction with the difficulty in determining a purchase price, prevents a classwide proceeding from generating "common answers."

In addition to the common evidence problem, the legal basis for Plaintiffs' usury claim is also questionable. Plaintiffs' usury argument is based on the Supreme Court of New Jersey's analysis in *Perez v. Rent-A-Center, Inc.*, 186 N.J. 188 (2006). There, the plaintiff entered into a contract requiring her to make a weekly payment for household appliances with the right to purchase the goods at the end of the rental period, for their "fair market value." *Id.* at 195. Applying New Jersey's usury statute, N.J.S.A. 2C:21-19(a), the New Jersey Supreme Court found that "[t]he difference between the market value of the goods and their ultimate cost was Rent-A-Center's interest charge for the privilege of buying the products over time." *Id.* at 197. The Court concluded that a seller cannot charge more than 30% interest on an installment contract for the sale of goods for "*personal, family, or household use*." *Id.* at 206 (emphasis added). Business items, unlike household ones, are generally not considered to be necessities, and this Court is unable to find any New Jersey cases applying a similar analysis to business equipment leases such as the ones at issue. *See Steffenauer v. Mytelka & Rose, Inc.*, 87 N.J. Super. 506, 517 (Ch. Div. 1965) (observing "[i]t seems reasonable to infer that the Legislature,

**FOR PUBLICATION**

when it addressed itself to the problem of installment sales, was concerned only with protecting, and therefore regulating, the average consumer in the purchase of goods which in our present day society are considered necessaries. The commercial entrepreneur was left to deal at arm's length with the seller and financer.").

In *Human Resources Development Press, Inc. v. Ikon Office Solutions Co.*, the plaintiffs attempted to bring a nearly identical challenge to copy machine leases in Massachusetts District Court. Civ. No. 05-30068, 2006 WL 149043 (D. Mass. Jan. 12, 2006). The Court rejected plaintiffs' arguments, stating that there "is no way to even estimate, let alone precisely calculate, the amount of any 'interest' supposedly charged Plaintiff in the [lease]." *Id.* at *6. The Court noted that Massachusetts' usury statute was "designed to prevent overbearing lenders from taking advantage of poorly situated borrowers," and "[h]ere, in contrast, the parties entered into commercial leases for equipment which only addressed price, term, breach, assignment and remedies. Nowhere in the leases was there any mention of a 'loan' or 'principal' or, for that matter, 'interest.'" *Id.* The Court continued, "Plaintiff would have the court engage in conjecture to establish the 'usurious interest rate.' Plaintiff would have the court first determine the fair market rental value of the equipment and then guess the amount allocated to 'principal' and 'interest.' This, of course, is speculation at its worst." *Id.*

Plaintiffs are similarly asking this Court to engage in conjecture. As stated, this Court declines to engage in the mathematical exploration proposed by Plaintiffs' expert to determine a hypothetical interest rate. And the Court will not go beyond present New Jersey law to apply usury analysis to business equipment leases.

14

**FOR PUBLICATION**

### B. Proving Whether First Data Failed to Disclose Certain Information Cannot Be Done With Common Evidence

Plaintiffs' other claims are based on the allegation that First Data failed to disclose certain data in the leases, including the retail "purchase price" of the POS terminals, the interest rate for the leases, the total amount being financed, and the amount and method of the calculation of sales tax. Class Cert. Mot. at 13, 31-32.

As noted, there is no stand-alone "purchase" price that can be disclosed to customers, and thus no "interest rate" or "amount being financed." Plaintiffs point to a statute that requires price tags to be affixed to goods for sale (Class. Cert. Mot. at 13 citing N.J.S.A. 56:8-2.5[4]). First Data responds that there is no evidence that the provision was intended to apply to leases, and that N.J.S.A. 56:8-1(e) does not include "lease" in the definition of "sale."[5] Opp. at 23. Plaintiffs rejoin, arguing that N.J.S.A. 56:8-2.5 applies to all leases, as well as sales, Reply at 12 n.12, and regardless, that this is a merit-based challenge, and inappropriate at the class certification stage.

But the common evidence problem remains, regardless whether the Consumer Fraud Act applies to the leases. If the Act does not apply, Plaintiffs would have to prove that First Data sales representatives omitted the information orally. First Data says that every single one of the over 24,000 leases was negotiated orally between a merchant and a First Data sales representative. "There is no script that salespeople follow. To the contrary, there are literally hundreds of different types of sales channels, all of which operate differently . . . . The sales

---

[4] "It shall be an unlawful practice for any person to sell, attempt to sell or offer for sale any merchandise at retail unless the total selling price of such merchandise is plainly marked by a stamp, tag, label or sign either affixed to the merchandise or located at the point where the merchandise is offered for sale." N.J.S.A. 56:8-2.5.

[5] "The term 'sale' shall include any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute[.]" N.J.S.A. 56:8-1(e).

channels operate completely independently from one another."[6] Opp. at 3-4. Testimony from every individual merchant and sales representative would be needed in order to determine whether First Data disclosed certain information.[7] *See Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 191 (3d Cir. 2001) (denying class certification because "we do not know the content of the individual representations as they were not . . . scripted but were oral and varied"). Plaintiffs have also provided no evidence that First Data sales representatives orally omitted certain pieces of information, but argue that "[b]ecause First Data did not train its sales force to understand the nature of the financing relationship, its sales agents did not possess the knowledge to disclose financing terms." Reply at 10. Plaintiffs base this argument on the few sales managers that they deposed, and their assertion that the sales staff was insufficiently trained. *Id.* Drawing such a broad conclusion on the basis of a few depositions is highly speculative; this claim could only be demonstrated through interviewing each merchant and sales representative to determine what was disclosed.

If the Consumer Fraud Act does apply, First Data argues that it would only require the lease price (monthly amount to be paid to First Data) to be stated in the lease, which is done in all their leases. Opp. at 23. Both parties agree that the Merchant Processing Applications do list the lease price and the duration of the lease. Plaintiffs have failed to establish that additional information is required.

With regard to the sales tax, an alleged violation of N.J.S.A. 54:32B-23, the sales tax and its method of calculation is disclosed in the individual Welcome Letters that First Data sends to merchants. Opp. at 25; *see also* Eastman Decl., Ex. B. ("Based on your state's sales tax laws,

---

[6] First Data also states that the different channels have different methods of negotiating and packaging goods and services. Opp. at 6.
[7] The parties also concur that First Data uses third party sales agents and banks to originate the POS terminal leases, making the likelihood of any common script even more remote.

**FOR PUBLICATION**

sales tax must be remitted up front for your leased equipment . . . . you are required to reimburse us an amount of $235.17 to cover applicable sales tax due for the term of the lease."). Because First Data does not sell "stand-alone" POS terminals without services, there is no real "purchase price" that can be disclosed to its customers, and consequently no other method of sales tax calculation. Opp. at 23.

### C. Proving Whether First Data's Lease Prices Were Unconscionable Cannot Be Done With Common Evidence

Plaintiffs argue that First Data's lease program is unconscionable since "it hides the true market value of the equipment being financed." Class. Cert. Mot. at 14. "First Data has committed unconscionable commercial practices under the CFA [Consumer Fraud Act] by designing, deploying and operating a lease program crafted to place merchants into contracts obligating them to make excessive monthly payments bearing no relation to the market price of the POS terminals leased." *Id.* at 14-15. Plaintiffs argue unconscionability both in relation to the Defendant's cost, and the value to the consumers. *Id.*

As this Court has already said, the leases include different goods and services, making it hard to value them with common evidence. Moreover, the unconscionability inquiry will require determining the value to each individual merchant – an inquiry which cannot be determined with common evidence. *See* Opp. at 25-26. Each lease also does not cost the same amount for First Data to purchase from the sales channels. As example, First Data states that for the three leases belonging to the proposed class representatives, it paid $2,545.09 (Academic Software), $2,152.08 (AIA Enterprises), and $2,181.45 (Budget Windows) to the respective sales merchant. *Id.* at 26-27. Academic Software and Budget Windows each defaulted on their lease, causing First Data to lose $2,127.53 and $1,249.90 respectively. *Id.* at 27. Plaintiffs have not proposed a method by which unconscionability could be determined with common evidence.

**FOR PUBLICATION**

Because of the lack of commonality, the Court need not reach the other Rule 23(a) questions of typicality and adequacy of representation or Rule 23(b). Plaintiffs' motion for class certification is denied.

July 31, 2013

**/s/ William H. Walls**
United States Senior District Judge
